IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| DAVENPORT CHESTER, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>ABRAMS PROPERTIES, INC., and<br>SCIENERGY, INC.,<br><br>    Defendants. | Case No.<br><br>**NOTICE OF REMOVAL OF<br>CIVIL ACTION AND RULE 81.1<br>STATEMENT** |

**COME NOW** the Defendants, Abrams Properties, Inc., and Scienergy, Inc., by and through undersigned counsel, and pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, hereby files their Notice of Removal of Civil Action and Rule 81.1 Statement.  In support thereof, Defendants state:

1.    Plaintiff filed their Petition for Money Damages, Declatory and Other Relief, in the Iowa District Court for Scott County on or about June 1, 2015.  Defendants Abrams Properties, Inc., and Scienergy, Inc., was purportedly served with the Original Notice and Petition on or about June 8, 2015.  Return of Service, are attached hereto as Exhibit A.

2.    Due to complete diversity of citizenship, this action may be removed from the Iowa District Court for Scott County to the United States District Court for the Southern District of Iowa, Central Division, pursuant to 28 U.S.C. §§ 1332 and 1441(a).  Plaintiff is the lessor of a building located in Davenport, Iowa.  *See* Petition at ¶ 1.

Defendant Abrams is a Georgia corporation doing business in the State of Iowa. *See* Petition at ¶ 2. Defendant Scienergy, Inc., is a Delaware corporation doing business in the State of Iowa. *See* Petition at ¶ 3. The premises which is the subject of this lawsuit is located in Davenport, Scott County, Iowa. *See* Petition at ¶ 5.

3.     Plaintiff's Petition alleges the Tenant's Defaults Under the Lease. *See* Petition ¶¶'s 28-37; The Condition of the Premises Following Termination of the Lease and Landlord's Damages Resulting Therefrom. *See* Petition ¶¶'s 38-45; Landlord's Contract for Sale of the Premises and Resulting in Damages. *See* Petition ¶¶'s 46-52; Breach of Contract. *See* Petition ¶¶'s 54-62; and Waste. *See* Petition ¶¶'s 64-66.

4.     Plaintiff's Petition prays for and Declaratory Relief. *See* Petition ¶¶'s 68-72.

5.     Based on the facts and damages pled by Plaintiff it is clear that the amount in controversy exceeds $75,000, and because the parties are citizens of different states, pursuant to 28 U.S.C. § 1332(a), the United States District Court for the Southern District of Iowa shall have original jurisdiction of this civil action.

6.     Pursuant to 28 U.S.C. § 1446(b)(2)(C), Defendants, Abrams Properties, Inc., and Scienergy, Inc., consent to removal of this action.

7.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on the Plaintiff, through his attorney, and will be filed with the Iowa District Court for Scott County.

8.     Pursuant to Local Rule 81.1, Defendants state that they are unaware of any other matters pending in state court. The attorney appearing in state court on behalf of

Plaintiff, Davenport Chester, LLC, is Robert V.P. Waterman, Jr., and Douglas R.

Lindstrom, Jr., Lane & Waterman, LLP, 220 N. Main Street, Suite 600, Davenport, Iowa,

52801, Telephone 563-333-6618, Facsimile 563-324-1616, E-mail

bwaterman@l-wlaw.com and dlindstrom@l-wlaw.com, respectively.  No attorney has

appeared on behalf of any of the Defendants in state court.

9.      Likewise, pursuant to Local Rule 81.1, copies of all process, pleadings, and

orders filed in the state court case are attached to this Notice and filed under the same

docket entry.

**WHEREFORE**, for the reasons stated herein, this Court has jurisdiction over this

matter pursuant to 28 U.S.C. §§ 1332 and 1441(b), and over the parties, and removal is

proper pursuant to 28 U.S.C. § 1441.  Defendants Abrams Properties, Inc., and

Scienergy, Inc., therefore respectfully requests this Court accept jurisdiction of this

matter.

BRADSHAW, FOWLER, PROCTOR & FAIRGRAVE, P.C.

By:      */s/ Jason C. Palmer*

Jason C. Palmer  AT0006089
801 Grand Avenue, Suite 3700
Des Moines, IA  50309-8004
Phone:  (515) 243.4191
Fax:  (515) 246-5808
E-Mail:  palmer.jason@bradshawlaw.com

ATTORNEY FOR DEFENDANTS

Original filed.

Copy to:

Robert V.P. Waterman, Jr.
Douglas R. Lindstrom, Jr.
LANE & WATERMAN LLP
220 N. Main Street, Suite 600
Davenport, IA 52801
Telephone:  563-333-6618
Facsimile:  563-324-1616
E-Mail:  bwaterman@l-wlaw.com
          dlindstrom@l-wlaw.com

Of Counsel:

Daniel E. Izenson
Michael T. Cappel
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, OH  45202
Telephone:  513-579-6480
Facsimile:  513-579-6457
E-Mail:  dizenson@kmklaw.com
          mcappel@kmklaw.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon one of the attorneys of record for all parties to the above-entitled cause by serving the same on such attorney at his/her respective address/fax number as disclosed by the pleadings of record herein, on the _10_ of _June_____, 2015 by:

☐ U.S. Mail            ☐ FAX
☐ Hand Delivered       ☐ UPS
☐ Federal Express      ☒ Other: CM/ECF

E-FILED  2015 JUN 11 3:58 PM SCOTT - CLERK OF DISTRICT COURT

### RETUN OF SERVICE

**State of IOWA; County of SCOTT SS.**                                    **CVCV294709**

    **I,** the undersigned, hereby certify that on the 8th day of June2015, received the following document(s) for service: **ORININAL NOTICE AND PETITION**

**Served at: 400 East Court Ave, Suite 110 Des Moines, IA**

☐   I served the said document(s) on the person named below by delivering a copy therof to each of said persons, personally, at the date and time set apposite in their respective names:

| Name and Party Served | Date | City, Town, Twp | County | State |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

☒   I hereby certify that on the 9th day of June 2015, I served *Registered Agent Laura Graham Abrams Properties Inc. C/O CT Corporation System, Polk Co.*

☐   at his/her/their dwelling house or place of abode in the city, town or township of_____ in Scott County, State of Iowa, by delivering a copy thereof to , said person being:

☐   the individual's spouse at the individual's dwelling house, OR

☐   the individual's spouse at a place other that the individual's dwelling house or usual place of abode, OR

☒   a person residing in therein who is at least 18 years of age

☐   that such place was a rooming house, hotel, club or apartment building and the person to whom a copy was delivered was _____who is either:

    ☐   the manager

    ☐   the clerk

    ☐   the proprietor

    ☐   the custodian of such place

☐   The person(s) served is a partnership, corporation, or an individual suable under a common mane, and that I served this notice by delivering a copy thereof to_____
Served on the___ day of _____, 2015 in the capacity as:: for said entity

*Anthony W. Reistroff*

Anthony W. Reistroffer (process server)

    Subscribed and sworn to befor me, a notary public, by the said Anthony W. Reistroffer.
This the 11th day of June 2015.

*Sarah Lee Ann Reistroffer*

Notary Public

Fees: $40.00 Mileage: $35.00  Total: $75.00



EXHIBIT
A



SARAH LEE ANN REISTROFFER
Commission Number 780592
My Commission Expires
September 30, 2016

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR SCOTT COUNTY

| | |
|---|---|
| **DAVENPORT CHESTER, LLC**<br>135 Jericho Turnpike<br>Old Westbury, New York 11568-1508 )<br><br>)<br>**Plaintiff,** )<br><br>)<br>-v- )<br><br>)<br>**ABRAMS PROPERTIES, INC.**<br>1945 The Exchange )<br>Suite 300 )<br>Atlanta, Georgia 30339 )<br><br>**Also serve:** )<br>**ABRAMS PROPERTIES, INC.** )<br>c/o its Statutory Agent: )<br>CT Corporation System )<br>500 East Court Avenue )<br>Des Moines, Iowa 50309 )<br><br>**and** )<br><br>**SCIENERGY, INC.** )<br>4100 Alpha Road, Suite 900 )<br>Dallas, Texas 75244 )<br><br>**Also serve:** )<br>**SCIENERGY, INC.** )<br>c/o its Statutory Agent: )<br>CT Corporation System )<br>1201 Peachtree Street, NE )<br>Atlanta, Georgia 30361 )<br><br>**Defendants.** )<br> ) | Case No. **CVCV294709**<br><br>(Judge _____ )<br><br><br><br>**PETITION FOR MONEY DAMAGES,<br>DECLARATORY AND OTHER<br>RELIEF_____** |

For its Petition against Defendants Abrams Properties, Inc. ("Abrams") and SCIEnergy, Inc. ("SCIEnergy") (collectively, Abrams and SCIEnergy sometimes referred to as "Defendants" or "Tenant"), Plaintiff Davenport Chester, LLC ("Plaintiff"), by its attorneys Lane and Waterman LLP, states as follows:

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

## PARTIES, JURISDICTION AND VENUE

1.        Plaintiff is an Ohio limited liability company registered to do business in the State of Iowa with its principal place of business located in Old Westbury, New York. Pursuant to a certain Assignment of Claims attached hereto as **Exhibit 1**, Plaintiff is the assignee of the claims brought herein of Lawrence Kadish (hereinafter "Kadish" or "Landlord"), a New York resident, and the lessor of approximately 89,380 square feet of leased premises constituting a building and land (referred to under the Lease as the "Demised Premises") located at 3616 West Kimberly Road, Davenport, Iowa 52806 (hereinafter the "Premises").

2.        Upon information and belief, Abrams is a Georgia corporation with its principal place of business located in Atlanta, Georgia, and does business in the State of Iowa, including within this judicial district.

3.        Upon information and belief, SCI is a Delaware corporation with offices located in Dallas, Texas and Atlanta, Georgia, and does business in the State of Iowa, including within this judicial district.

4.        This Court has subject matter and personal jurisdiction.

5.        Venue is proper before this Court. The Premises are located in Davenport, Scott County, Iowa, which is within the Court's jurisdiction, the acts complained of herein occurred within this judicial district, and Defendants conduct business within this judicial district.

## FACTS COMMON TO ALL COUNTS

### Landlord's Lease With Tenant

6.        On or about November 16, 1977, Kadish, as Landlord, and Financial Properties Developers, Inc. ("FPDI"), predecessor-in-interest to Defendants, as Tenant, entered into a

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

certain Agreement of Lease (the "Lease") for the Premises.  A true and correct copy of the Lease, as amended, is attached hereto as **Exhibit 2**.

7.      On or about April 14, 1977, FPDI, as Sublandlord, and S.S. Kresge, predecessor-in-interest to Kmart Corporation ("Kmart"), as Subtenant, entered into a certain sublease agreement (the "Sublease") for the Premises.  A true and correct copy of the Sublease, as amended, is attached as **Exhibit 3**.

8.      Abrams succeeded to the interests of FBDI under the Lease and Sublease.

9.      Pursuant to Article 25.01, the covenants, agreements, terms, provisions and conditions of the Lease are binding upon Abrams and SCIEnergy as Tenant.

10.     SCIEnergy, in turn, succeeded to the interests of Abrams under the Lease and Sublease.

11.     The initial terms of the Lease and the Sublease were 25 years with ten 5-year renewal options.

12.     Pursuant to the Sublease, FPDI was responsible for the construction of the Kmart building upon the Demised Premises in accordance with all applicable rules and specifications.

13.     Under Article 3 of the Lease, rent is due the first day of each month.  Pursuant to Article 4 of the Lease, Tenant agreed to pay additional rent when due under the Lease.

14.     The term "Demised Premises" is broadly defined in the Lease as "the Demised Land and the Buildings."  *See* Lease, Article 2.01(a)-(c).

15.     Pursuant to Article 5 of the Lease, Tenant is required to collect rents received from Kmart, the Operating Tenant under its Sublease with Tenant, in trust for the payment of the current month's rent to Landlord. Specifically, Article 5, entitled "Operating Tenant's Rental," states:

The Tenant shall be entitled to collect and shall collect the rental to be paid by the Operating Tenant, subject to the following condition:

An amount of such rents received by Tenant each month equal to the monthly rental to be paid Landlord hereunder shall be received and held by Tenant in trust for the payment of the then current month's rent, and to the extent such funds are not so applied Tenant shall have full personal liability to Landlord, the provisions of Section 26.01 of the Lease notwithstanding.

16. Under the Lease, Tenant assumed full and sole responsibility for the condition, renovation, operation, repair, replacement, maintenance and management of the Demised Premises and agreed to take "first class" care of the Demised Premises and to make all repairs required to keep the Demised Premises and parking lots and driveways in "first class order, repair and condition."

17. Relevant repair, maintenance and surrender obligations of Tenant as specified in Article 6 of Lease include the following:

**Article 6.01** "The Landlord shall not be required to furnish any services or facilities or to make any repairs or alterations in or to the Building, throughout the term of this Lease, the Tenant hereby assuming the full and sole responsibility for the condition, renovation, operating, repair, replacement, maintenance and management of the Demised Premises."

**Article 6.04** "The Tenant shall take good care of the Demised Premises, make all repairs thereto, interior and exterior, structural and non-structural, ordinary and extraordinary, foreseen and unforeseen, and shall maintain and keep the said Demised Premises and the parking lots and driveways in first class order, repair and condition. . ."

**Article 6.05** "The Tenant shall assume all of the obligations of the Landlord pursuant to lease dated April 14, 1977 between Financial Properties Developers, Inc., as Landlord, and K Mart Corporation, as Tenant …."

**Article 6.06** "The Tenant will not do or permit or suffer any waste, damages, disfigurement or injury to or upon the Demised Premises or any part thereof."

**Article 6.12** "Upon the expiration of the term of this Lease or upon a sooner termination thereof, the Tenant shall peaceably and quietly leave, surrender and yield up onto the Landlord all and singular the Demised Premises, broom-clean and free of occupants and shall repair all damage

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

to the Demised Premises caused by or resulting from the removal of any removable property of the Tenant or of the subtenants or assignees."

18.    In addition to the foregoing repair, maintenance and surrender provisions, the Lease contains numerous other provisions which Tenant is obligated to observe, the breach of which Tenant is personally liable to Landlord under the Lease.  For example,

**Article 5**       "An amount of such rents received by Tenant each month equal to the monthly rental to be paid Landlord hereunder shall be received and held by Tenant in trust for the payment of the then current month's rent, *and to the extent such funds are not so applied Tenant shall have full personal liability to Landlord, the provision of Section 26.01 of the Lease notwithstanding*."

**Article 6.12**    "The Tenant will indemnify, protect and save harmless the Landlord from and against each and every claim, demand, find, penalty, cause of action, liability, *damage*, judgment or loss, of whatsoever kind or nature, to which the Landlord may be subject or which the Landlord may sustain, including without limitation, reasonably attorneys' fees, costs and other expenses by the Landlord in defending against the same, *resulting from any violation by the Tenant of any failure of the Tenant in the performance of any of the covenants or agreements contained in this Article 6 or in any other Article of this Lease or from any other matter or thing growing out of the Tenant's use and occupancy of the Demised Premises*."

**Article 12.01**   "[T]his Lease and the term and estate hereby granted shall expire and terminate upon the day so specified in the second notice as fully and completely and with the same force and effect as if the day so specified were the date herein – before fixed for the expiration of the term of this Lease and all rights of the Tenant under this Lease shall expire and terminate, *but the Tenant shall remain liable for damages as hereinafter provided*."

**Article 12.03(a)-(b)**    "Tenant shall, in the event of the expiration or termination of this Lease or of re-entry by the Landlord, under any of the provisions of this Article 12 or pursuant to law, *by reason of default hereunder on the part of the Tenant, pay to the Landlord, as damages, at the election of the Landlord either* . . . .(i) the aggregate rent and additional rent . . .; (ii) sums equal to the rent which would have been payable by the Tenant had this lease not so terminated . . . .  *Suits or suit for the recovery of such damages, or any installments thereof, may be brought by the Landlord from time to time at its election* . . . ."

**Article 13.01**   "If Landlord makes any expenditures or incurs any obligation for the payment of money in connection therewith including, but not limited to,

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

> attorney's fees in instituting, prosecuting or defending any action or proceeding, *such sums paid or obligations incurred with interest thereon at maximum legal rate and costs shall be deemed to be additional rent hereunder and shall be paid to it by Tenant*."

(Emphasis added).

19. Article 26.01 of the Lease provides:

> Tenant shall have no personal liability for the performance of the obligations of Tenant hereunder, and in the event of default by Tenant in the performance of its obligations, the sole remedy of Landlord shall be to terminate this Lease.

20. The exculpatory clause found in Article 26.01 of the Lease cannot be read to preclude Landlord from recovering damages caused by the Tenant's defaults under the Lease or due to Tenant's tortious conduct.

21. Contracts are read and interpreted as an entirety, and if a clause is repugnant to the general purpose and intent of the instrument, it can be disregarded. Here, the exculpatory clause found in Article 26.01 of the Lease, which purports to only afford the remedy of termination of the Lease upon default, contradicts numerous provisions allowing Landlord to recover damages from Tenant's defaults.

22. The exculpatory clause also contradicts provisions governing the Tenant's post-Lease termination or expiration obligations, such as returning the Premises in a first class condition. If termination of the Lease was the sole, exclusive remedy, the Tenant would be free to breach any Lease provision with impunity and without recourse, which is contrary to a fair reading of the Lease.

23. In addition, the Sublease, which was entered into only a few months prior to the Lease, contains the following provision, also contradicts the Lease's exculpatory clause. Article 34 of the Sublease provides:

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

**Article 34**     "[U]nless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereunto shall be relieved of any further liability hereunder except as to acts, omissions, or defaults occurring prior to such termination."

24.     By contradicting and nullifying numerous provisions in the Lease, the exculpatory clause found in Article 26.01 contradicts the general purpose and intent of the Lease.  Therefore, this Court should   disregard the exculpatory clause found in Article 26.01 of the Lease and declare Landlord is entitled to recover damages for the Tenant's defaults.

## Following Exercise of Renewal Options, the Lease and Sublease Terms Were Extended to November 30, 2012

25.     During the course of their tenancies, Tenant and Subtenant exercised their first two  renewal options, extending the Lease and Sublease terms to November 30, 2012.   A true and correct copy of correspondence evidencing same is attached as **Exhibit 4**.

26.     Kmart closed its store located at the Premises in early 2012.  Upon information and belief, Kmart did not exercise the third 5-year renewal, and the Sublease expired on November 30, 2012.

27.     By email dated July 11, 2012, Derek Harmer, on behalf of SCIEnergy, successor in interest to Abrams, advised Landlord that SCIEnergy did not wish to renew its leasehold interest in the Premises, and "[u]pon expiration in November 2012, those rights will revert back to you and [SCIEnergy] will no longer have an interest in that property."   A true and correct copy of the July 11, 2012 email is attached as **Exhibit 5**.

## Tenant's Defaults Under the Lease

28.     Tenant failed to pay May and June 2012 rent when due under the Lease. Accordingly, by letter dated June 18, 2012, Landlord advised Tenant of its default under the

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

Lease for non-payment of May and June 2012 rent.   Landlord demanded Tenant to cure its default within ten (10) days pursuant to Tenant's obligations under the Lease.

29.     On or around June 20, 2012, SCIEnergy, through Rick A. Paternostro, Vice President, Finance, wrote Landlord and advised that SCIEnergy had acquired Abrams in August 2011, apologized for the oversight, made payment of May 2012 rent required under the Lease, and further advised that June 2012 rent "will follow shortly."   A true and correct copy of the June 20, 2012 correspondence is attached as **Exhibit 6**.

30.     Despite notice and demand, and notwithstanding the representations in SCIEnergy's letter dated June 20, 2012 that its June 2012 rent payment was forthcoming, Tenant failed to cure its default.

31.     By letter dated July 13, 2012, Landlord, through counsel, advised Tenant of its default for failure to pay June rent and July rent and stated, in relevant part, as follows:

> In accordance with Section 12.01 of the Lease, please accept this letter as Landlord's "second notice" and Landlord's intent to end the term of the Lease in sixty (60) days, effective September 12, 2012, subject to Tenant's continuing obligations under the Lease. Pursuant to the terms of the Lease, including without limitation Articles 5 and 12, Tenant shall remain personally liable to Landlord for any and all rent, additional rent (including "Impositions"), expenses and other damages incurred by Landlord arising from Tenant's default under the Lease.

A true and correct copy of the July 13, 2012 letter is attached hereto as **Exhibit 7**.

32.     Tenant failed to respond to Landlord's July 13, 2012 letter.

33.     On July 26, 2012, Landlord received two checks dated July 20, 2012 in the amount of $8,766.88 from Abrams, purportedly for June and July 2012 rent.  Landlord applied and credited the payments received against Tenant's continuing obligations under the default provisions of Article 12 of the Lease, with full reservation of rights.

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

34.   By letter dated July 30, 2012, Landlord, through counsel, advised Tenant, in relevant part, as follows:

> By letter dated July 13, 2012, Landlord provided its "second notice" of default and advised of its intent to end the term of the Lease in sixty (60) days, effective September 12, 2012, subject to Tenant's continuing obligations under the Lease. Tenant was further advised that pursuant to the terms of the Lease, including without limitation Articles 5 and 12, Tenant shall remain personally liable to Landlord for any and all rent, additional rent (including "Impositions"), expenses and other damages incurred by Landlord arising from Tenant's default under the Lease.

A true and correct copy of the July 30, 2012 is attached hereto as **Exhibit 8**.

35.   Tenant failed to respond to Landlord's July 30, 2012 letter.

36.   On October 24, 2012, Landlord received a check dated October 4, 2012 in the amount of $26,300.64 from Abrams purportedly for August, September and October 2012 rent. Landlord applied and credited the payments received against Tenant's continuing obligations under the default provisions of Article 12 of the Lease, with full reservation of rights.  A true and correct copy of Landlord's counsel October 29, 2012 letter memorializing same is attached hereto as **Exhibit 9**.

37.   As described above, given Tenant's recurring defaults under the Lease, the Landlord terminated the Lease effective September 12, 2012, following delivery of a second notice of default dated July 13, 2012.  The Lease was terminated with full reservation of rights and the Tenant remaining liable for all damages under the Lease.

**The Condition of the Premises Following Termination of
the Lease and Landlord's Damages Resulting Therefrom**

38.   Landlord retained Professional Service Industries, Inc ("PSI") to conduct a property condition assessment of the Premises following Tenant and Kmart's surrender of the Premises and expiration of the Lease and Sublease.  PSI prepared a Report of Limited Property

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

Condition Assessment dated December 3, 2012 (the "PCA Report"). The PCA Report includes, *inter alia*, recommendations of reasonable remedies or physical needs for the Premises and opinions of cost associated with remedies.  A true and correct copy of the PCA Report (without appendices) is attached hereto as **Exhibit 10**.

39.     The PCA Report detailed the many instances where Tenant failed to maintain the Premises in first class order, repair and condition.

40.     Based on the findings of the PCA Report, Tenant breached its obligations under the Lease due to certain conditions existing at the Premises following the Lease and Sublease expiration. In accordance with PSI's estimates, the immediate needs and costs associated to perform the repairs and replacements necessary to remedy Tenant's defaults under the Lease equal $2,160,046.00, excluding the abatement costs associated with the asbestos tile and mastic of the flooring.

41.     Landlord also retained PSI to perform a limited  environmental assessment of the Premises. PSI prepared a Phase I Environmental Site Assessment Report dated November 30, 2012 memorializing its findings (the "Phase I Report").  A true and correct copy of the Phase I Report (without appendices) is attached hereto as **Exhibit 11**.  The Phase I Report noted a Penske Automotive Center formerly operated at the site, as well as the presence of a UST which has since been removed.

42.     Based on the findings and recommendations set forth in PSI's Phase I Report, Landlord  retained PSI to provide a Limited Phase II Environmental Assessment Report (the "Phase II Report").  The purpose of the Phase II assessment was to investigate potential soil and groundwater contamination that may be present due to REC(s) identified in the Phase I Report.

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

A true and correct copy of the Phase II Report (without appendices) is attached hereto as **Exhibit 12**.

43.     By letter dated January 25, 2013, Landlord, through counsel, advised Tenant of its default under the Lease and demanded the following:  (a) the principal sum of $8,766.88 for past due November 2012 monthly rent, plus interest thereon as permitted under law; (b) the sum of $2,160,046.00 for the cost to perform the repairs and replacements required under Section 6 of the Lease and/or for the waste and diminution in value of the Premises due to Tenant's defaults thereunder; and (c) the sum of money (the precise sum to be determined following additional analysis) to remediate contaminants, asbestos or other environmental conditions specified in the Phase I Report, Phase II Report, and any asbestos survey performed and/or for the waste and diminution in value of the Premises due to Tenant's defaults under the Lease.  A true and correct copy of the January 25, 2013 letter (without the referenced Tabs) is attached hereto as **Exhibit 13**.

44.     By letter dated February 19, 2013, Tenant, through counsel, advised that notwithstanding Tenant's alleged defaults, Landlord's sole remedy was termination of the Lease and considered the matter closed.  A true and correct copy of the February 19, 2013 letter is attached hereto as **Exhibit 14**.

45.     Despite notice and demand, Tenant refuses and continue to refuses to perform its obligations under the Lease, as a result of which Plaintiff, as assignee of Landlord, has been damaged, including, without limitation, past due rent, incurring losses for the reasonable cost of repair and restoration, damages occasioned by loss of use of the Premises and/or damages occasioned by the waste and/or diminution in fair market value of the Premises.

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

**Landlord's Contract for Sale of the Premises and Resulting Damages**

46.     In or around November, 2014, Landlord entered into a contract for sale of the Premises in an "as is" condition to a third party buyer.

47.     Tenant's failure to maintain the Premises and keep it in first class order, repair and condition during the term of the Lease, failure to surrender the Premises in its original state, ordinary wear and tear excepted, resulted in diminution in its fair market value of the Premises, for which Plaintiff is entitled to damages.

48.     Plaintiff further learned following entering into the contract for sale of the Premises that the building on Lot 1 of Georgetown Square (the parcel owned by Davenport Chester LLC) encroached the easterly property line by over five feet, onto what has been replatted as Lot 1 of Westlyn Square, which is owned by the adjoining property owner, WK Development, Inc. ("WK").

49.     Indeed, unbeknownst to Landlord, Tenant had built or expanded the Kmart store outside the boundaries of the Premises by over five feet, thereby requiring Plaintiff to acquire from WK rights to the strip of land on which the encroachment is located in order to remove any clouds on the title and proceed with its closing.

50.     Pursuant to Section 6.05 of the Lease, the Tenant assumed all the obligations of Landlord under the Sublease with Kmart, and further agreed, *inter alia*, pursuant to Section 6.06 of the Lease, not to do or permit or suffer any waste or damages to or upon the Demised Premises or any part thereof.

51.     Tenant failed to perform its construction obligations under the Sublease by erecting or expanding Kmart's building outside the boundaries of the Premises by over five feet.

Accordingly, Defendants are in material breach of the Sublease, to which Plaintiff is a third party beneficiary.

52.     By virtue of the foregoing, Defendants are responsible for Plaintiff's out of pocket expenses, costs and attorney's fees associated with Plaintiff's acquisition of rights to the strip of land on which the encroachment is located.

## COUNT ONE
## (BREACH OF CONTRACT)

53.     Plaintiff hereby incorporates by reference Paragraphs 1 through 52 of its Petition, as if fully rewritten.

54.     Landlord entered into a valid and binding Lease with Tenant.

55.     Landlord performed all of his obligations under the Lease.

56.     Landlord has made demand upon Tenant to perform its rental and repair and restoration obligations under the Lease, but Tenant refuses and continues to refuse to perform their obligations.

57.     Tenant had a duty to repair the Premises during the term of the Lease, and a duty upon expiration of the Lease to surrender the Premises in its original state, ordinary wear and tear excepted.

58.     Tenant further had a duty to build the Kmart store within the boundaries of the Premises and in accordance with applicable rules and specifications.

59.     Tenant is in default of the Lease provisions by failing to pay rent, failing to maintain the Premises and keep it in first class order, repair and condition during the term of the Lease, and failing to surrender the Premises in its original state, ordinary wear and tear excepted.

60.     Tenant is further in default of the Lease provisions by virtue of building or expanding the Kmart store outside the boundaries of the Premises by over five feet, thereby

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

requiring Plaintiff to acquire from WK rights to the strip of land on which the encroachment is located in order to remove any clouds on title and proceed with its closing.

61.     Tenant's failure to comply with its building, rental, repair and restoration obligations under the Lease constitutes a breach of contract, as a result which Plaintiff, as assignee of Landlord, has been damaged.

62.     As a direct and proximate result of Tenant's breach of the Lease, Plaintiff has been damaged, including, without limitation, incurring losses for unpaid rent, the reasonable cost of repair and restoration of the Premises, damages occasioned by loss of use of the Premises and/or damages occasioned by the waste and/or diminution in fair market value of the Premises, together with Plaintiff's out of pocket expenses to acquire rights to the strip of land on which the encroachment is located, in an amount presently undetermined but believed to be in excess of the jurisdictional requirements of this District Court, in the precise amount to be proven at the trial of this action, plus prejudgment and post-judgment interest, costs, expenses and attorney's fees as allowable under law.

## COUNT TWO
### (WASTE)

63.     Plaintiff hereby incorporates by reference Paragraphs 1 through 62 of its Petition, as if fully rewritten herein.

64.     This is a claim for waste pursuant to Iowa common law and Iowa Code § 658.1A.

65.     Tenant was in lawful possession of the Premises for a term of many years. Tenant committed waste upon the Premises and substantially diminished its value due to Tenant's actions and inactions.

66.     Pursuant to Iowa common law and Iowa Code § 658.1A, Tenant is liable to pay Plaintiff three times the damages which have resulted from such waste, in an amount presently

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

undetermined but believed to be in excess of the jurisdictional requirements of this District Court, in the precise amount to be proven at the trial of this action, plus prejudgment and post-judgment interest, costs, expenses and attorney's fees as allowable under law.

### COUNT THREE
### (DECLARATORY RELIEF)

67.     Plaintiff hereby incorporates by reference Paragraphs 1 through 66 of its Petition, as if fully rewritten herein.

68.     This claim is brought for declaratory relief pursuant to Iowa Rule of Civil Procedure 1.1101 *et seq.* with respect to Plaintiff's and Tenant's rights and obligations under the Lease.

69.     Plaintiff  has demanded that Tenant comply with its rental and repair and surrender obligations under the Lease, but Tenant has refused and continues to refuse to comply with the terms of the Lease, causing Plaintiff to be damaged and to incur losses and expenses.

70.     An actual, justifiable controversy exists as to Plaintiff's and Tenant's respective rights and obligations under the Lease.

71.     Speedy intervention by this Court is necessary to preserve the rights of the parties.

72.     Plaintiff is entitled to a declaratory judgment setting forth its rights under the Lease in declaring as follows:

   a.     That the Lease is valid, binding and in a fully enforceable legal instrument;

   b.     That at all relevant times, Plaintiff complied with its obligations under the Lease;

   c.     That Plaintiff has a right to demand Tenant to comply with its building, rental and repair and surrender obligations under the Lease;

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

d.      That Tenant has failed to comply with its building, rental and repair and surrender obligations under the Lease, and is in material breach of same;

e.      That the exculpatory clause found in Article 26.01 of the Lease contradicts the general purpose and intent of the Lease and should disregarded, or should be found inapplicable to the post-termination contract and tort claims; and

f.      That Tenant is personally liable to Plaintiff for its losses and expenses occasioned by Tenant's breach of the Lease and waste.

WHEREFORE, Plaintiff, Davenport Chester, LLC, demands judgment against Defendants, Abrams Properties, Inc. and SCIEnergy, Inc., as follows:

a.      On Count One, for money damages in an amount presently undetermined but believed to be in excess of be in excess of the jurisdictional requirements of this District Court, in the precise amount to be proven at the trial of this action, plus prejudgment and post-judgment interest as allowable under law;

b.      On Count Two, to pay Plaintiff three times the damages which have resulted from such waste, in an amount presently undetermined but believed to be in excess of the jurisdictional requirements of this District Court, in the precise amount to be proven at the trial of this action, plus prejudgment and post-judgment interest, costs, expenses and attorney's fees as allowable under law;

c.      On Count Three, for the declaratory relief as specified in Paragraph 72 above; and

    d.    On all Counts, for its costs, expenses, reasonable attorney fees, and such further relief to which this Court deems just and proper.

**LANE & WATERMAN LLP**

OF COUNSEL:

By:  /s/ Douglas R. Lindstrom, Jr.

Daniel E. Izenson (Ohio Sct. #0047086)
Michael T. Cappel (Ohio Sct #0079193)
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Tel: (513) 579-6480
Fax: (513) 579-6457
dizenson@kmklaw.com
mcappel@kmklaw.com

Robert V. P. Waterman, Jr. (AT0008339)
Douglas R. Lindstrom, Jr. (AT0008903)
220 N. Main Street, Suite 600
Davenport, Iowa 52801
Tel:  (563) 333-6618
Fax:  (563) 324-1616
bwaterman@l-wlaw.com
dlindstrom@l-wlaw.com
**Attorneys for Plaintiff,**
**Davenport Chester, LLC**

## CERTIFICATE OF SERVICE

    I hereby certify that on this 1st day of June, 2015, a copy of the foregoing was filed electronically.  Notice of this filing will be sent through the electronic document management system to all parties who are registered filers.

/s/ Douglas R. Lindstrom, Jr.
Douglas R. Lindstrom, Jr.

## ASSIGNMENT OF CLAIMS

For valuable consideration, the receipt and adequacy of which are hereby acknowledged, the undersigned, Lawrence Kadish, an individual and resident of the State of New York ("Kadish"), hereby assigns, transfers and conveys to Davenport Chester, LLC ("Davenport Chester"), an Ohio limited liability company with its principal office located in Old Westbury, New York, any and all rights, remedies, claims, causes of action and/or damages relating to that certain Agreement of Lease between Kadish, as Landlord, and Financial Properties Developers, Inc. ("FPDI"), predecessor-in-interest to Abrams Properties, Inc. ("Abrams") and SCIEnergy, Inc. ("SCI")(collectively, FPDI, Abrams and SCI referred to as "Tenant"), entered into on or around November 16, 1977, as amended (the "Lease"), for the approximately 89,380 square feet of leased premises located at 3616 West Kimberly Road, Davenport, Iowa 52806 (the "Premises"), for which FBDI, predecessor-in-interest to Abrams and SCI, as Sublandlord, and S.S. Kresge, predecessor-in-interest to Kmart Corporation ("Kmart"), as Subtenant, entered into a certain sublease agreement on or about April 14, 1977, as amended (the "Sublease"), including but not limited to (1) all claims for breach of contract relating to Tenant's and Kmart's rent and post surrender/deferred maintenance obligations under the Lease and Sublease, respectively, losses for the reasonable cost of repair and restoration, damages occasioned by loss of use of the Premises and/or damages occasioned by the waste and/or diminution in fair market value of the Premises, and (2) any and all other claims that Kadish may have against Tenant and Kmart, their predecessors, partners, members, venturers, shareholders, managers, directors, officers, attorneys, employees, agents, representatives, servants, insurers, subcontractors, suppliers, and materialmen and related or associated companies, parents, subsidiaries, affiliated entities, divisions or enterprises, and their directors, officers, employees, agents, representatives, servants,

EXHIBIT   1

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

- 2 -

insurers, heirs, executors, administrators, successors and assigns, known and unknown, foreseen and unforeseen, anticipated and unanticipated, expected and unexpected, causes of action, demands, damages, costs, liabilities, expenses, compensation, third-party actions, suits at law, or in equity, including claims for contribution and/or indemnity, of whatever kind or nature, arising out of or in any way relating to the Lease, the Sublease and/or the Premises (collectively the "Claims").

It is understood by the undersigned that this is an absolute assignment and is given for the purpose of permitting Davenport Chester to pursue Claims against Tenant and Kmart. In consideration of the agreement between the parties, it is understood that Kadish shall deliver to Davenport Chester such additional documents as may be needed by it to pursue the Claims identified in this Assignment of Claims and that Kadish shall cooperate, upon reasonable notice, with Davenport Chester in prosecution of those Claims in whatever capacity may be required.

This Assignment of Claims shall inure to the benefit of and be binding upon the parties hereto, and each of their successors, and assigns.

This Assignment of Claims may be executed in multiple counterparts, all which together shall constitute one instrument. The parties shall accept electronic or facsimile signatures to this Assignment of Claims, with original signature pages to follow by regular mail.


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Case 3:15-cv-00070-SMR-SBJ   Document 1   Filed 06/18/15   Page 25 of 187
E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

- 3 -

**IN WITNESS THEREOF**, the parties have signed this Assignment of Claims on the dates indicated below.

LAWRENCE KADSH

_____

_____
Witness                                    _____

_____
Witness                                    Dated: _____ 11/10/14 _____


DAVENPORT CHESTER, LLC


_____
Witness                                    By: _____

_____
Witness                                    Its: _____ Member _____

_____     Dated: _____ 11/10/14 _____

# A G R E E M E N T   OF   L E A S E

LAWRENCE KADISH                    – LANDLORD


FINANCIAL PROPERTIES
    DEVELOPERS, INC.               – TENANT


DATED: AS OF NOVEMBER 16, 1977

EXHIBIT 2

E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

| ARTICLE | | PAGE |
|---|---|---|
| 1 | LEASE OF PROPERTY TERM OF LEASE | 1 |
| 2 | DEFINITIONS | 2 |
| 3 | RENT | 3 |
| 4 | ADDITIONAL RENT | 4 |
| 5 | OPERATING TENANT'S RENTAL | 7 |
| 6 | USE, MAINTENANCE, REPAIRS, ETC. | 8 |
| 7 | INSURANCE | 16 |
| 8 | DAMAGE OR DESTRUCTION | 19 |
| 9 | CONDEMNATION | 20 |
| 10 | ASSIGNMENT AND SUBLETTING | 22 |
| 11 | SUBORDINATION | 23 |
| 12 | DEFAULT PROVISIONS | 24 |
| 13 | RIGHT TO PERFORM AND OTHER PARTY'S OBLIGATION | 30 |
| 14 | FURTHER ADDITIONAL RENT | 32 |
| 15 | RENEWAL PRIVILEGES | 33 |
| 16 | ARBITRATION AND APPRAISAL | 34 |
| 17 | INTENTIONALLY OMITTED | 36 |
| 18 | QUIET ENJOYMENT - TRANSFER OF LANDLORD'S INTEREST | 37 |
| 19 | SUSPENSE OF DEFAULTS | 38 |
| 20 | INTENTIONALLY OMITTED | 39 |
| 21 | NOTICES | 40 |
| 22 | ESTOPPEL CERTIFICATE - MEMORANDUM FOR RECORDING | 41 |
| 23 | AUDITED STATEMENTS | 42 |
| 24 | INVALIDITY OF PARTICULAR PROVISIONS - CONSTRUCTION - INDEMNIFY - CONSENTS | 43 |
| 25 | COVENANTS | 44 |
| 26 | EXCULPATION | 44 |
| 27 | PERFORMANCE BY AND RIGHTS OF OPERATING TENANT | 45 |

E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

AGREEMENT OF LEASE made as of the _16th_ day of
November _____, 1977, between LAWRENCE KADISH of New York,
New York, "LANDLORD" and FINANCIAL PROPERTIES DEVELOPERS, INC.,
a Georgia corporation having its principal office at 5825
Glenridge Drive, N. E., Building No. 2, Suite 202, Atlanta,
Georgia 30328 (hereinafter called "TENANT");

## W I T N E S S E T H :

## ARTICLE 1
### Lease of Property - Term of Lease

Section 1.01 - The Landlord, for and in considera-
tion of the rents to be paid and of the covenants and agree-
ments hereinafter contained to be kept and performed by the
Tenant, hereby leases to the Tenant, and the Tenant hereby hires
from the Landlord, ALL that certain plot, piece or parcel of
land, with the buildings and improvements thereon erected,
situate, lying and being in Davenport, Iowa, as more particularly
described and set forth on Exhibit "A" annexed hereto.

TO HAVE AND TO HOLD the same, for a term of TWENTY-
FIVE (25) years commencing on the _16th_ day of November _____,
1977 and ending on the _16th_ day of November _____,
2002, (unless this Lease shall sooner terminate or be extended
as hereinafter provided), and upon and subject to the covenants,
agreements, terms, provisions and limitations hereinafter set
forth, all of which the Tenant covenants and agrees to perform
and observe. Should the Operating Tenant exercise the option
contained in subsection (b) of Article 13 of the Operating
Tenant's Lease to extend the initial term of said Lease to
January 31, 2003, the initial term of this Lease shall auto-
matically be extended to such date.

E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

ARTICLE 2

Definitions

Section 2.01 - The terms defined in this Section shall, for all purposes of this Lease, and all agreements supplemental hereto, have the meanings herein specified, unless the context otherwise requires.

(a) The term "Demised Land" shall mean the parcel of land described on Schedule "A" hereof.

(b) The term "Building" shall mean and include any and all buildings, improvements and structures upon the Demised Land, all equipment, machinery, fixtures and appurtenances therein and thereto, and all fixtures and articles of personal property affixed or attached to, or used in connection therewith (other than the property which may be removed by the Tenant or any subtenant or assignee as permitted by Section 6.12 hereof) and any and all renewals and replacements thereof, additions thereto and substitutes therefor.

(c) The term "Demised Premises" shall mean the Demised Land and the Buildings as defined in subsections (a) and (b) of this Article.

(d) The phrase "term of this Lease" shall mean the original term described in Article 1, hereof, and any renewal term which has become effective pursuant to the provisions of Article 15 hereof.

(e) The phrase "Operating Tenant" shall mean K mart Corporation under a lease between Tenant and K mart Corporation dated April 14, 1977.

E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

## ARTICLE 3

### Rent

Section 3.01 - The Tenant shall pay to the Landlord, in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts, at the address specified herein or furnished pursuant hereto, during the term of this Lease, a net annual rental herein called Net Rent, as follows:

    (a)   The sum of $204,405.00 payable in equal monthly installments of $17,033.75 in advance on the first day of each calendar month during said term.

    (b)   Such other sums as shall become due and payable as additional rent hereunder.

All such net rent and additional rent payments shall be paid to Landlord without any setoff, deduction, abatement or prior notice or demand except as in this Lease specifically provided.

Section 3.02 - The foregoing to the contrary notwithstanding, should any Qualified Mortgage be satisfied as a result of the application of fire insurance proceeds as provided in Section 7.02 hereof, the rental hereinabove provided forthwith shall reduce to the rental provided in Section 15.01 hereof.

ARTICLE 4

Additional Rent

Section 4.01 – As used herein "Impositions" shall mean all taxes, assess-
ments, use and occupancy taxes, transit taxes, water and sewer charges, rates and
rents, charges for public utilities, excises, levies, license and permit fees and
other charges, general and special, ordinary and extraordinary, foreseen and
unforeseen, of any kind and nature whatsoever, which during the term of this Lease
shall or may be assessed, levied, charged, confirmed or imposed upon or accrue or
become due or  payable out of or on account of or become a lien on the Demised
Premises or any part thereof, the appurtenances thereto or the parking lot and
driveways adjacent thereto; and such franchises, licenses and permits as may be
appurtenant to the use of the Demised Premises, but shall not include any income
taxes, estate, succession, inheritance or transfer taxes of the Landlord, or any
franchise taxes imposed upon any corporate owner of the fee of the Demised Premises,
or  any income, profits or revenues tax, assessment or charge imposed upon the rent
received as such by the Landlord under this Lease, by any municipality, County or
State, the United States of America or any governmental body; however, if at any
time during the term of this Lease, the present method of taxation or assessment
shall be so changed that the whole or any part of the taxes, assessments, levies,
impositions or charges      levied, assessed or imposed on real estate and the
improvements thereon shall be levied, assessed and/or imposed wholly or partially
as a capital levy or otherwise on the rents received from said real estate or the
rents reserved herein or any part thereof, then such taxes, assessments, levies,
impositions or charges to the extent so levied, assessed or imposed, shall be deemed
to be included within the term "Impositions" to the extent that such tax would be
payable if the Demised Premises were the only property of the Landlord subject to
such tax.

Section 4.02 – As additional rent during the term of this Lease, Tenant
will pay or cause to be paid as and when the same become due, all Impositions as
defined in Section 4.01, except that where any Imposition

-4-

E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

is permitted by law to be paid in installments , the Tenant may pay such Imposition in installments as and when such installments become due, and Tenant shall not be required to pay any such installment becoming due after the expiration of the term of this Lease.

Section 4.03 - Except as set forth in Section 4.02, Tenant shall pay all such Impositions directly to the taxing authorities, and shall exhibit, and deliver to Landlord, photostatic copies of the receipted bills or other evidence satisfactory to Landlord showing such payment promptly after such receipts shall have been received by Tenant.

Section 4.04 - The Tenant shall have the right to participate in all negotiations of Impositions.  Tenant shall have the right to contest the validity of the amount of any Impositions levied against the taxable premises by such appellate or other proceedings as may be appropiate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deed appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises.  Landlord shall cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any document required therefor.

Should the Landlord institute proceedings to contest the validity or the amount of any Imposition levied against the taxable premises, the Tenant will cooperate in such proceedings.

Should any of the proceedings referred to in the preceding two paragraphs of this Section 4.04 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled to receive all refunds paid by the taxing authorities.  After payment of all of Landlord's and Tenant's expenses incurred

in any such proceeding in which a refund is paid, any balance of said refund remaining after such payment to Landlord shall belong to the Tenant. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

Section 4.05 - Tenant may, if it shall be desired, endeavor at any time or times to obtain a lowering of the assessed valuation upon the Demised Premises for the purpose of reducing taxes thereon and, in such event, Landlord will offer no objection and, at the request of the Tenant, will cooperate with Tenant, but without expense to Landlord, in effecting such a reduction. Tenant shall be authorized to collect any tax refund payable as a result of any proceeding Tenant may institute for that purpose and any such tax refund shall be the property of Tenant to the extent to which it may be based on a payment made by Tenant, subject, however, to an apportionment between Landlord and Tenant with respect to taxes paid or contributed by Landlord in the year in which this Lease begins and the year in which the term of this Lease ends, after deducting from such refund the cost and expenses, including reasonable legal fees, incurred in connection with obtaining such refund.

Section 4.06 - All additional rents and other payments provided to be paid by the Tenant shall constitute rent payable under this Lease with the same effect as if the same were the net rent reserved herein; and in the event of non-payment by the Tenant of such additional rent or other payments, when due, according to the terms of this Lease, the Landlord shall have the same rights and remedies in respect thereof as the Landlord shall or may have in respect to the net rent herein reserved.

-6-

## ARTICLE 5

### Operating Tenant's Rental

The Tenant shall be entitled to collect and shall collect the rental to be paid by the Operating Tenant, subject to the following condition:

An amount of such rents received by Tenant each month equal to the monthly rental to be paid Landlord hereunder shall be received and held by Tenant in trust for the payment of the then current month's rent, and to the extent such funds are not so applied Tenant shall have full personal liability to Landlord, the provisions of Section 26.01 of the Lease notwithstanding.

ARTICLE 6

Use, Maintenance, Repairs, etc.


Section 6.01 - The Landlord shall not be required to furnish any services or facilities or to make any repairs or alterations in or to the Building, throughout the term of this Lease, the Tenant hereby assuming the full and sole responsibility for the condition, renovation, operating, repair, replacement, maintenance and managemen t of the Demised Premises.

Section 6.02 - The Tenant may use and occupy the Demised Premises for any lawful purpose.

Section 6.03 - The Tenant shall not use or occupy or permit the Demised Premises to be used or occupied, nor do or permit anything to be done in or on the Demised Premises, in whole or in part, in a manner which would in any way violate the certificate of occupancy then in force with respect thereto, or which may make it impossible to obtain fire or other insurance thereon required to be furnished by the Tenant hereunder, or, as will constitute a public or private nuisance, and shall not use or occupy or permit the Demised Premises to be used or occupied, in whole or in part, in a manner which may violate any present or future laws, regulations, ordinances or requirements of the federal, state or municipal governments, or of any departments, subdivisions, bureaus or offices thereof, or of any other governmental, public or quasi-public authorities now existing or hereafter created, having jurisdiction in the premises; provided, however, that the Tenant may, in good faith (and wherever necessary, in the name of, but without expense to, the Landlord) contest the validity of any such laws, regulations, ordinances or requirements and,  pending the determination of such contest, may  postpone compliance therewith, except that the Tenant shall not so postpone compliance therewith as to subject the Landlord to any fine or  penalty or to  prosecution for a crime, or to cause

-8-

the Demised Premises or any part thereof to be condemned or to be vacated and except that the Tenant shall keep the Landlord informed as to any such contest. The Tenant will indemnify and save harmless the Landlord against any recovery or loss to which the Landlord may be subject or which the Landlord may sustain, including reasonable attorneys' fees and expenses incurred by the Landlord, arising from any breach of this covenant or by reason of any action or proceedings which may be brought against the Landlord or against the Demised Premises, or any part thereof, by virtue of any such laws, regulations, ordinances or requirements or by virtue of any present or future law of the United States of America, or of the State of Iowa, or other municipal, public or quasi-public authority now existing or hereafter created, having jurisdiction in the premises.

Section 6.04 – The Tenant shall take good care of the Demised Premises, make all repairs thereto, interior and exterior, structural and non-structural, ordinary and extraordinary, foreseen and unforeseen, and shall maintain and keep the said Demised Premises and the parking lotsand driveways in firstclass order, repair and condition. The Tenant shall also keep the parking lots and driveways of the Demised Premises free and clear from rubbish, ice and snow and shall not encumber or obstruct the same or allow the same to be encumbered or obstructed in any manner. The Tenant shall indemnify and hold the Landlord harmless of and from any and all claims or demands, upon or arising out of any accident, injury or damage to any person or property which shall or may happen in or upon the said Demised Premises or any part thereof, or upon the parking lots and driveways about said premises, however caused, and shall keep the Demised Premises free and clear of any and all mechanics' liens or other similar liens or charges incidental to work done or material supplied in or about the premises.

-9-

Section 6.05 - The Tenant shall assume all of the obli-
gations of the Landlord pursuant to lease dated April 14, 1977
between Financial Properties Developers, Inc., as Landlord and
K mart Corporation, as Tenant, and shall further assume and com-
ply with all of the requirements of Financial Properties Developers,
Inc. pursuant to Cross Easement Agreement between Financial
Properties Developers, Inc. and Davenport Garden Homes, Incor-
porated dated April 12, 1977, and shall further assume and com-
ply with all of the requirements of Financial Properties Developers,
Inc. pursuant to Declaration of Easements by Financial Properties
Developers, Inc. dated  September 23          , 1977.

Section 6.06 - The Tenant will not do or permit or suffer
any waste, damages, disfigurement or injury to or upon the Demised
Premises or any part thereof.

Section 6.07 - The Tenant shall diligently comply with
and execute at its own expense during the term of this Lease,
all present and future laws, acts, rules, requirements, orders,
directions, ordinances, and/or regulations, ordinary or extra-
ordinary, foreseen or unforeseen, concerning the Demised Premises
or any part thereof, or the use thereof, of any federal, state,
municipal or other public department, bureau, officer of authority
of the National Board of Fire Underwriters, Fire Insurance Rating
Organization, or other body having similar functions, or of any
liability, fire or other insurance company having policies out-
standing with respect to the Demised Premises, whether or not
such laws, acts, rules, requirements, orders, directions, ordinances
and/or regulations require the making of structural alterations
or the use or application of portions of the Demised Premises
for compliance therewith or interfere with the use and enjoyment
of the Demised Premises, and shall protect, hold harmless and
indemnify the Landlord of and from all fines, penalties, claim
or claims for damages of every kind and nature arising out of
any failure to comply with any such laws, acts, rules, requirements,

-10-

orders, directions, ordinances and/or regulations, the intention of the parties being with respect thereto that the Tenant, during the term hereby granted shall discharge and perform all the obligations of the Landlord, as well as all the obligations of the Tenant, arising as aforesaid, and save the Landlord harmless therefrom, so that at all times from and after the commencement of the term of this Lease the rental of the Demised Premises shall be net to the Landlord without deduction or expenses on account of any such law, act, rule, requirement, order, direction, ordinance and/or regulation whatever it may be; provided, however, that the Tenant may, in good faith (and wherever necessary, in the name of, but without expense to, the Landlord) contest the validity of any such law, act, rule, requirement, order, direction, ordinance and/or regulation and, pending the determination of such contest, may postpone compliance therewith, except that the Tenant shall not postpone compliance therewith, as to subject the Landlord to any fine or penalty or to prosecution for a crime, or to cause the Demised Premises or any part thereof to be condemned or to be vacated and except that the Tenant shall keep the Landlord informed as to any such contest.

Section 6.08 - Unless the same shall result from the act or neglect of Landlord, the Landlord shall not be responsible or liable for any damage or injury to any property, fixtures, merchandise or decoration or to any person or persons at any time on the Demised Premises from any cause whatsoever; nor shall the Landlord be in any way responsible or liable in case of any accident or injury including death to any of the Tenant's employees, agents, or to any person or persons in or about the Demised Premises or the driveways or parking lot adjacent thereto; and the Tenant agrees that it will not hold the Landlord in any way responsible or liable therefor and will further indemnify and hold the Landlord harmless from and against any and all claims, liability, penalties, damages,

-11-

expenses and judgments arising from injury to persons or property
of any nature and also for any matter or thing growing out of
the occupation of the Demised Premises, or the parking lot and
driveways adjacent thereto.  The Landlord shall not be liable
for interference with light or incorporeal hereditament by any-
body or caused by the operation by or for any governmental authority
in construction of any public or quasi-public work and the Landlord
shall not be liable for any latent or any other defects in the
Building upon the Demised Land.

Section 6.09 - The Landlord shall have the right to show
the Demised Premises at all reasonable times of business hours
of the Tenant during the term thereof to any prospective purchasers
or mortgagees of the same, and may enter upon the Demised Premises,
or any part thereof, for the purpose of ascertaining the condi-
tion of said premises or whether the Tenant is observing and per-
forming the obligations assumed by it under this Lease, all with-
out hindrance or molestation from the Tenant.  The Landlord shall
also have the right to enter upon the Demised Premises for the
purpose of making any necessary repairs thereto and performing
any work thereof that may be necessary by reason of the Tenant's
failure to make any such repairs or perform any such work.  The
abovementioned rights of entry shall be exercisable upon request
made on reasonable advance notice to the Tenant, or an authorized
employee of the Tenant at the Demised Premises.  Nothing contained
herein, however, shall impose or imply any duty on the part of
the Landlord to make any such repairs or perform any such work.

Section 6.10 - The Tenant shall allow any person, muni-
cipality or agency authorized by law and desiring to excavate
upon land or streets adjacent to the Demised Premises, to enter
the Demised Premises and shore up any walls during such excava-
tion to the extent required.  The Tenant shall, at the Tenant's

own expense, repair or cause to be repaired, any damage caused
to any part of the Demised Premises because of any excavation,
construction work or other work of a similar nature which may
be done on any property or street adjoining or adjacent to the
Demised Premises, and the Landlord hereby assigns to the Tenant
any and all rights to sue for or recover against any parties
causing such damage, the amounts so expended or incurred by the
Tenant because of the provisions of this Section requiring the
Tenant to repair any damages sustained by such excavation work
or other work.

Section 6.11 - Notice is hereby given that the Landlord
shall not be liable for any labor or materials furnished or to
be furnished to the Tenant upon credit, and that no mechanic's
or other lien, for any such labor or materials shall attach to
or affect the reversionary or other estate or interest of the
Landlord in and to the Demised Premises.  Whenever and as often
as any such lien shall have been filed against the Demised Premises,
whether or not based upon any action or interest of the Tenant,
any subtenant or of any one claiming through the Tenant or subtenant,
or if any chattel mortgage or conditional bill of sale shall have
been filed for or affecting any materials, machinery or fixture
used in the construction, repair or operation thereof, or annexed
thereto by the Tenant, the Tenant shall forthwith take such action
by bonding, deposit or payment as will remove or satisfy the lien
or conditional bill of sale or chattel mortgage and, in default
thereof for thirty (30) days after notice to the Tenant, then,
in addition to any other of the Landlord's rights and remedies,
the Landlord may pay the amount of such mechanic's lien, condi-
tional bill of sale or chattel mortgage, or discharge the same
by bond or deposit, and the amount so paid or deposited (including
the premium on any such bond) with interest thereon at the then
maximum rate provided by law from the date of such payment or

deposit shall be deemed additional rent reserved under this Lease and, at the option of the Landlord, shall be payable with the next installment of rent or with any subsequent installments of rent thereafter becoming due.

Section 6.12 - Upon the expiration of the term of this Lease or on the sooner termination thereof, the Tenant shall peaceably and quietly leave, surrender and yield up unto the Landlord all and singular the Demised Premises broom-clean and free of occupants and shall repair all damage to the Demised Premises caused by or resulting from the removal of any removable property of the Tenant or of the subtenants or assignees. Any property of the Tenant which shall remain in the Building after the expiration of the term of this Lease or sooner termination thereof and the removal of the Tenant from the premises may, at the option of the Landlord, be deemed to have been abandoned and either may be retained by the Landlord as its property or may be disposed of in such manner as the Landlord may see fit. If such personal property or any part thereof shall be sold, the Landlord may receive and retain the proceeds of such sale and apply the same, at its option, against the expenses of the sale, the cost of moving and storage, any arrears of rent or additional rent payable hereunder and any damages to which the Landlord may be entitled under Article 12 hereof or pursuant to law.

Section 6.12 - The Tenant will indemnify, protect and save harmless the Landlord from and against each and every claim, demand, fine, penalty, cause of action, liability, damage, judg-ment or loss, of whatsoever kind or nature, to which the Landlord may be subject or which the Landlord may sustain, including without limitation, reasonable attorneys' fees, costs and other expenses by the Landlord in defending against the same, result-ing from any violation by the Tenant or any failure of the Tenant in the performance of any of the covenants or agreements

-14-

E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

contained in this Article 6 or in any other Article of this Lease or from any other matter or thing growing out of the Tenant's use and occupancy of the Demised Premises.

ARTICLE 7

Insurance

Section 7.01 – During the  term of this Lease, the Tenant will, at its sole cost and expense, keep and maintain policies of:

(a) Insurance on the Building against loss or damage by fire in amounts at all times sufficient to prevent the Landlord or the Tenant from becoming a co-insurer under the terms of the applicable policies. The term "full insurable value" shall mean actual replacement value (exclusive of cost of excavation, foundation and footings) less physical depreciation. Such "full insurable value" shall be determined from time to time, (but not more frequently than once in any twenty-four (24) calendar months) at the request of the Landlord, by one of the insurers or, at the option of the Tenant, by an appraiser, engineer, architect or contractor approved in writing by the Landlord (which approval shall not be unreasonably withheld) and paid by the Tenant.  No omission on the part of the Landlord to request any such determination shall relieve the Tenant of any of its obligations under this Article;

(b) General public liability insurance protecting and indemnifying the Tenant and the Landlord against any and all claims for damages to person or  property or for loss of life or property occurring upon, in, or about the Demised Premises, such insurance to afford immediate protection to the limit of not less than $500,000.00 in respect to bodily injury or death to

-16-

any one person, and to the limit of not less than $3,000,000.00 in respect to any one accident, and to the limit of not less than $100,000.00 for property damage;

(c) Such other insurance on the building and in such amounts as may from time to time be reasonably required by the Landlord against other insurable hazards which at the time are commonly insured against in the case of premises similarly situated, due regard being given to the height and type of Building, its construction, location, use and occupancy.

(d) So long as the Operating Tenant remains liable under its Lease, paragraphs (a) and (c) of this clause shall be inoperative.

Section 7.02 - All insurance provided for in subsections (a), (b) and (c) of Section 7.01 hereof, if readily obtainable, shall be affected under standard form policies, issued by companies authorized to do business in the State of Iowa and shall name the Landlord, any mortgagee, and the Tenant, provided that in the event that Landlord is multiple entities, Tenant shall not be obligated to provide more than one copy of the certificate of insurance. If any such policies shall not be readily obtainable the same may be issued by companies licensed to do business in the United States, which are well rated by National Rating Organizations. All such insurance may be blanket policies of the Tenant covering other properties.

Any policies of insurance of the character described in subsections (a) and (c) of Section 7.01 hereof shall expressly provide that any losses thereunder shall be adjusted with and approved by the Tenant. All such insurance shall be carried in the

-17-

name of the Landlord and mortgagee and the Tenant and subject to
the terms of any qualified mortgage, the loss shall be paid to the
Tenant, as work progresses. If paid to the Tenant, such insurance
proceeds shall be held by the Tenant in trust for the purpose of
paying the cost of such restoration and repair. Except as provided
in the following paragraph, the Landlord shall promptly endorse to
the order of the Tenant, without recourse, any check or draft or order
for the payment of money representing the proceeds of any such policy
or representing any other payment growing out of or connected with
said policies.

In the event of a default by the Tenant under any of the
provisions of Section 8.01, 8.02, or 8.03 hereof, or of the termina-
tion of this Lease for any reason whatsoever, such insurance pro-
ceeds shall be paid to and retained by the Landlord; provided how-
ever, should the Operating Tenant terminate its lease pursuant to
the provisions of Article 20 thereof, any such insurance proceeds,
or any sums paid by the Operating Tenant in lieu thereof, shall be
applied: first to the satisfaction of any Qualified Mortgage; then
to pay Landlord the sum of $150,000.00, and the balance shall be
divided equally between Landlord and Tenant.

Section 7.03 - Concurrently with the commencement of this
Lease and not less than thirty (30) days prior to the expiration
dates of the expiring policies theretofore furnished pursuant to
this Article 7, originals or certificates of the policies bearing
notations evidencing the payment of premiums or certificates or
accompanied by any other evidence reasonably satisfactory to the
Landlord of such payment shall be delivered by the Tenant to the
Landlord.

Section 7.04 - Each policy or certificate evidencing such
insurance delivered hereunder shall, to the extent obtainable,
contain an agreement by the insurer that such policy shall not
be cancelled without at least ten (10) days prior written notice
to the Landlord or any mortgagee.

## ARTICLE 8

### Damage or Destruction

Section 8.01 - If, at any time during the term of this Lease, the Building or any part thereof shall be damaged or destroyed by fire or other casualty (including any casualty for which insurance coverage was not obtained or obtainable) of any kind or nature, ordinary or extraordinary, foreseen or unforeseen, the Tenant, at its sole cost and expense, and whether or not the insurance proceeds, if any, shall be sufficient for the purpose, shall proceed with reasonable diligence (subject to a reasonable time allowance for the purpose of adjusting the insurance loss and for unavoidable delay) to repair, alter, restore, replace or rebuild the same as nearly as possible to its value, condition and character immediately prior to such damage or destruction. Such repair, restoration, replacement or rebuilding, including temporary repairs or the protection of other property pending the completion of any thereof, are sometimes referred to in this Article 8 as the "Work".

Section 8.02 - If the insurance proceeds received by the Tenant shall be insufficient to pay the entire cost of the Work, the Tenant shall supply the amount of any such deficiency. Under no circumstances shall the Landlord be obligated to make any payment, disbursements or contribution towards the cost of the Work.

Section 8.03 - In no event shall the Tenant be entitled to any abatement, allowance, reduction or suspension of rent because part or all of the Building shall be untenantable owing to the partial or total destruction thereof, and notwithstanding anything herein to the contrary, no such damage or destruction shall affect in any way the obligation of the Tenant to pay the fixed rent, additional rent and other charges herein reserved or required to be paid, nor release the Tenant of or from any obligation imposed upon the Tenant under this Lease.

-19-

ARTICLE 9

Condemnation

Section 9.01 - If at any time during the term of
this Lease title to the whole or substantially all of the Demised
Premises shall be taken in condemnation proceedings or by any
right of eminent domain, then in that event, this Lease shall
terminate on the date of such taking and the net rent and
additional rent reserved herein shall be apportioned and paid
to the date of such taking.  Substantially all of the Demised
Premises shall be deemed to have been taken if the portion re-
maining cannot, in the sole option of the Operating Tenant,
reasonably be used, after restoration to a complete architectural
unit, for the conduct and operation of the Operating Tenant's
business, as required under Operating Tenant's Lease.

Section 9.02 - In the event of a taking hereinabove
referred to and the termination of the Lease after the commence-
ment date of this Lease and prior to the end of the term of
the Lease, the rights and interests of the Landlord and Tenant
in and to the entire award, including interest, or the aggre-
gate of any separate awards (made by the court or otherwise),
it being understood and agreed that each party shall pay its
own fees and expenses in connection with establishing and
collection of such awards, shall be apportioned as follows:

(a)   The amount necessary to satisfy any qualified
mortgage shall be paid to the mortgagee; then

(b)   the amount necessary to satisfy the requirements
of Article 21 of the Operating Tenant's Lease
shall be paid to tenant; then,

(c)   the sum of $150,000.00 shall be paid to Land-
lord; then

(d)   the balance shall be divided equally between
Landlord and Tenant.

-20-

Section 9.03 - The Tenant shall be entitled to receive and retain such portion of the award, including interest, as shall represent compensation for fixtures owned by it at title vesting. Tenant's fixtures shall not include electrical wiring, air conditioning ducts and system, heating units, plumbing and conduits, all of which shall be included in the share of the award allocated to the Building.

Section 9.04 - In the event of a taking less than the whole or less than substantially all of the Demised Premises and the Lease is not terminated under Section 9.01, the Lease shall continue in full force and effect as to the portion not taken, and the Tenant shall at its cost and expense restore with reasonable diligence the remaining structural portion of the Demised Premises as nearly practicable to the same condition it was in prior to such condemnation or taking.  The entire award or awards, including interest, after payment of all reasonable fees and expenses incurred by both parties in connection with establishing and collection of such awards shall belong to the Tenant.

Section 9.05 - The Tenant shall have the right, at its own expense, to appear in any Condemnation Proceedings and to participate in any and all hearings, trials and appeals thereto.

Section 9.06 - In the event the Landlord or the Tenant shall receive notice of any  proposed or pending Condemnation Proceedings affecting the Demised Premises, the party receiving such notice shall promptly notify the other party of the receipt and contents thereof.

-21-

## ARTICLE 10

### Assignment and Subletting

Section 10.01 - Tenant may, without Landlord's written consent, assign this Lease or sublease the Demised Premises.

## ARTICLE 11

### Mortgage of the Fee (Subordination)

Section 11.01 - This Lease shall be subject and
subordinate to the lien of any Qualified First Mortgage (as
hereinafter defined) on the fee and to any and all extensions
and renewals thereof.  For purposes of this Article 11, a
Qualified First Mortgage shall be a first mortgage which is
at all times held by a bank, savings institution or insurance
company, and which mortgage shall be self-liquidating in
monthly installments not greater than the monthly installments
of rent to be paid Landlord hereunder.

Section 11.02 - The provisions of this Article 11
for subordination of this Lease shall be self-operative and no
further instrument shall be required to effect such subordination.
However, the Tenant shall, upon reasonable notice, execute and
deliver such instruments as the Landlord may request confirming
such subordination subject to the conditions in this Article 11
contained.

Section 11.03 - The Landlord agrees to pay all installments
of interest and principal under any mortgage to which this
Lease may become subject and subordinate and to maintain the
same in good standing without default.  The Landlord further
agrees that any sums expended by the Tenant to cure a default
under any such mortgage may be deducted from any net annual
rental or additional rental due under this Lease.  Landlord
shall notify Tenant of any default or receipt of notice of
default under any mortgage hereafter placed which affects
the Demised Land and Tenant shall have the right to cure such
default.

E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

Section 11.04 - Landlord and Tenant hereby acknowledge that this lease is initially subject to and subordinate to the interest of John Hancock Mutual Life Insurance Company as evidenced by any and all documentation evidencing or securing an indebtedness of Landlord to said John Hancock Mutual Life Insurance Company in the original principal amount of $2,050,000.00, such documentation of indebtedness to be executed, delivered and recorded subsequent to the exection and delivery hereof.

## ARTICLE 12

### Default Provisions

Section 12.01 - This Lease and the term and estate hereby granted are subject to the limitation that:

(a)  Whenever the Tenant shall default in the payment of any installment of rent, additional rent, or of any other sum payable by the Tenant to the Landlord, on any date upon which the same ought to be paid, and if such default shall continue for ten (10) days, after written notice; or

(b)  Whenever the Tenant shall do, or permit anything to be done, whether by action or inaction, contrary to any covenant or agreement on the part of the Tenant herein contained or contrary to any of the covenants, agreements, terms or provisions of this Lease, or shall fail in the keeping or performance of any of the covenants, agreements, terms or provisions contained in this Lease which on the part or behalf of the Tenant are to be kept or performed (other than those referred to in the foregoing subsection (a) of this Section 12.01) and the Tenant shall fail to commence (subject to unavoidable delay) to take steps to remedy the same within thirty (30) days after the Landlord shall have given to the Tenant a written notice specifying the same, or having so commenced shall thereafter fail to proceed diligently to remedy the same; or

(c)  Whenever an involuntary petition shall be filed against the Tenant under any bankruptcy or insolvency laws or under the Reorganization provisions of any law of like import, or a Receiver of the Tenant or of the property of the Tenant shall be appointed without the acquiescence of the Tenant, or whenever this Lease or the estate hereby granted or the unexpired balance of the term would, by operation of law or otherwise,

-24-

except for this provision, devolve upon or pass to any
person, firm or corporation other than the Tenant or any
corporation in which the Tenant may be duly merged, converted
or consolidated under statutory procedure, and such situation
under this subsection (c) shall continue and shall
not be remedied by the Tenant within one hundred and twenty
(120) days after the happening of any such event; or

(d)   Whenever the Tenant shall make an assignment of the
property of the Tenant for the benefit of creditors or
shall file a voluntary petition under any bankruptcy or
insolvency law, or whenever any court or competent
jurisdiction shall approve a petition filed by the
Tenant under the Reorganization provisions of the United
States Bankruptcy Act or under the provisions of any law
of like import, or whenever a petition shall be filed by the
Tenant under the arrangement provisions of the United
States Bankruptcy Act or under the provisions of any law
of like import, or whenever the Tenant shall desert or
abandon the premises, then at any time after the date

(1)   of the expiration of any such period of ten (10)
days as hereinbefore provided; or

(ii)   of the expiration of any such period of thirty
       (30) days if the Landlord shall have given to
       the Tenant a thirty (30) day notice as herein-
       before provided, or at any time thereafter if
       the Tenant shall have failed to commence and
       thereafter to proceed diligently to remedy
       the default; or

(iii)  of the expiration of any such period of one
       hundred and twenty (120) days if the Tenant
       shall have failed to vacate such involuntary
       petition or the appointment of such Receiver
       or the devolution or transfer of this Lease
       as hereinbefore provided; or

(iv)   when the Tenant shall make an assignment for
       the benefit of creditors or shall file a volun-
       tary petition under any bankruptcy or insol-
       vency law, or when a court of competent juris-
       diction shall approve a petition filed by the
       Tenant under the Reorganization provisions of
       any law or like import, when the Tenant shall
       file a petition under the Arrangement provi-
       sions of the United States Bankruptcy Act or
       under the provisions of any law of like import,
       or when the Tenant shall desert or abandon the
       premises,

then regardless of and notwithstanding the fact that the Landlord has

or may have some other remedy under this Lease or by virtue hereof,

or in law or in equity, the Landlord may give to the Tenant a notice

(herein called the "second notice") of intention to end the term of

this Lease specifying a day not less than sixty (60) days thereafter and, upon the giving of the second notice, this Lease and the term and estate hereby granted shall expire and terminate upon the day so specified in the second notice as fully and completely and with the same force and effect as if the day so specified were the date herein-before fixed for the expiration of the term of this Lease and all rights of the Tenant under this Lease shall expire and terminate, but the Tenant shall remain liable for damages as hereinafter provided.

Section 12.02 - Upon any such termination or expiration of this Lease, the Tenant shall peaceably quit and surrender the Demised Premises to the Landlord, and the Landlord may without further notice enter upon, re-enter, possess and repossess themselves thereof, by force, summary proceedings, ejectment, or otherwise, and may dispossess and remove the Tenant and all other persons and property from the Demised Premises and may have, hold and enjoy the Demised Premises and the right to receive all rental and other income of and from the same.

Section 12.03 - Tenant shall, in the event of the expiration or termination of this Lease or of re-entry by the Landlord, under any of the provisions of this Article 12 or pursuant to law, by reason of default hereunder on the part of the Tenant, pay to the Landlord, as damages, at the election of the Landlord either:

    (a)  A sum which at the time of such termination of this Lease represents the excess, if any, of:

        (i)  the aggregate rent and additional rent which would have been payable by the Tenant for the period commencing with such earlier termination of this Lease, and ending with the date hereinabove set for the expiration of the full term hereby granted had this Lease not so terminated or had the Landlord not so re-entered the premises, over

-27-

         (ii)   the aggregate rental value of the premises for the same period, or

   (b)   sums equal to the rent which would have been payable by The Tenant had this Lease not so terminated, payable upon the rent days specified herein following such termination or such re-entry and until the date hereinabove set for the expiration of the full term hereby granted plus any additional rent payable as and when such sums become due, provided, however, that if the Landlord shall re-let the premises during said period, the Landlord shall credit the Tenant with the net rents received by the Landlord from such re-letting, such rents to be determined by first deducting from the gross rents as and when received by the Landlord from from such re-letting, the expenses incurred or paid by the Landlord in terminating this Lease or of re-entering the premises and of securing possession thereof, as well as the expenses of re-letting, including altering and preparing the premises for new tenants, brokers' commission, and all other expenses properly chargeable against the premises and the rental therefrom; but in no event shall the Tenant be entitled to receive any excess of such net rents over the sums payable by the Tenant to the Landlord hereunder.

       Suits or suits for the recovery of such damages, or any installments thereof, may be brought by the Landlord from time to time at its election and nothing contained herein shall be deemed to require the Landlord to postpone suit until the date when the term of this Lease would have expired if it had not been terminated under the provisions of this Article 12, or under any

-28-

E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

provisions of law, or had the Landlord not re-entered the premises.

Section 12.04 - The Tenant, for the  Tenant, and on behalf of any and all persons claiming through or under the Tenant, including creditors of all kinds, does hereby waive and surrender all right and privilege which they or any of them might have under or by reason of any present or future law, to redeem the premises or to have a continuance of this Lease for the term hereby demised after being dispossessed or ejected therefrom by process of law or under the terms of this Lease or after the termination of this Lease as herein provided.

Right to Perform the Other Party's Obligation

Section 13.01 - If Tenant shall default in the observance or performance of any term or covenant on its part to be observed or performed under or by virtue of any of the terms or pvisions in any Article of this Lease, Landlord, without being under any obligation to do so and without thereby waiving such default, may remedy such default for the account and at the expense of Tenant, immediately and without notice in case of emergency (in which event Landlord shall take only such action as may be necessary to meet the emergency), or in any other case only provided that Tenant shall fail to remedy such default with all reasonable dispatch after Landlord shall have notified Tenant in writing of such default.  If Landlord makes any expenditures or incurs any obligation for the payment of money in connection therewith including, but not limited to, attorneys' fees in instituting, prosecuting or defending any action or proceeding, such sums paid or obligations incurred with interest thereon at maximum legal rate and costs shall be deemed to be additional rent hereunder and shall be paid to it  by Tenant.

Section 13.02.  If Landlord shall default in the observance or performance of any term or covenant on Landlord's part to be observed or performed under or by virtue of any of the terms or provisions in any Article of this Lease, Tenant, without being under any obligation to do so and without thereby waiving such default, may remedy such default for the account and at the expense of Landlord, immediately and without notice in case of emergency (in which event Tenant shall take only such action as may be necessary to meet the emergency), or in any other case only provided that Landlord shall fail to remedy such default with all reasonable dispatch after Tenant shall have notified Landlord in writing of such default.  If Tenant

-30-

E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

makes any expenditures or incurs any obligations for the payment of money in connection therewith including, but not limited to, attorneys' fees in instituting, prosecuting or defending any action or proceeding, such sums paid or obligations incurred with interest at maximum legal rate and costs shall be paid to it by Landlord on demand, or may be deducted by Tenant from any rent theretofore or thereafter falling due hereunder.

## ARTICLE 14

### Further Additional Rent

**Section 14.01**

(a) As further additional rent, the Tenant shall pay
to the Landlord a sum equal to twenty-five (25%)
percent of the gross receipts in excess of the
sum of TWO HUNDRED FIFTY-NINE THOUSAND THREE
HUNDRED EIGHT AND NO/100THS ($259,308.00) DOLLARS
(as herein defined) presently paid by the Operating
Tenant, K mart Corporation.

(b) As used herein, the term "Gross Receipts" shall
mean rents and any and all other income received
by Tenant for the use and occupancy of space within
the Property and shall include rents received by
Tenant based upon sales by others of merchandise
or services within the Property, but shall not
include amounts separately designated and paid to
Tenant, though designated as rent, for services
performed or materials supplied by Tenant (except
to the extent the charge therefor exceeds the cost
thereof).

## ARTICLE 15

### Renewal Privileges

Section 15.01

(a)  If no event of default shall have occurred and
be continuing under this Lease, Tenant is hereby
granted the right to extend this Lease for ten
(10) successive periods of five (5) years each,
such extended term to begin respectively upon
the expiration of the term of this Lease or of
this Lease as extended and the same terms and
conditions as herein set forth shall apply to
each such extended term, except for the payment
of rent which shall be as set forth hereafter.

(b)  The minimum rental during that portion of the
first extended term which shall not extend beyond
the three hundred thirty-sixth monthly anniversary
of the initial payment on the indebtedness to
John Hancock Mutual Life Insurance Company as set
forth in Section 11.04 hereof shall remain the
same as provided for herein in Section 3.01,
thereafter (i.e., after the three hundred thirty-
sixth monthly anniversary of the initial payment
to John Hancock Mutual Life Insurance Company)
the minimum rental during each of the extended
terms shall be the annual sum of $105,202.50,
payable in equal monthly installments of $8,766.88,
payable in advance on the first day of each and
every month of said extended term period.

ARTICLE 16

Arbitration and Appraisal

Section 16.01 - In each case specified in this Lease
in which it shall become necessary to resort to arbitration or
appraisal, such arbitration or appraisal shall be determined as
provided in this Article 16.  The party desiring such arbitration
or appraisal shall give written notice to that effect to the other
party, specifying in said notice the name and address of the person
designated to act as arbitrator or appraiser on its behalf of
Davenport, Iowa.  Within fifteen (15) days after the service
of such notice, the other party shall give written notice to the
first party specifying the name and address of the person designated
to act as arbitrator or appraiser on its behalf of Davenport, Iowa.
If the second party fails to notify the first party of the appoint-
ment of its arbitrator or appraiser, as aforesaid, within or by
the time above specified, then the appointment of the second
arbitrator or appraiser shall be made in the same manner as is
hereinafter provided for the appointment of a third arbitrator
or appraiser of Davenport, Iowa in a case where the two arbitrators
or appraiser appointed hereunder and the parties are unable to
agree upon such appointment.  Each arbitrator or appraiser so
chosen shall be a fit and impartial person having at least ten
(10) years experience in a calling connected with the subject matter
of the dispute.  The arbitrators or appraisers so chosen shall
meet within ten (10) days after the second arbitrator or appraiser
is appointed and if, within thirty (30) days after the second
arbitrator or appraiser is appointed, the said two arbitrators
or appraisers shall not agree upon the question in dispute, they
shall themselves appoint a third arbitrator or an appraiser in
Davenport, Iowa who shall be a competent and impartial person
having at least ten (10) years experience in a calling connected

-34-

with the subject matter of the dispute; and in the event of
their being unable to agree upon such appointment within ten
(10) days after the time aforesaid, the third arbitrator or
appraiser shall be selected by the parties themselves if they
can agree thereon within a further period of fifteen (15) days.
If the parties do not so agree, then either party, in behalf
of both, may apply to the Court of General Jurisdiction for
Scott, Iowa for the appointment of such third arbitrator or
appraiser, and the other party shall not raise any question
as to the Court's full power and jurisdiction to entertain the
application and make the appointment.  In the event of the
failure, refusal or inability of any arbitrator or appraiser
to act, a new arbitrator or appraiser shall be appointed in
his stead, which appointment shall be made in the same manner
as heretofore provided for the appointment of the arbitrator
or appraiser so failing, refusing or unable to act.  The
decision of the arbitrators or appraisers so chosen shall be
given within a period of thirty (30) days after the appointment
of such third arbitrator or appraiser.  The decision in which
any two arbitrators or appraisers so appointed and acting
hereunder concur shall in all cases be binding and conclusive
upon the parties.  Each party shall pay the fees and expenses
of the one of the two original arbitrators or appraisers appointed
by such party, or in whose stead as above provided, such arbitrator
or appraiser was appointed, and the fees and expenses of the
third arbitrator or appraiser, if any, shall be borne equally
by both parties.

ARTICLE 17

I N T E N T I O N A L L Y

O M I T T E D

ARTICLE 18

Quiet Enjoyment - Transfer of Landlord's Interest

Section 18.01 - The Landlord covenants that if and so long as the Tenant keeps and performs each and every covenant, agreement, term, provision and condition herein contained on the part and on behalf of the Tenant to be kept and performed, the Tenant shall quietly enjoy the Demised Premises without hindrance or molestation by the Landlord, subject to the covenants, agreements, terms, provisions and conditions of this Lease.

Section 18.02 - The term "Owner", as used in this Lease, means only the Owner for the time being of the Demised Premises, and in the event of the sale, assignment or transfer by such party of its or their interest in said premises, such party shall thereupon be released and discharged from all covenants and obligations of the Landlord thereafter accruing; but such covenants and obligations shall run with the land and be binding upon each new owner or successor for the time being of the Demised Premises.

-37-

E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

## ARTICLE 19

### Suspense of Defaults

Section 19.01 - Whenever any matter in dispute between the parties shall be referred to arbitration in accordance with a specific provision of this Lease for such arbitration, any default hereunder by either party against the other by reason of the matter in dispute shall be deemed suspended, provided the party so claimed to be in default shall proceed diligently with the arbitration, until the dispute is determined adversely to the party claimed to be in default and notice thereof is given to such party, whereupon such party (whether Tenant or Landlord) shall have the same opportunity to cure such default as is provided for in Article 12 as if such notice of determination were the first notice of default given to the party in default.   In the event of any  emergency, the party claiming the default may take such action as may be necessary to cure such default, subject to the reimbursement of the cost thereof, if the dispute is determined in such party's favor.

ARTICLE 20

INTENTIONALLY OMITTED

ARTICLE 21

Notices


Section 21.01 - All notices, demands, requests or other
communications which may be or are required to be given, served
or sent by either party to the other shall be in writing and shall
be deemed to have been properly given or sent -

    (a)  If intended for the Tenant - by mailing by certified
        or registered mail with the postage prepaid, addressed
        to the Tenant at 5825 Glenridge Drive N.E.,
        Building 2, Suite 202, Atlanta, Georgia 30328.

    (b)  If intended for the Landlord - by mailing by certified
        or registered mail with the postage prepaid, addressed
        to the Landlord at  100 Park Avenue, New York,
        New York  10017.


Each party may designate by notice in writing a new address to which
any notice, demand, request or communication may hereafter be so
given, served or sent.  Each notice, demand, request or communication
which shall be mailed by registered or certified mail to the Landlord
or the Tenant in the manner aforesaid shall be deemed sufficiently
given, served or sent for all purposes hereunder at the time such
notice, demand, request or communication shall be mailed by United
States registered or certified mail in any post office or branch
post office regularly maintained by the United States Postal Service.

E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

## ARTICLE 22

### Estoppel Certificate - Memorandum for Recording

Section 22.01 - Each party hereto shall, at any time and from time to time (but not more than twice in any twelve month period) as requested by the other party, upon not less than ten (10) days' prior written notice, execute, acknowledge and deliver to the other a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), certifying the dates to which the net annual rent and additional rent and other charges, if any, have been paid, and stating whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Lease, and if so, specifying each such default of which the signer may have knowledge, it being intended that any such statement delivered pursuant hereto be relied upon by others with whom the party requesting such certificate may be dealing.

Section 22.02 - At the request of either party, the Landlord and the Tenant shall promptly execute, acknowledge and deliver a memorandum with respect to this Lease sufficient for recording. Said memorandum shall not in any circumstances be deemed to change or otherwise affect any of the obligations or provisions of this Lease.

E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

ARTICLE 23

Audited Statements


<u>Section 23.01</u> - The Tenant shall supply to the first mortgagee, to which this Lease is subordinate, such audited statements as are required of the mortgagor by the mortgagee.

ARTICLE 24

Invalidity of Particular Provisions –

Construction - Indemnify - Consents

Section 24.01 - If any term or provision of this Lease or the application thereof to any person or circumstances shall, to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

Section 24.02 - This Lease shall be construed and enforced in accordance with the laws of the State of Iowa.

Section 24.03 - Whenever either party hereto is obligated under the terms of th is Lease to indemnify the other party, the indemnitor shall be entitled to defend the indemnitee by counsel selected by the indemnitor who shall be reasonably satisfactory to the indemnitee and the indemnitor or its counsel shall keep the indemnitee fully apprised at all times of the status of such defense. Wherever any defense is undertaken by an insurance company or companies, the counsel selected by the insurance company or companies shall be deemed satisfactory.

Section 24.04 - Wherever in this Lease it is provided that the approval or consent of the Landlord is required for any particular matter, the Landlord covenants and agrees that such approval or consent shall not be unreasonably withheld or delayed.

-43-

## ARTICLE 25

### Covenants Binding

Section 25.01 - The covenants, agreements, terms, provisions and conditions of this Lease shall be binding upon and inure to the benefit of the successors and assigns of the Landlord and except as otherwise provided herein, the successors and assigns of the Tenant.

## ARTICLE 26

### Exculpation

Section 26.01 - Tenant shall have no personal liability for the performance of the obligations of Tenant hereunder, and in the event of a default by Tenant in the performance of its obligations, the sole remedy of Landlord shall be to terminate this Lease.

Section 26.02 - Except as in this Section 26.02 provided, Landlord shall have no personal liability for the performance of the obligations of Landlord hereunder, and in the event of a default by Landlord in the performance of its obligations, the sole remedy of Tenant shall be the right to off-set against rent due Landlord by Tenant of any sums expended by Tenant to cure any such Landlord defaults. The foregoing to the contrary notwithstanding, an amount of any funds received by Landlord each month (either from the Operating Tenant or Tenant) equal to the monthly amortization of any Qualified Mortgage shall be received and held by Landlord in trust for the payment of the then current monthly installments and, to the extent such funds are not so applied, Landlord shall have full personal liability to Tenant.

ARTICLE 27

Performance by and Rights of
Operating Tenant

Section 27.01 - The performance by the Operating
Tenant of any condition or obligation imposed on Tenant by
the terms of this lease shall be deemed to be performance of
such condition or obligation by Tenant.  Any right granted
Landlord by the terms of this lease shall be subject to any
right of the Operating Tenant.

IN WITNESS WHEREOF, the parties hereto have duly
executed and sealed this instrument as of the day and year
first above written.

LAWRENCE KADISH

FINANCIAL PROPERTIES DEVELOPERS, INC.

By:
Pres/dent

Attest:

[CORPORATE SEAL]

-45-

STATE OF *New York*

COUNTY OF *New York*

I, *Robert Linker*, a Notary Public in and for said County in said State, hereby certify that Lawrence Kadish whose name is signed to the foregoing instrument to which this is attached, and who is known to me, acknowledged before me on this day that, being informed of the contents of the foregoing instrument, he with full authority executed the same voluntarily for and as the act of himself, his heir, executors and assigns.

IN WITNESS WHEREOF, my hand and seal of office this *11* day of *November*, 1977.

Notary Public
My commission expires:
ROBERT LINKER
Notary Public, State of New York
No. 24-4608494
Qualified in Kings County
Commission Expires March 30 19 79

STATE OF GEORGIA

COUNTY OF FULTON

On this *16th* day of *November*, A.D., 1977, before me the undersigned, a Notary Public in and for the State of Georgia, personally appeared ARTHUR HEYMAN and *Ann La Cara* to me personally known, who, being by me duly sworn, did say that they are the President and *Asst. Secretary* respectively, of said corporation executing the within and foregoing instrument to which this is attached; that the seal affixed thereto is the seal of said corporation; that said instrument was signed and sealed on behalf of said corporation by authority of its Board of Directors; and that the said Arthur Heyman and *Ann La Cara* as such officers, acknowledge the execution of said instrument to be the voluntary act and deed of said instrument to be the voluntary act and deed of said corporation, by it and by them voluntarily executed.

Notary Public
My commission expires:

Notary Public, Georgia, State at Large
My Commission Expires June 5, 1978

EXHIBIT "A"

A parcel of land located in the northwest quarter of Section 16,
Township 78 North, Range 3 East of the 5th P.M. in Davenport,
Scott County, Iowa, and being more particularly described as
follows:

BEGINNING at the northwest corner of the northwest quarter of
said Section 16; thence S 00°47'30" W along the west line of the
northwest quarter of said Section 16, said line being along the
centerline of Fairmount Street, a distance of 1429.45 feet to
a point; thence S 89°12'30" E a distance of 40.00 feet to a point
on the easterly right-of-way line of Fairmount Street which is
the POINT OF BEGINNING; thence S 89°12'30" E a distance of
508.00 feet to a point; thence S 12°20'35" E a distance of 102.68
feet to a point; thence S 00°47'30" W a distance of 268.00 feet
to a point; thence N 89°12'30" W a distance of 4.33 feet to a
point; thence S 00°47'30" W a distance of 358.00 feet to a point;
thence S 89°12'30" E a distance of 36.00 feet to a point; thence
S 00°47'30" W a distance of 267.36 feet to a point on the northerly
right-of-way of Kimberly Road; thence northwesterly along the
northerly right-of-way of Kimberly Road for a distance of 157.23
feet along the arc of a curve concave northerly that has a radius
of 3104.00 feet, a chord bearing of N 74°13'36" W, and a chord
distance of 157.21 feet to a point; thence N 72°46'30" W a distance
of 1.70 feet along the northerly right-of-way of Kimberly Road
to a point; thence northwesterly along the northerly right-of-
way of Kimberly Road for a distance of 225.78 feet along the arc
of a curve concave northerly that has a radius of 3770.00 feet,
a chord bearing of N 71°03'32" W, and a chord distance of 225.75
feet to a point; thence N 00°47'30" E a distance of 290.92 feet
to a point; thence N 89°12'30" W a distance of 195.00 feet to
a point on the easterly right-of-way of Fairmount Street; thence
N 00°47'30" E along the said easterly right-of-way of Fairmount
Street a distance of 591.00 feet to the POINT OF BEGINNING, said
parcel containing 9.97 acres.

EXHIBIT "A"

**Parties**

THIS LEASE made and entered into as of this 14th day of April, 1977, between . FINANCIAL PROPERTIES DEVELOPERS, INC.

a   Georgia   corporation having its principal office at 5825 Glenridge Drive, N.E. Building 2, Suite 202; Atlanta, Georgia 30328, (herein referred to as "Landlord"), and S. S. KRESGE COMPANY, a Michigan corporation having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein referred to as "Tenant");

WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth, Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised Premises**

1. Landlord does demise unto Tenant and Tenant does take from Landlord for the lease term the following property: Tenant's completed building or buildings (designated K mart and Food Market), together with site improvements to be constructed as hereinafter specified by Landlord at its expense together with land comprising not less than nine and nine-tenths (9.9) acres described in Exhibit "A" attached hereto and made a part hereof, and situated in the City of Davenport, County of Scott, State of Iowa; said building or buildings to be in the locations depicted on Exhibit "B" attached hereto and made a part hereof, and of the following dimensions:

K mart Department Store: 401'4" x 209'8" (84,180 sq. ft.) with 8-bay TBA

Outdoor Garden Shop: 51'3" x 102'

Said land, completed buildings and site improvements, together with all licenses, rights, privileges and easements, appurtenant thereto shall be herein collectively referred to as the "demised premises".

**Term**

2. The term of this lease shall commence upon the "date of occupancy by Tenant", as that term is defined in Article 11 hereof, and shall terminate upon such date as shall be twenty-five (25) years from the last day of the month in which said date of occupancy by Tenant shall occur; provided, however, the term of this lease may be extended as provided in Article 13 hereof. The phrase "lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant to said Article 13.

**Annual Minimum Rental**

3. Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall designate in writing from time to time, an annual minimum rental of TWO HUNDRED FIFTY-NINE THOUSAND THREE HUNDRED EIGHT----------------------------------------------------------DOLLARS ($259,308.00      ), unless abated or diminished as hereinafter provided, in equal monthly install-ments on the first day of each month, in advance, commencing upon the first day of the lease term; provided, however, in the event the first day of the lease term shall not be the first day of a calendar month, then the rental for such month shall be prorated upon a daily basis.

**Additional Rental**

4. In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of NINE MILLION----------------------------------------------------------------------- ---------------------DOLLARS ($9,000,000.00    ), Tenant shall pay to Landlord as additional rental an amount equal to one percent (1%) of gross sales exceeding NINE MILLION----------- -----------------------------------------------------------------------DOLLARS ($9,000,000.00    ) up to but not in excess of----------------------- ------------------------------- DOLLARS ($                      ); and Tenant shall pay to Landlord as additional rental an amount equal to five-tenths of one percent (.5%) of gross sales for such lease year exceeding----------------- DOLLARS ($                ) up to but not in excess of------------------------------------- ------------------------DOLLARS ($                );

**Additional Rental (continued)**

Said additional rental shall be paid on or before the thirtieth (30th) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve (12) consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall on or before the thirtieth (30th) day following the end of each lease year or lesser period, deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraph shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 12 shall have been fulfilled, or an opening for business under Article 11 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of the demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of the demised premises, whether wholesale or retail, cash or credit (including merchandise ordered on the demised premises and delivered from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the land described in Exhibit "A", except that the following shall be excluded:

(a) Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b) Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c) Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

(d) Service and interest charges for time payment accounts and charge accounts;

(e) ~~All sales of merchandise or services made by any food market which shall occupy any portion or portions of the demised premises; and~~

(e) (f) All sales of automotive gasoline or diesel fuel.

**Additional Rental (continued)**

Should the Tenant at any time elect to discontinue the operation of its store, the Tenant shall give to the Landlord notice in writing of its intention so to do and in such event the Landlord shall have one option, to be exercised by notice in writing given to the Tenant within ninety (90) days after the date of mailing of the Tenant's aforesaid notice to the Landlord, to cancel and terminate this lease. If the Landlord exercises its said option, this lease shall cancel and terminate on the last day of the month next following the end of said ninety (90) day period and the Tenant shall be released from any further liability under this lease.

Should the Landlord fail to exercise its said option and should the Tenant at any time thereafter discontinue the operation of its said store then and in any such event, anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the rent which Tenant shall pay to the Landlord during the remainder of the term of this lease shall be the rent more particularly set forth in said Article 3, and the word "minimum" in said Article 3 shall be deemed deleted. Upon the discontinuance of the operation of said store, all of the covenants and provisions contained in the preceding paragraph of this article shall be of no further force and effect.

**Real Estate Taxes**

5. Tenant shall pay and discharge all ad valorem real estate taxes and assessments which shall be levied against the taxable premises during the lease term, excluding therefrom payment of assessments which are incurred or levied as a result of Landlord's activity in developing the demised premises for Tenant's occupancy.

To the extent permitted by law, Tenant may pay any such assessment in annual installments. In the event any such assessment shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment. If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments which shall become due and payable during the lease term. Any such installments due and payable in the years in which this lease commences and terminates shall be prorated proportionately.

Tenant shall not be chargeable with nor be obligated to pay any tax of any kind whatsoever which may be imposed on the Landlord, the rents payable hereunder or the demised premises except the ad valorem real estate taxes and assessments mentioned in the first paragraph of this Article 5.

The amount, if any, by which the ad valorem real estate taxes and assessments payable hereunder exceed

DOLLARS ($ 3 9 5 6 0    ) during any lease year, shall be hereinafter referred to as an "excess tax payment". All excess tax payments shall be deductible by Tenant from additional rentals, as defined in Article 4, due and payable for such lease year. In the event the excess tax payment for any lease year exceeds said additional rental due and payable during the same lease year, the amount by which said excess tax payment exceeds said additional rental shall be carried forward and be deductible from additional rentals due and payable for succeeding lease years on a cumulative basis.

The taxable premises, as defined below, shall be separately assessed if practicable from any contiguous lands and from any additional lands and improvements incorporated into the demised premises in the future.

In the event Tenant constructs, as provided in Article 16 hereof, additional buildings or structures on any portion of the land described in Exhibit "A", said additional buildings or structures shall be excluded from the taxable premises. Said additional buildings or other structures shall be separately assessed and all ad valorem taxes and assessments levied thereon shall be paid and discharged by Tenant and shall not be deductible from additional rentals as provided herein.

The Tenant shall have the right to participate in all negotiations of tax assessments. Tenant shall have the right to contest the validity or the amount of any tax or assessment levied against the taxable premises by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises. Landlord shall cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents required therefor.

Should the Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the taxable premises, the Tenant will cooperate in such proceedings.

3

(SEMI-GROSS) 5/23/72

**Real Estate Taxes (continued)**

. Should any of the proceedings referred to in the preceding two paragraphs of this Article 5 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled to receive all refunds paid by the taxing authorities. After payment of all of Landlord's and Tenant's expenses incurred in any such proceeding in which a refund is paid, the Tenant shall pay to the Landlord either the balance of such refund or, alternatively, Tenant shall pay to the Landlord that part of the excess tax payment which may have been deducted from additional rent in the tax year for which the refund was granted, whichever amount shall be the lesser. Any balance of said refund remaining after such payment to Landlord shall belong to the Tenant. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

The term "taxable premises", as used in this lease, shall be that certain land described in Exhibit "A" together with such buildings and other improvements required by Tenant to be constructed thereon by Landlord under the terms of this lease.

**New Building by Landlord.**

6. Tenant's said buildings and site improvements shall be completed and delivered to Tenant promptly and with due diligence. If the performance by Landlord of any of its obligations hereunder is delayed by reason of the act or neglect of Tenant, act of God, strike, labor dispute, boycott, governmental restrictions, riot, insurrection, war, catastrophe, or act of the public enemy, the period for the commencement or completion thereof shall be extended for a period equal to such delay. Landlord warrants that a general contract for construction of said buildings and improvements referred to in Articles 1 and 12 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than   June 1, 1977   . If for any reason whatever, Landlord shall fail to comply fully with this warranty, Landlord shall so notify Tenant in writing and in such event, Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease within sixty (60) days thereafter by notice to Landlord; provided, further, in the event that, regardless of the reason therefor, said buildings and site improvements shall not have been completed in accordance with working drawings and specifications prepared by Landlord as approved in writing by Tenant's Construction Department, and possession thereof tendered to Tenant prior to   February 1, 1978   , then Tenant shall, at any time thereafter, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

**Drawings and Specifications**

7. Tenant's said buildings and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with the working drawings and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store drawings and specifications, prior receipt of which Landlord hereby acknowledges and which are identified as Set No. B-0122 containing such additions, changes and modifications as are more particularly set forth in that certain letter dated April 4, 1977, written by Mr. James A. Kilgore, Manager Design Division, Construction Department, to Financial Properties Developers, Inc., 5825 Glenridge Dr., N. E., Bldg. 2, Suite 202, Atlanta, Georgia 30328, Attention Mr. Arthur Heyman, a copy of which is attached hereto and marked as Exhibit "C"

(a) Said working drawings are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department.

(b) Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

**Drawings and Specifications (continued)**

Said working drawings and specifications shall be submitted to Tenant for approval prior to commencement of construction and such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working drawings and specifications, Tenant shall in writing, inform Landlord of required revisions or corrections thereto which are necessary to conform said working drawings and specifications to the Tenant's typical store drawings and specifications hereinbefore referred to, and Landlord shall make such revisions or corrections and resubmit them for Tenant's final approval. In the event Tenant shall not inform Landlord of such desired revisions or corrections within said sixty (60) days, said working drawings and specifications shall be deemed approved and accepted for the purposes hereof.

Said typical drawings and specifications, and working drawings and specifications as approved by Tenant shall constitute a part of this lease.

**Guarantee of Materials**

8. Landlord shall unconditionally guarantee all work performed by or for Landlord in the construction of Tenant's buildings and site improvements against defective workmanship and materials for the period of one (1) year from the commencement of the lease term. Landlord shall assign to Tenant any and all guarantees of workmanship and materials which it may receive.

**Advance Possession for Fixturing**

9. For a period of thirty (30) days prior to completion of Tenant's buildings by Landlord, as set forth in Article 11(b), Tenant shall have the privilege, rent free, of entering said buildings for the purposes of installing storage bins, storing merchandise, and other of Tenant's construction activities in conjunction with Landlord's preparation for Tenant's acceptance of said buildings, which shall not create unreasonable interference with the work of the Landlord. Such entry shall not be construed as an acceptance of the demised premises by the Tenant under the provisions of this lease or as a waiver of any of the provisions hereof.

**Parking and Other Common Areas**

10. Prior to commencement of the lease term, Landlord shall construct, in accordance with said working drawings and specifications approved by Tenant, on the premises described in Exhibit "A", all of the sidewalks, service drives, parking areas, driveways, streets, curbs, directional signs (not Tenant's pylon) and related improvements, substantially as shown on said working drawings and specifications (all of which improvements shall hereinafter, along with the land thereon constructed, be referred to as the "common areas").

Landlord shall also construct or cause to be constructed upon certain property or rights-of-way contiguous to the premises described in Exhibit "A", all sidewalks, driveways, streets, curbs, acceleration, deceleration and stacking lanes, traffic controls, and signals, directional signs and related improvements in accordance with said working drawings and specifications and the requirements of any governmental bodies.

Landlord covenants and represents that at the commencement of the lease term, there shall be adequate sidewalks, driveways, roadways and entrances for automotive and pedestrian ingress and egress to and from the demised premises and adjacent public streets and highways, as shown on said working drawings and specifications.                                          on the demised premises

Landlord further covenants that the aggregate area provided for the parking of automobiles shall during the lease term be sufficient to accommodate not less than four hundred thirty———————— (—430—        ) automobiles on basis of arrangement depicted on Tenant's working drawings and specifications, and additional parking shall be provided on the parcel described in Exhibit "D" in accordance with the provisions of Article 37 hereof.

At least sixty (60) days prior to the commencement of the lease term, Landlord shall provide paved driveways running from the adjoining public streets around the front, sides and rear of Tenant's buildings in order to secure convenient ingress and egress from said public streets to the front and rear entrances of Tenant's buildings for the purpose of receiving and delivering fixtures, merchandise and other property. Such driveways shall be of sufficient width to permit the passage, unloading, and if necessary, the turning around of trailer trucks and other commercial vehicles.

During the lease term, Landlord shall keep Tenant insured against all statutory and common law liabilities for damages on account of damage to property or injuries and loss of life sustained by any person or persons within said common areas, in a policy or policies in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) with respect to injury to any one person and in the amount of One Million Dollars ($1,000,000.00) with respect to any one accident or disaster, and in the amount of One Hundred Thousand Dollars ($100,000.00) with respect to damage to property; and Landlord shall also indemnify and save Tenant harmless against any such liability. Any such policies shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

EXHIBIT "B"

**Parking and Other Common Areas (continued)**

In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now or at any future time located beyond the limits of the land described in Exhibit "A" utilize the demised premises for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall at its sole expense, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

Should Tenant, at any time, utilize portions of the common areas for outdoor shows, entertainment or such other uses which in Tenant's judgment tend to attract the public, Tenant shall give Landlord notification of such intended use, a reasonable time in advance thereof, and on request supply Landlord with reasonable proofs of adequate insurance or indemnification against damage to property, injuries to persons and loss of life sustained in connection therewith. In addition, Tenant shall be responsible for any physical damage to said common areas resulting from said use. Rent, if any, from such use shall be included as part of "gross sales" under Article 4 hereof.

SEE RIDER ATTACHED – ARTICLE 10A.

**Store Opening**

11. The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's buildings and site improvements shall be completed in accordance with said working drawings and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 12 shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and the last day of February, the lease term shall not commence until March 1 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 11, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible; provided, however, if Landlord shall have failed to complete said buildings and improvements according to the said working drawings and specifications within ninety (90) days after Tenant opens for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct, or remedy in all or part any such deficiency, and the cost therof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

**Landlord's Representations and Warranties**

12. Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements substantially in accordance with the site plan depicted on said Exhibit "B", including completion of said common areas in accordance with the provisions of Article 10 hereof. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" except as shown on said Exhibit "B".

Landlord further represents, warrants and covenants that the land described in Exhibit "A" will, at the time of the commencement of construction by Landlord and at the time of the commencement of the lease term, be properly zoned for Tenant's intended use, and that all necessary governmental consents, permits and approvals for such use shall have been obtained. Further, Landlord shall deliver to Tenant a Certificate of Occupancy prior to commencement of the lease term.

The lease term shall not commence and said annual minimum rental and other charges payable under this lease shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears one percent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental set forth in Articles 3 and 4 hereof.

In the event Landlord's said representations and warranties shall not be fulfilled within ninety (90) days after commencement of the lease term, Tenant thereafter shall have the option of either completing said representations and warranties at Landlord's cost and expense, or, alternatively, Tenant shall have an option to terminate this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

**Options to Extend Lease**

13. (a) Tenant shall have ten (10) successive options to extend the term of this lease for an additional period of five (5) years on each such option, such extended term to begin respectively upon the expiration of the term of this lease or of this lease as extended and the same terms and conditions as herein set forth shall apply to each such extended term. If Tenant shall elect to exercise the aforesaid options, it shall do so by giving notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or of this lease as extended.

CODE NO. 920-02

6

(SEMI-GROSS 5/23/72)

EXHIBIT "B"

Options
to Extend
Lease
(continued)

(b) Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or any extension thereof. Tenant's rental during this option period shall be the same rental payable under the terms of this lease at the time Tenant notifies Landlord of its intention to exercise this option.

First
Refusal to
Purchase
Option

14. Anything in this lease contained to the contrary notwithstanding, and without in any manner affecting or limiting any of the rights, privileges, options or estates granted to Tenant under this lease, it is agreed that if the Landlord at any time during the term of this lease (excepting the first lease year) receives one or more bona fide offers from third parties to purchase the demised premises or property of which the demised premises are a part, and if any such offer is acceptable to the Landlord, then Landlord agrees to notify Tenant in writing, giving the name and address of the offeror, and the price, terms and conditions of such offer, and Tenant shall have thirty (30) days from and after the receipt of such notice from Landlord in which to elect to purchase the property for the consideration contained in the bona fide offer. If Tenant does not elect to purchase said property and Landlord thereafter sells the property, the purchaser shall take the property, subject to and burdened with all the terms, provisions and conditions of this lease, including this Article 14 and the rights of the Tenant under this lease as against the new owner shall not be lessened or diminished by reason of the change of ownership. Tenant's failure at any time to exercise its option under this Article 14 shall not affect this lease or the continuance of Tenant's rights and options under this Article 14 or any other article.

In the event Tenant elects to purchase the property as provided in this lease, then Landlord shall, within thirty (30) days after receipt of such notice of election by Tenant, deliver to Tenant a title insurance policy in the amount of the consideration set forth in such offer, issued by a responsible title guarantee company, showing a good and marketable title in Landlord. If Landlord fails or refuses to furnish the title policy, then Tenant may, at its election, procure the same at Landlord's expense, and in the amount of the purchase price, and deduct the cost thereof from the cash consideration to be paid for the property. Tenant shall have thirty (30) days after receipt of the title policy in which to examine the title and notify the Landlord whether or not the title is acceptable to Tenant. If Tenant is willing to accept Landlord's title and consummate the purchase, then Landlord shall, within ten (10) days after written notice thereof from Tenant, convey the premises to Tenant by full warranty deed, free and clear of all liens and encumbrances except highway easements, private road easements and restrictions of record which were of record as of the date of Tenant's acceptance of the premises hereunder or incorporated in an amendment to this lease, if any, and deliver such deed to Tenant upon tender of the consideration.

Notwithstanding any other provisions of this lease, the provisions of this Article 14 will not apply to any sale of the demised premises or any property of which the demised premises are a part at foreclosure, and shall not be binding upon any purchaser at foreclosure, any mortgagee in possession, or any holder of a deed in lieu of foreclosure or the successors or assigns of any of the foregoing, or to any sale of the demised premises by Landlord in connection with sale and leaseback financing.

If Tenant is not willing to accept Landlord's title, Tenant shall make any objections thereto in writing to Landlord and Landlord shall be allowed one hundred twenty (120) days to utilize its best efforts to make such title acceptable to Tenant. If such title is not rendered marketable within one hundred twenty (120) days from the date of said written objections thereto, Tenant may, at its election, take such action, including instigation of legal process (in which the Landlord agrees to participate) to remedy any such defect in title making such acceptable to Tenant, and to deduct all costs thereof from the cash consideration to be paid for the property. If the Tenant is unable to correct such defects in title or elects not to attempt such remedy, neither party shall be held liable for damages to the other party and both parties shall be released of all liabilities and obligations under this Article 14.

Repairs
and
Main-
tenance

15. Tenant shall make and pay for all maintenance, replacement and repair necessary to keep the demised premises in a good state of repair and tenantable condition, except for the following maintenance, replacement or repair which shall remain the Landlord's sole responsibility:

(a) all maintenance, replacement and repair to the roof, outer walls and structural portion of the buildings which shall be necessary to maintain the buildings in a safe, dry and tenantable condition and in good order and repair; and

(b) all repairs, maintenance or replacement of or to the demised premises, including but not limited to, underground utility installations and underground electrical conduit and wire, which are occasioned by settlement of the premises or a portion thereof, or caused by soil conditions; and

EXHIBIT "B"

E-FILED 2015 JUN 07 22:11:09 SCOTT - CLERK OF DISTRICT COURT

**Repairs and Maintenance (continued)**

(c) all repairs and replacement (exclusive of sweeping, striping and snow and ice removal) necessary to maintain all driveways, sidewalks, street and parking areas free of all settling, clear of standing water, and in a safe, sightly and serviceable condition, free of chuck holes, fissures and cracks.

In the event buildings or improvements constituting the demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed Two Thousand Dollars ($2,000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

**Alterations and Additional Construction**

16. Tenant may, at its own expense, from time to time make such alterations, additions or changes, structural or otherwise, in and to its buildings as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural integrity of the buildings will not be impaired by such work. The term "structural changes", as used herein, shall not include moving of non-loadbearing partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.

**: shall be isible :pair, lding estora- of any to any onal ng in lance article 20**

Tenant may, at its own expense, at any time, erect or construct additional buildings or structures on any portion of the demised premises. In such event gross sales made in or from said additions shall be excluded from gross sales as defined in Article 4 of this lease and provided further, said additional building or structure shall be excluded from the taxable premises and all ad valorem taxes and assessments levied thereon shall not be deductible from additional rents payable under the terms of Article 4 hereof. Tenant shall reimburse Landlord for any increase in insurance premiums attributable solely thereto. Tenant shall also be solely responsible for exterior and interior repairs thereto, ~~except those necessitated by fire, the elements or other casualty.~~ In the event Tenant constructs any such additions or new construction, Landlord shall not be obligated to furnish additional parking areas in substitution of areas thereby built over, and the number of parking spaces required under Article 10 shall be reduced by the number of spaces covered by such additional buildings or structures.

**Utilities**

17. Landlord covenants and agrees that the demised premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements as of the commencement of the lease term. Tenant shall pay all charges for utility services furnished to the demised premises during the lease term.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition at its sole expense.

**Governmental Regulations**

18. Tenant shall observe and comply with all requirements of rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said demised premises including the making of non-structural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes, including but not limited to, the erection of a fire escape or exit, or (b) require non-structural changes which would have been required irrespective of the nature of the tenancy, then in either such event, the same shall be complied with by Landlord at its sole expense.

**Exculpation**

19. Anything to the contrary in this lease notwithstanding the covenants contained in this lease to be performed by Landlord shall not be binding personally, but instead said covenants are made for the purpose of binding only the fee simple or leasehold estate which Landlord owns in the demised premises; provided, however, the obligations imposed by Article 8 of this lease shall be personally binding upon Landlord.

SEE RIDER ATTACHED – ARTICLE 20.

**Damage to Demised Premises**

20. ~~From and after the date on which Tenant shall be privileged to enter upon the demised premises~~ for the purposes specified in Article 9 hereof, Landlord shall insure the buildings depicted on Exhibit "B", including Tenant's buildings, against damage or destruction by fire ~~and other~~ casualties insurable under a standard extended coverage endorsement. Said ~~insurance~~ shall be in an amount equal to not less than eighty percent (80%) of the ~~insurable~~ value of the permanent improvements thereof. All such policies shall bear ~~endorsements~~ to the effect that Tenant shall be notified not less than five (5) days in ~~advance of~~ modification or cancellation thereof and that the assured has waived right of recovery ~~from Tenant. Copies of such insurance policies or certificates evidencing the existence thereof so~~

EXHIBIT "B"

**Damage to Demised Premises (continued)**

endorsed, shall be promptly delivered to Tenant upon written request therefor. Irrespective of the cause thereof, Tenant shall not at any time be liable for any loss or damage to said buildings resulting from fire, explosion or any other casualty.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's buildings and site improvements shall be damaged or destroyed (partially or totally) by fire or any other casualty insurable under a standard fire and extended coverage endorsement Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, if as a result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding Twenty-five Thousand Dollars ($25,000.00), then either party may terminate this lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. Notwithstanding any such termination of this lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 13 within thirty (30) days after the date of the receipt of Landlord's notice of termination, and upon the exercise of any such option (other than the option set forth in paragraph (b) of Article 13) by Tenant, then this lease shall continue in full force and effect despite such notice of termination by Landlord and Landlord shall repair, rebuild and restore the said permanent improvements as above provided. In the event that this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

During any period commencing upon the date of any such damage or destruction by fire, the elements or any other casualty whatsoever, and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this lease shall abate in the proportion that the part of Tenant's buildings which shall be untenantable shall bear to the whole. The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business in that part of Tenant's buildings rendered untenantable by such damage or destruction, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Landlord herein.

In the event that, at any time during the lease term except the last two (2) years thereof, any building or buildings within the site depicted on Exhibit "B", other than Tenant's building or buildings, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or Landlord may, at its option, elect to raze any buildings so damaged or destroyed and pave the area formerly occupied by said buildings so as to provide additional parking facilities, said areas to be paved, marked, lighted, drained and maintained in the same manner as required in Articles 10 and 15 hereof for other parking areas in the demised premises.

Each party hereto has hereby remised, released and discharged the other party hereto and any officer, agent, employee or representative of such party of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty for which insurance (permitting waiver of liability and containing a waiver of subrogation) is carried by the party at the time of such loss, damage or injury to the extent of any recovery by the injured party under such insurance.

**Eminent Domain**

21. In the event all of Tenant's buildings constructed by Landlord shall be expropriated or the points of ingress and egress to the public roadways substantially as depicted on Exhibit "B" be materially impaired by a public or quasi-public authority, this lease shall terminate as of the date Tenant shall be deprived thereof.

In the event that less than the whole but more than ten percent (10%) of Tenant's buildings constructed by Landlord shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

EXHIBIT "B"

EXHIBIT "B"

Case 3:15-cv-00070-SMR-SBJ Document 1 Filed 06/18/15 Page 85 of 187
E-FILED 2015 JUN 05 4:20 PM SCOTT - CLERK OF DISTRICT COURT

**Eminent Domain (continued)**

In the event of an expropriation of any portion of Tenant's buildings, constructed by Landlord, and if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and the dollar amounts set forth in the first paragraph of Article 4 shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

Without limiting the foregoing, in the event that any of the land described in Exhibit "A" shall be expropriated by public or quasi-public authority, Landlord shall make every effort to substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B". If Landlord shall be unable to substitute such lands and if one or more expropriations shall in total deprive Tenant of the use of more than ten percent (10%) of the land described in Exhibit "A", then, in such event, the Tenant shall have the option to terminate this lease at any time within twelve (12) months after such deprivation becomes effective by giving notice to Landlord.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign to Tenant that portion of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

**[left margin partially obscured]** withstanding foregoing, ever, that tion of the ised premises ibit "B" as served for ure Highway ing" shall excluded m the pro-ions of this icle 21.

Tenant shall not be entitled to share in any award made by reason of expropriation of Landlord buildings on the demised premises, or any part thereof, by public or quasi-public authority, except as set forth in the preceding paragraph relative to unamortized expenditures by Tenant and then only if the award for such unamortized expenditures shall be made by the expropriating authority in addition to the award for the land, buildings and other improvements (or portions thereof) comprising the demised premises; however, the Tenant's right to receive compensation for damages or to share in any award shall not be affected in any manner hereby if said compensation, damages, or award is made by reason of the expropriation of the land or buildings or improvements constructed or made by Tenant.

**Use, Assignment and Subletting**

22. The premises hereby demised may be used for any lawful purpose. Tenant may assign this lease or sublet the whole or any part of the demised premises, but if it does so, it shall remain liable and responsible under this lease.

**Signs**

23. The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect at its sole cost and expense upon any portion of the demised premises signs of such height and other dimensions as Tenant shall determine, bearing such legend or inscription as Tenant shall determine. Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the demised premises.

**Ingress and Egress**

24. Landlord warrants as a consideration for Tenant entering into this lease it will initially provide and will maintain, for the period of this lease and any extension thereof, ingress and egress facilities to the adjoining public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances beyond Landlord's control.

**Landlord's Remedies**

25. If Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of such default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter the demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

**Bankruptcy**

26. If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all of the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Covenant of Title**

27. Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple or has a good and marketable leasehold title to the land described in Exhibit "A", free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof), except as follows:

(a) Public utility easements not impairing Tenant's use of the demised premises.

(b) Cross Easement Agreement dated April 12, 1977 between Davenport Garden Homes, Incorporated and Financial Properties Developers, Inc., recorded as Document Number 6720-77, in the records of Scott County, Iowa.

Landlord shall, without expense to Tenant and within thirty (30) days after written request by Tenant, furnish (a) a certification by an attorney acceptable to Tenant that Landlord's title is as herein represented and certifying that the premises depicted on Exhibit "B" are within the bounds of the property described in Exhibit "A", (b) a survey by a licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

copy of an
.TA type
.licy of
.tle
.surance
.owing

EXHIBIT "B"

In the event Landlord's estate is derived from a leasehold interest in a ground lease, Landlord shall, prior to the commencement of construction of the improvements required hereunder, deliver to Tenant an agreement executed by the fee owner of the demised premises wherein the fee owner recognizes this lease and Tenant's rights hereunder and agrees that, notwithstanding any default by the Landlord and subsequent termination of said ground lease, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such fee owner unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage Subordination**

28. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Tenant Indemnifies Landlord**

29. During the lease term Tenant shall indemnify and save Landlord and Landlord's ground lessor, if any, harmless against all penalties, claims, or demands of whatsoever nature arising from Tenant's use of the Tenant's buildings except those which shall result, in whole or in part, directly or indirectly, from the default or negligence of Landlord or Landlord's ground lessor, if any.

**Tenant's Right to Cure Landlord's Defaults**

30. In the event Landlord shall neglect to pay when due any obligations on any mortgage or encumbrance affecting title to the demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant, pay said principal, interest or other charges and cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand, pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of seven percent (7%) per annum or the then current prime rate, whichever is the higher, and Tenant may to the extent necessary withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

**Condition of Premises at Termination**

31. At the expiration or earlier termination of the lease term Tenant shall surrender the demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty. All furniture and trade fixtures installed in said buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option the property specified in said notice shall be the property of Landlord.

**Holding Over**

32. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the demised premises after the expiration of the lease term, it shall so remain as a tenant, from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

**Notices**

33. Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in Troy, Michigan, or to any subsequent address which Tenant shall designate for such purpose. Date of notice shall be the date on which such notice is deposited in a post office of the United States Postal Service.

**Captions and Definitions**

34. Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provision thereof. The necessary grammatical changes which shall be required to make the provision of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

**Successors and Assigns**

35. The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

**Memorandum of Lease**

36. The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.

IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate as of the day and year first above written.

WITNESSES:

FINANCIAL PROPERTIES DEVELOPERS, INC.

By: _____ President
     Arthur Heyman

Attest: _____
          Assistant Secretary

S. S. KRESGE COMPANY

By: _____ Vice President

Attest: _____ Assistant Secretary

E-FILED 2015 JUN 01 2:20 PM SCOTT - CLERK OF DISTRICT COURT

## ACKNOWLEDGMENTS

STATE OF GEORGIA }ss:
COUNTY OF FULTON

I do hereby certify that on this _____ day of _____, 19___, before me, Kimberly Schneeberger _____, a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared Arthur Heyman and Ann LaCara Asst. known to me to be the President and/Secretary of Financial Properties Developers, Inc. who, being by me duly sworn, did depose and say that they reside in Fulton and Cobb County, Georgia Asst. respectively; that they are the President and Secretary respectively of Financial Properties Developers, Inc. the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires:_____          _Kimberly Schneeberger_
Notary Public, Georgia, State at Large                        Notary Public
My Commission Expires Sept. 16, 1979.

STATE OF MICHIGAN }ss:
COUNTY OF OAKLAND

I do hereby certify that on this _____ day of _____, 19___, before me, _____, a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared _____ and _____, known to me to be the Vice President and Assistant Secretary of S. S. Kresge Company, who, being by me duly sworn, did depose and say that they reside in _____ respectively; that they are the Vice President and Assistant Secretary respectively of S. S. Kresge Company, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires:_____          _____
                                                        Notary Public

EXHIBIT "B"

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

THIS RIDER IS ATTACHED TO AND FORMS A PART OF THAT CERTAIN LEASE DATED
, BETWEEN FINANCIAL PROPERTIES, INC. AS
LANDLORD, AND THE S. S. KRESGE COMPANY, AS TENANT.

10A.  The design of said parking area shall be in accordance with
working plans and specifications approved by Tenant.  Subject to the
rights of termination under Article 21 hereof, any reduction of such
parking area below said amount which shall have resulted from expropriation
or taking thereof by eminent domain, condemnation, or by public or quasi-.
public authority, shall not be deemed a violation of this Article 10; nor
shall any loss of parking area be deemed a violation if it shall have
resulted from any alterations, additions or changes made to the demised
premises by Tenant pursuant to the rights granted Tenant under Article 16,
regardless of whether or not any such lost parking spaces are covered
by additional buildings or structures or are used for walkways, service
drives, accessways, roadways, loading areas or any other purposes.

20.  From and after the "date of occupancy by Tenant", as that term is
defined in Article 11 hereof, should Tenant's net worth at any time be
less than One Hundred Million Dollars ($100,000,000.00), upon written
request of the Landlord or mortgagee, Tenant shall procure insurance with
extended coverage endorsement covering loss by fire, the elements and other
casualty upon the buildings erected by Landlord pursuant to Article 6
hereof in an amount equal to eighty per cent (80%) of the insurable
value of the buildings above the foundation walls.  At any time while
Tenant's net worth shall exceed One Hundred Million Dollars ($100,000,000.00),
the Tenant may elect to self-insure its obligation to restore.

Policies of insurance procured pursuant to this article shall
assure and be payable to Landlord, Tenant and mortgagee and shall provide
for release of insurance proceeds to Tenant for restoration of loss.

Rider
Page 1

EXHIBIT "B"

EXHIBIT "B"

Case 3:15-cv-00070-SMR-SBJ Document 1 Filed 06/18/15 Page 91 of 187
E-FILED 2015 JUN 07 4:20 PM SCOTT - CLERK OF DISTRICT COURT

Article 20 -
(continued)

Landlord and mortgagee, if any, shall be furnished certificates from the insuring company showing the existence of such insurance. In case of loss, Tenant is hereby authorized to adjust the loss and execute proof thereof in the name of all parties in interest.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's buildings and site improvements shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty insurable under a standard fire and extended coverage endorsement Tenant shall, at its expense, promptly and with due diligence either (1) repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction or (2) repair, rebuild and restore the same for the same use and purposes but in accordance with such plans and specifications as are then generally in use by Tenant for the construction of K marts and related structures, provided, however, the repaired, rebuilt or replaced buildings will have a value not less than its value just prior to said loss. Anything herein to the contrary notwithstanding, it is understood and agreed that if (1) as a result of any such damage or destruction during the last two years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding One Hundred Thousand Dollars (100,000.00), or (2) if such damage or destruction shall have taken place within five years of the then scheduled expiration date of the current term of the lease and if the extent of such damage or destruction is such that the cost of restoration would exceed fifty per cent (50%) of the amount it would have cost to replace the Tenant's buildings on the demised land in their entirety at the time such damage or destruction took place, then Tenant may terminate this lease as of the date of such damage or destruction by giving written notice to the Landlord within thirty (30)

Rider

-2-

EXHIBIT "B"

days thereafter and Tenant shall have an additional sixty (60) days,
rent free, within which to remove its property from the demised premises.
If Tenant is carrying insurance as provided in this article to eighty
per cent (80%) of the insurable value, all the insurance proceeds shall
belong to Landlord and/or Landlord's mortgagee as their interest may
appear; in the event the property is self-insured at the time of the
loss Tenant shall reimburse Landlord and/or the mortgagee for an amount
equivalent to the insurance proceeds that would have been paid had insurance
been in force, but not to exceed eighty per cent (80%) of the insurable
value of the buildings.  In the event that this lease shall be terminated
as above provided, all unearned rent and other charges paid in advance
shall be refunded to Tenant.

In the event that, at any time during the lease term, any building
or buildings within the site depicted on Exhibit "B", other than Tenant's
building or buildings, shall be damaged  or destroyed (Partially or
totally) by fire, the elements or any other casualty, Landlord shall,
at its expense, promptly and with due diligence repair, rebuild and
restore the same as nearly as practicable to the condition existing
just prior to such damage or destruction; or alternatively Landlord
shall be required to clear, clean and raze the fire damaged buildings.

Rider

-3-

**OSS
EMENTS
ticle 37)**

37. Landlord represents that Landlord will be, at the commencement of the term herein, the owner of the real estate described in Exhibit "D" (Food Store Parcel) hereto attached, which real estate adjoins the demised premises on the east. Following such time as improvements are developed on said real estate, Tenant, its agents, employees, licensees, sublessees, invitees and customers shall have the non-exclusive right in common with the owner of said real estate, its invitees and customers to use the common area upon the demised premises during the term of this lease for ingress, egress, motor vehicle parking, loading, unloading and for roadway and sidewalk purposes. This lease includes and is made subject to the aforesaid mutual and reciprocal rights and obligations with respect to the use of said common areas and subject also to the right of the Landlord, which right is hereby reserved to install or cause the installation in and upon the demised premises of pipes, conduits, wires and other utility facilities in locations which will not materially interfere with the Tenant's use of the premises, but which will serve or be for the benefit of the adjoining Food Store Parcel described on Exhibit "D" hereto attached. All of the said parking areas, driveways and roadways as shown upon Exhibit "B" hereto attached shall at all times remain open and unobstructed and Tenant shall use and enjoy the same without unreasonable interference with the rights of any other parties entitled to also use and enjoy the same; and Landlord agrees that a provision imposing corresponding obligations upon any tenant or owner of all or part of the Food Store Parcel described in Exhibit "D" will be included in the lease of that tenant or deed to succeeding owner. The provisions of this Article 37 shall be controlling of any provisions in this Lease to the contrary. The owner or owners of the land described in Exhibit "D" shall restrict the total development so that the aggregate area provided for the parking of automobiles on the two parcels described in Exhibits "A" and "D" will be sufficient to accommodate enough automobiles so as to provide a ratio of 5.5 cars for each 1,000 square feet of building area on the two parcels. Should this condition be violated, Tenant shall have the right, but not the obligation, to terminate this easement.

Garden Shop and Trailer Sales
    Notwithstanding the foregoing, Tenant shall have the right to use in a not unreasonable, nonpermanent manner portions of the area shown upon Exhibit "B", as described below, for the sale of Garden Shop items and also for occasional Trailer Sales. The area designated for Garden Shop items would be all that land west of the west building line and north of a westerly extension of the south building line of the K mart building. The area designated for only Trailer Sales would be that portion of the parking areas south of the south building line and west of the main K mart store entrance. Use of the area south of the south building line shall not at any time exceed 32 parking spaces.

Cross Maintenance Obligation
    It is a further condition of the easements granted herein that Tenant with respect to the property described in Exhibit "A" hereof and the fee owner or owners of the land described in Exhibit "D" hereof shall be responsible at their own expense for the maintenance, repair and replacement of the common areas located on their respective parcels, which shall be kept clean, well maintained and in good condition and state of repair, free of rubbish, adequately drained and lighted and free of ice and snow. If said party ("Defaulting Party") fails within 30 days after receipt of written notice from any other party to commence and proceed with due diligence to complete the performance of any of its obligations as provided herein, then said party making said demand shall have the right but not the duty to perform the same. Any party performing the obligations of the defaulting party, as aforesaid, shall have a lien against the interests of the other party in the land and improvements upon which the services

Rider

-4-

E-FILED 2015 JUN 07 4:28 PM SCOTT - CLERK OF DISTRICT COURT

were performed for the full cost and expenses incurred in such performance; provided, however, said lien shall be junior and subordinate to any first mortgage then existing on the defaulting party's parcel.

If failure to perform any such covenant causes any emergency or performance of such covenant is necessary to prevent or relieve an emergency, then the notice required to be given hereunder to either party need only be such reasonable notice, if any, as is warranted by the nature of the specific condition involved and, if appropriate action is not timely taken, the non-defaulting party shall be entitled to immediately cure such default or defaults without the requirement of notice.

Notwithstanding the above two paragraphs, the Landlord shall remain responsible for those obligations set forth in Article 15 with respect to the property described in Exhibit "A".

Rider

-5-

EXHIBIT "B"

*Davenport Iowa*

AMENDMENT TO LEASE

THIS AGREEMENT, entered into this 7th day of December , 1978,
by and between FINANCIAL PROPERTIES DEVELOPERS, INC., a Georgia
corporation, having its principal office in Atlanta, Georgia, hereinafter
referred to as Landlord, and K MART CORPORATION, a Michigan corporation,
having its principal office in Troy, Michigan, hereinafter referred to
as Tenant;

WITNESSETH:

WHEREAS, Landlord and Tenant are Landlord and Tenant,
respectively, under an Agreement of Lease for certain property located
in Scott County, Davenport, Iowa, dated April 14, 1977, a Memorandum of
Lease is filed for record in the Recorder's Office, Scott County, and,

WHEREAS, the parties hereto are mutually desirous of
amending the aforesaid Lease in the particulars hereinafter set forth;

NOW THEREFORE, in consideration of the premises and the mutual
covenants and agreements herein contained, the parties hereto do hereby
agree as follows:

1.  Article 3 of the aforesaid Lease is hereby amended by
deleting the dollar amount of "TWO HUNDRED FIFTY NINE THOUSAND THREE
HUNDRED EIGHT AND NO/100 DOLLARS ($259,308.00)" and inserting in lieu
thereof the dollar amount of "TWO HUNDRED FIFTY FIVE THOUSAND THREE
HUNDRED EIGHT AND NO/100 DOLLARS ($255,308.00)".

2.  Article 10 of the aforesaid Lease is further amended by
deleting the sixth paragraph thereof and inserting in lieu thereof the
following paragraph:

1/25/79

During the lease term, Tenant shall keep Landlord and any other parties in interest designated by Landlord insured against all statutory and common law liabilities for damages on account of damage to property or injuries and loss of life sustained by any person or persons within the demised premises in a policy or policies in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) with respect to injury to any one person and in the amount of One Million Dollars ($1,000,000.00) with respect to any one accident or disaster, and in the amount of One Hundred Thousand Dollars ($100,000.00) with respect to damage to property; and Tenant shall also indemnify and save Landlord harmless against any such liability. Any such policies shall bear endorsements to the effect that Landlord shall be notified not less than ten (10) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Landlord. Notwithstanding the foregoing, should Tenant's net worth exceed the sum of One Hundred Million Dollars ($100,000,000.00) and so long as at least such net worth is so maintained, Tenant may elect to self insure its obligation as required in this Article. Should Tenant so elect, Tenant shall furnish to Landlord and any other parties in interest designated by Landlord written evidence of such indemnification and self-insurance in lieu of the copies of policies or certificates required in this paragraph if Tenant does not self-insure.

All and singular the remaining terms and conditions of the aforesaid Lease remain unchanged.

IN WITNESS WHEREOF, the parties hereto have caused their names to be signed and their corporate seals affixed, this the day and year first hereinabove written.

WITNESS:                          FINANCIAL PROPERTIES DEVELOPERS, INC.

_Kimberly Bentley_               BY: _____
                                      Arthur Heyman, President
_Martha Morris_
                                 BY: _____
                                          Assistant Secretary

                                 LANDLORD                (CORPORATE SEAL)


WITNESS:                          K MART CORPORATION

_Deborah Davas_                  BY: _____
                                                        Vice President
_Debra A. Griffiths_
                                 BY: _____
                                          Assistant Secretary

                                 TENANT                  (CORPORATE SEAL)

## ACKNOWLEDGMENTS

STATE OF   GEORGIA

COUNTY OF   FULTON    }ss:

    I do hereby certify that on this 7th     day of . December     , 1978    , before me, the County and State aforesaid, and duly commissioned, personally appeared
Arthur Heyman        and   John T. Micha       ,
known to me to be the President and Asst. Secretary of FINANCIAL PROPERTIES DEVELOPERS, INC.

who, being by me duly sworn, did depose and say that they reside in Fulton County , GA      ,

respectively; that they are the President and Asst. Secretary respectively of FINANCIAL PROPERTIES DEVELOPERS, INC.
the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

    In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

                 Notary Public, Georgia State at Large

My commission expires: My Commission Expires Oct. 1, 1982

                                          Notary Public

---

STATE OF MICHIGAN

COUNTY OF OAKLAND    }ss:

    I do hereby certify that on this 15th     day of DECEMBER     , 19 78 , before me, DEBORAH J WILLIAMS       , a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared
J. P. JOHNSON     and    C.E. LOTZAR JR.       ,
known to me to be the Vice President and Assistant Secretary of K mart Corporation, who, being by me duly sworn, did depose and say that they reside in BIRMINGHAM, MICHIGAN      ,

respectively; that they are the Vice President and Assistant Secretary respectively of K mart Corporation, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

    In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires DEBORAH J. WILLIAMS

         Notary Public, Oakland County, Michigan

         My Commission Expires Sept. 12, 1981

                                          Notary Public

## CONSENT

The foregoing Amendment to Lease dated the ___7th___ day of ___December___, A. D. 1978, is hereby approved and consented to by LAWRENCE KADISH, of New York, New York.

IN WITNESS WHEREOF, LAWRENCE KADISH has hereunto set its hand and seal this _____ day of _____, A. D. 197__.

Signed, sealed and delivered
in the presence of:

By: _____

_____
Witnesses

STATE OF _New York_
COUNTY OF _New York_ ss.

Before me personally appeared _Lawrence Kadish_ to me personally known, who, being duly sworn did say that he, being informed of the contents of the instrument, did execute the same voluntarily and as his individual act.

IN WITNESS WHEREOF, my hand and seal of office, this _15th_ day of _January_, 197_9_.

_____
NOTARY PUBLIC - State of _____

My commission expires:

ROBERT LINKER
Notary Public, State of New York
No. 24-4608404
Qualified in Kings County
Commission Expires March 30, 19_79_

CONSENT

The foregoing    Amendment to Lease    dated the    7th    day

of    December    , A. D. 1978, is hereby approved and consented to by

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, conditioned upon the written consent
of the fee owners being obtained and made a part of the within Amendment to Lease.
        IN WITNESS WHEREOF, JOHN HANCOCK MUTUAL LIFE INSURANCE    has
                              COMPANY

hereunto set its hand and seal this    9th    day of    March

A. D. 197 9.

Signed, sealed and delivered
in the presence of:

_____                By: _____
Ethel M. Loberg                           C. G. Richert,    Vice President
_____                Attest: _____
Witnesses                                 James H. Young,  Assistant Secretary
Gertrude M. Scheibel                      (CORPORATE SEAL)

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF    SUFFOLK    ) ss.

        Before me personally appeared    C. G. Richert

and    James H. Young    a    Vice President    Assistant Secretary,
                              _____ and _____,

to me well known and known to me to be the individuals described in and who

executed the foregoing instrument, and acknowledged to and before me that

they executed the same for the purposes therein expressed.

        WITNESS my hand and official seal this    9th    day of

March    A. D. 197 9.

_____
NOTARY PUBLIC, State of Commonwealth of
Ethel M. Loberg,    Massachusetts
My commission expires:    May 14, 1982.

## C O N S E N T

The foregoing  Amendment to Lease dated the 7th day of December, A. D. 1978, is hereby approved and consented to by  Walter Spengler of Franklin Lakes, New Jersey;

Gordon W. Hall, Jr., of Greenwich, Connecticut;

Raymond Zager of Point Pleasant, New Jersey; and

Robert M. Worsfold of Saddle River, New Jersey, as fee owners.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands and seals this  2nd day of May, A. D. 1979.

Signed, sealed and
delivered in the
presence of:

Walter Spengler, Gordon W. Hall, Jr.,
Raymond Zager and Robert M. Worsfold

By: *Leonard Green*
Leonard Green, pursuant to
Powers of Attorney dated
*December 7, 1978*

Witnesses

STATE OF NEW YORK  )
                   )  ss.:
COUNTY OF NEW YORK )

Before me personally appeared LEONARD GREEN, to me personally known, who, being duly sworn did say that he, being informed of the contents of the instrument, did execute the same voluntarily and as his individual act on behalf of WALTER SPENGLER, GORDON W. HALL, JR., RAYMOND ZAGER and ROBERT M. WORSFOLD, pursuant to Powers of Attorney dated  12-7-78

IN WITNESS WHEREOF, my hand and seal of office, this 2nd day of May, 1979.

(Notarial
  Seal)

NOTARY PUBLIC - State of New York

My Commission Expires: _____

ROBERT LINKER
Notary Public, State of New York
No. 24-4608494
Qualified in Kings County
Commission Expires March 30, 19___



**Melinda S. (Mindy) Garrett**
Chief Executive Officer & President

October 29, 2007                                      *Certified Mail, Return Receipt Requested*

Mr. Lawrence Kadish
135 Jericho Turnpike
Old Westbury, New York 11568

RE:    Davenport, Iowa Kmart #3441
       Lease between Lawrence Kadish and Financial Properties Developers, Inc. dated
       November 16, 1977 (the "Lease")

Dear Mr. Kadish:

Enclosed please find a copy of Kmart's letter to Abrams Properties, Inc. dated May 23, 2007, in
which Kmart exercised its option to extend Kmart's lease term for the premises commencing
December 1, 2007, to and including November 30, 2012.

Please be advised that Abrams Properties, Inc. (formerly known as Financial Properties
Developers, Inc.) hereby exercises its right under the Lease to extend the term of the Lease
commencing December 1, 2007, to and including November 30, 2012, upon the terms,
conditions and rental as set forth in said Lease as amended.

Sincerely,

ABRAMS PROPERTIES, INC.

Melinda S. Garrett
Chief Executive Officer & President

Enclosure

                                                                    EXHIBIT  4

ABRAMS PROPERTIES, INC.    1945 THE EXCHANGE, SUITE 400   ATLANTA, GA 30339-2029
Phone (770) 953-1777   Fax (770) 953-9922   Email: mgarrett@abramsproperties.com

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL  60179

May 23, 2007

**CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7006 0810 0002 7421 3887**

Abrams Properties, Inc.
1945 The Exchange; Suite 400
Atlanta, GA  30339-2029
Attn:  Melinda S. Garrett

*KMart* ¥

Re:  Lease dated April 14, 1977, as amended, for
the premises located at 3616 W. Kimberly Rd.,
Kmart Center, Davenport, IA, Kmart #3441

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of five (5) years, commencing December 1, 2007, to and including November 30, 2012, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Sincerely,

KMART CORPORATION

By _____
    Jeffrey Stollenwerck
    Senior Vice President of Real Estate

JS/jc

cc:   J. Catanese
      Lease File


RECEIVED
MAY 29 2007
By _____

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT



ABRAMS
PROPERTIES

1945 The Exchange, Suite 400
Atlanta, Georgia 30339-2029



CERTIFIED MAIL

7099 3400 0011 4372 2248



Mr. Lawrence Kadish
135 Jericho Turnpike
Old Westbury, New York 11568





neopost
045J83008I824
$5.210
10/29/2007
Mailed From 30339

US POSTAGE

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

## Lawrence Kadish

| | |
|---|---|
| **From:** | "Derek Harmer" <Derek.Harmer@SClenergy.com> |
| **To:** | <LawrenceKadish@gmail.com> |
| **Sent:** | Wednesday, July 11, 2012 12:10 PM |
| **Subject:** | Notice of Non-Renewal |

M. Kadish,

By way if introduction, my name is Derek Harmer. I am a consultant for SClenergy (formerly Servidyne/Abrams Properties) and am assisting them with the disposition of certain real estate assets/interests. It is my understanding upon review of our agreement that the leasehold interest in the Davenport property is up for renewal at our option in November, 2012.

Please let this email serve as formal notice that SClenergy does <u>not</u> wish to renew its leasehold interest in the Davenport property. Upon expiration in November 2012, those rights granted will revert back to you and SCI will no longer have an interest in that property.

Please confirm receipt of this correspondence and contact me should you wish to discuss this matter in greater detail.

Regards,

Derek Harmer
702-302-6100

EXHIBIT 5

EXHIBIT 5

7/11/2012

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT



VIA Federal Express

June 20, 2012

Mr. Lawrence Kadish
Lawrence Kadish Real Estate
135 Jericho Turnpike
Old Westbury, NY 11568

     Re:    Kmart Store #3441 – 3616 West Kimberly Road, Davenport, Iowa

Dear Mr. Kadish:

Per our telephone conversation, SCIenergy acquired Servidyne, Inc., including its subsidiary, Abrams Properties, Inc. in August 2011.  In addition, Ms. Garrett is no longer with the company.  Please find a check attached to this letter in the amount of $8,766.88 for the May rent for payment on the lease on the above mentioned property.  A check for the June rent will follow shortly.

I apologize for this oversight.  Should you have any other questions or concerns, please do not hesitate to contact me at (770) 953-0304 extension 175.

Sincerely,

Rick A. Paternostro
Vice President, Finance

Cc: Sears Holding Corp.
       Real Estate Legal Dept
       3333 Beverly Road
       Hoffman Estates, IL 60179

EXHIBIT   6



| 4099 McEwen | 1945 The Exchange | 2 Bryant Street |
| Suite 420 | Suite 325 | Suite 210 |
| Dallas, TX 75244 | Atlanta, GA  30339 | San Francisco, CA 94105 |
| (972) 386-5335 | (770) 953-0304 | (415) 625-4500 |

EXHIBIT  6

E-FILED  2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT



**DANIEL E. IZENSON**
DIRECT DIAL: (513) 579-6480
FACSIMILE: (513) 579-6457
E-MAIL: DIZENSON@KMKLAW.com

July 13, 2012

***VIA CERTIFIED MAIL & FACSIMILE***

Mr. Rick A. Paternostro
Vice President, Finance
SCIenergy, Inc.
1945 The Exchange
Atlanta Georgia 30339

Re:     Lease by and between Lawrence Kadish (the "Landlord") and SCIenergy, Inc., as successor in interest to Abrams Properties, Inc./Financial Properties Developers, Inc. (the "Tenant") dated November 16, 1977, as amended (the "Lease") for the premises located at 3616 West Kimberly Road, Davenport, Iowa (the "Premises")/ K Mart Store #3441

Dear Mr. Paternostro:

Please be advised that this law firm and the undersigned represent Landlord in conjunction with its dispute with Tenant regarding the above referenced Lease. Please direct all future correspondence or inquiries regarding this matter to my attention.

By letter dated June 18, 2012, Landlord advised Tenant of its default under the Lease for non-payment of May and June 2012 rent. Landlord demanded Tenant to cure its default within ten (10) days pursuant to Tenant's obligations under the Lease. Despite notice and demand, and notwithstanding the representations in your letter dated June 20, 2012 that payment in full was forthcoming, Tenant failed to cure its default. As of the date of this letter, June rent, and now July rent, remains outstanding.

In accordance with Section 12.01 of the Lease, please accept this letter as Landlord's "second notice" and Landlord's intent to end the term of the Lease in sixty (60) days, effective September 12, 2012, subject to Tenant's continuing obligations under the Lease. Pursuant to the terms of the Lease, including without limitation Articles 5 and 12, Tenant shall remain personally liable to Landlord for any and all rent, additional rent (including "Impositions"), expenses and other damages incurred by Landlord arising from Tenant's default under the Lease.

EXHIBIT  7

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

Mr. Rick A. Paternostro
July 13, 2012
Page 2

Pursuant to Article 5 of the Lease, Tenant is required to collect rents received from K Mart Corporation ("K Mart"), the Operating Tenant under its sublease with Tenant, in trust for the payment of the current month's rent to Landlord. Specifically, Article 5, entitled "Operating Tenant's Rental," states:

> The Tenant shall be entitled to collect and shall collect the rental to be paid by the Operating Tenant, subject to the following condition:
>
> An amount of such rents received by Tenant each month equal to the monthly rental to be paid Landlord hereunder shall be received and held by Tenant in trust for the payment of the then current month's rent, and to the extent such funds are not so applied Tenant shall have full personal liability to Landlord, the provisions of Section 26.01 of the Lease notwithstanding.

Accordingly, by copy of this letter, K Mart is hereby advised of Tenant's uncured default, and that Tenant has failed to forward K Mart's June and July rents which are to be held in trust for the payment of current rent to Landlord. K Mart is therefore notified to pay Landlord its August 2012 rent under its sublease, and such additional rents through the balance of the sublease, directly to Lawrence Kadish at the following address:

> Lawrence Kadish
> Lawrence Kadish Real Estate
> 135 Jericho Turnpike
> Old Westbury, NY 11568

Landlord shall apply and credit the payment of rent received from K Mart against the rental obligations of Tenant under the Lease.

Pursuant to Section 6.09 of the Lease, Tenant is hereby notified of Landlord's intent to re-enter and inspect the Premises to ascertain its condition within fourteen (14) days of this letter. Once arrangements have been confirmed, Landlord will advise Tenant (and K Mart) of the precise date of the inspection.

Tenant is further reminded of its obligations under Sections 6.04 and 6.12 of the Lease to peaceably and quietly leave the Premises in a broom-clean condition, and to repair all damage to the Premises caused by Tenant or its subtenants. All personal property remaining on the Premises shall be deemed abandoned.

Landlord takes the foregoing steps without prejudice to any other remedy it may have under the Lease, at law, or in equity. Nothing contained herein shall be deemed or construed as a waiver of Landlord's rights or remedies under the Lease.

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

Mr. Rick A. Paternostro
July 13, 2012
Page 3

       Please contact me, or if Tenant is represented by counsel, have your attorney contact me, should you have any questions.

                    Very truly yours,

                    KEATING MUETHING & KLEKAMP PLL

                    By: _____
                          Daniel E. Izenson

DEI:amt

cc:     Marianne L. Simonini, Esq. (via electronic mail)
        Counsel-Real Estate
        Sears Holdings Corporation
        3333 Beverly Rd.
        BC-126B
        Hoffman Estates, IL   60179

4462636.1

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

# KMK | Keating Muething & Klekamp PLL

ATTORNEYS AT LAW

**DANIEL E. IZENSON**
DIRECT DIAL: (513) 579-6480
FACSIMILE: (513) 579-6457
E-MAIL: DIZENSON@KMKLAW.com

July 30, 2012

### *VIA CERTIFIED MAIL & FACSIMILE*

Mr. Rick A. Paternostro
Vice President, Finance
SCIenergy, Inc.
1945 The Exchange
Atlanta Georgia 30339

> Re: Lease by and between Lawrence Kadish (the "Landlord") and SCIenergy, Inc., as successor in interest to Abrams Properties, Inc./Financial Properties Developers, Inc. (the "Tenant") dated November 16, 1977, as amended (the "Lease") for the premises located at 3616 West Kimberly Road, Davenport, Iowa (the "Premises")/ K Mart Store #3441

Dear Mr. Paternostro:

As you know, this law firm and the undersigned represent Landlord in conjunction with its dispute with Tenant regarding the above referenced Lease.

By letter dated July 13, 2012, Landlord provided its "second notice" of default and advised of its intent to end the term of the Lease in sixty (60) days, effective September 12, 2012, subject to Tenant's continuing obligations under the Lease. Tenant was further advised that pursuant to the terms of the Lease, including without limitation Articles 5 and 12, Tenant shall remain personally liable to Landlord for any and all rent, additional rent (including "Impositions"), expenses and other damages incurred by Landlord arising from Tenant's default under the Lease.

On July 26, 2012, Landlord received two checks dated July 20, 2012 in the amount of $8,766.88 from Abrams Properties, Inc. purportedly for June and July 2012 rent. Landlord shall apply and credit the payments received against Tenant's continuing obligations under the default provisions of Article 12 of the Lease, with full reservation of rights.

Pursuant to Section 6.09 of the Lease, Tenant is hereby notified of Landlord's intent to re-enter and inspect the Premises to ascertain its condition upon reasonable notice.

Landlord takes the foregoing steps without prejudice to any other remedy it may have under the Lease, at law, or in equity. Nothing contained herein shall be deemed or construed as a waiver of Landlord's rights or remedies under the Lease.

**EXHIBIT 8**

EXHIBIT 8

Mr. Rick A. Paternostro
July 30, 2012
Page 2

Please contact me, or if Tenant is represented by counsel, have your attorney contact me, should you have any questions.

Very truly yours,

KEATING MUETHING & KLEKAMP PLL

By: _____
Daniel E. Izenson

DEI:jrr

cc:     Marianne L. Simonini, Esq. (via electronic mail)
        Counsel-Real Estate
        Sears Holdings Corporation
        3333 Beverly Rd.
        BC-126B
        Hoffman Estates, IL   60179

4483448.1

# KMK | Keating Muething & Klekamp PLL

### ATTORNEYS AT LAW

**DANIEL E. IZENSON**
DIRECT DIAL: (513) 579-6480
FACSIMILE: (513) 579-6457
E-MAIL: DIZENSON@KMKLAW.COM

October 29, 2012

**_VIA CERTIFIED MAIL & FACSIMILE_**

Mr. Rick A. Paternostro
Vice President, Finance
SCIenergy, Inc.
1945 The Exchange, Suite 325
Atlanta, GA  30339

> Re:  Lease by and between Lawrence Kadish (the "Landlord") and SCIenergy, Inc., as successor in interest to Abrams Properties, Inc./Financial Properties Developers, Inc. (the "Tenant") dated November 16, 1977, as amended (the "Lease") for the premises located at 3616 West Kimberly Road, Davenport, Iowa (the "Premises")/ K Mart Store #3441

Dear Mr. Paternostro:

As you know, this law firm and the undersigned represent Landlord in conjunction with its dispute with Tenant regarding the above referenced Lease.

By letter dated July 13, 2012, Landlord provided its "second notice" of default and advised of its intent to end the term of the Lease in sixty (60) days, effective September 12, 2012, subject to Tenant's continuing obligations under the Lease. Tenant was further advised that pursuant to the terms of the Lease, including without limitation Articles 5 and 12, Tenant shall remain personally liable to Landlord for any and all rent, additional rent (including "Impositions"), expenses and other damages incurred by Landlord arising from Tenant's default under the Lease.

On October 24, 2012, Landlord received a check dated October 4, 2012 in the amount of $26,300.64 from Abrams Properties, Inc. purportedly for August, September and October 2012 rent.  Landlord shall apply and credit the payment received against Tenant's continuing obligations under the default provisions of Article 12 of the Lease, with full reservation of rights.

EXHIBIT  9

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

Mr. Rick A. Paternostro
October 29, 2012
Page 2


Landlord takes the foregoing steps without prejudice to any other remedy it may have under the Lease, at law, or in equity. Nothing contained herein shall be deemed or construed as a waiver of Landlord's rights or remedies under the Lease.

Please contact me, or if Tenant is represented by counsel, have your attorney contact me, should you have any questions.

Very truly yours,

KEATING MUETHING & KLEKAMP PLL

By: _____
Daniel E. Izenson

DEI:jrr


cc:     Marianne L. Simonini, Esq. (via electronic mail)
        Counsel-Real Estate
        Sears Holdings Corporation
        3333 Beverly Rd.
        BC-126B
        Hoffman Estates, IL   60179


4621903.1

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT



*Information*
*To Build On*
**Engineering • Consulting • Testing**

December 3, 2012

Mr. Charles Kadish
Lawrence Kadish Real Estate
135 Jericho Turnpike
Old Westbury, New York 11568

**Re:    Limited Property Condition Assessment Cost Estimate**
**Former Kmart Store**
**3616 West Kimberly Road**
**Davenport, Scott County, Iowa 52801**
**PSI Project No. 0417.0423.PCA**

Dear Mr. Kadish:

As requested, Professional Service Industries, Inc. (PSI) has prepared an estimate of the approximate cost to correct issues observed at the above referenced property during our site visit on November 19, 2012.  This cost estimate is prepared in accordance with our general conditions included in our proposal number 0417-81562, dated October 25, 2012 and authorized November 9, 2012. PSI is providing this estimate of cost to repair deficiencies observed at the above referenced property and listed in our previously issued Limited Property Condition Assessment report number 0417.0423.PCA, dated December 3, 2012.

Based on the observed condition of the Former Kmart Store, Davenport, Iowa, PSI estimates the cost to correct deficiencies to be approximately **$2,160,046.00**. These items are covered in more detail in the previously issued Limited Property Condition Assessment report.

PSI developed Opinions of Probable Cost (Opinions of Cost) for the recommended remedies. PSI developed the costs using a combination of sources, typically including commercially **available published cost information (R.S. Means), PSI's experience, databases or files, or third** party cost information from contractors, vendors, or suppliers. Please note that the estimated cost above is an estimate only and that the estimated cost has not been provided by any particular contractor. Costs may vary depending on contractor, location, overall scope and market factors.

We appreciate this opportunity to provide professional services for this project.  If we can be of further service to you, or if you have any questions concerning this report, please do not hesitate to contact our office at (708) 236-0720 ext. 140.

Respectfully Submitted:
**PROFESSIONAL SERVICE INDUSTRIES, INC.**

Daniel Krzeczkowski, PE (IL)                         Mark A. Breitner, RRC, RRO
Report Preparer                                              PCR Reviewer
Principal Consultant                                        Senior Roof Consultant

Enclosed:  Cost Estimate Spreadsheet

EXHIBIT   10

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

| | | |
|---|---|---|
| **PSI Proj. No.:** | 0417.0423.PCA | |
| **Prop. Name:** | Former Kmart Store | |
| **Address:** | 3616 West Kimberly Road | |
| **City, State:** | Davenport, Scott County, Iowa 52801 | |
| **Walk-Thru:** | November 19, 2012 | |

| | | |
|---|---|---|
| **Property Age** | 35 | Years |
| **Number of Buildings** | 1 | |
| **Building Area** | 86,448 | Square Feet |



## Opinions of Probable Cost

| REF. | | IDENTIFICATION | ESTIMATES | | | TOTAL |
|---|---|---|---|---|---|---|
| Item No. | Rpt. Sec. | Building Component | Qty. | Unit | Unit Costs ($) | Cost ($) |
| 001 | 5.2.5 | Replace damaged concrete truck well plus a portion of the north storage area | 3,000 | SF | 4.00 | 12,000 |
| 002 | 5.2.9 | All of the pavement will likely require full depth replacement. | 23,430 | SY | 31.50 | 738,045 |
| 003 | 5.2.9 | Minor crack repair, seal coating and restriping the asphalt pavement | 23,430 | SY | 1.40 | 32,802 |
| 004 | 5.2.9 | Replace parking lot light poles | 15 | EA | 2,200.00 | 33,000 |
| 005 | 5.3.3 | Perform minor repairs and re-paint the building exteriors (EIFS and masonry) | 21,760 | SF | 1.00 | 21,760 |
| 006 | 5.3.3 | Rework sealant at thermal control joints | 670 | LF | 5.00 | 3,350 |
| 007 | 5.4.1 | Replace fully adhered single-ply EPDM roof | 86,448 | SF | 5.50 | 475,464 |
| 008 | 5.4.1 | Partial roof deck replacement (allowance) | 1 | LS | 20,000.00 | 20,000 |
| 009 | 5.5.2 | Replace rooftop split or package HVAC units | 197.5 | TON | 1,500.00 | 296,250 |
| 010 | 5.5.2 | Replace natural gas-fired suspended unit heaters | 4 | EA | 1,875.00 | 7,500 |
| 011 | 5.5.2 | Replace natural gas-fired infrared unit heaters | 11 | EA | 1,500.00 | 16,500 |
| 012 | 5.5.5 | Replace domestic hot water heater | 1 | EA | 2,175.00 | 2,175 |
| 013 | 5.7.1 | Perform fire sprinkler inspection | 1 | LS | 1,000.00 | 1,000 |
| 014 | 5.8.1 | Replace ceiling tiles in the sales and office areas | 68,000 | SF | 2.70 | 183,600 |
| 015 | 5.8.1 | Replace floor tiles in the sales and office areas | 68,000 | SF | 4.50 | 306,000 |
| 016 | 6.1.4 | Replace missing signage at existing ADA spaces | 2 | EA | 100.00 | 200 |
| 017 | 6.1.4 | Convert ADA spaces to meet "Van Accessible" guidelines | 2 | EA | 200.00 | 400 |
| 018 | 6.2.1 | Removal and replacement of the water damaged finish materials (allowance) | 1 | LS | 10,000.00 | 10,000 |
| | | | | | **Total, UNINFLATED** | 2,160,046 |

**Notes:** LS - Lump Sum
EA - Each
SF - Square Foot
SY - Square Yard
LF - Linear Foot

E-FILED  2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT



**REPORT OF
LIMITED PROPERTY CONDITION
ASSESSMENT**

**of**

**FORMER KMART STORE
3616 WEST KIMBERLY ROAD
DAVENPORT, SCOTT COUNTY, IOWA 52801**

**Prepared for:**

**Lawrence Kadish Real Estate
135 Jericho Turnpike
Old Westbury, New York 11568**

**Prepared by:**

**Professional Service Industries, Inc.
4421 Harrison Street
Hillside, Illinois 60162**

**PSI Project No.
0417.0423.PCA**

**December 3, 2012**

# 1.0    SUMMARY

| Project Summary | |
|---|---|
| **Client Name** | Lawrence Kadish Real Estate |
| **Project Number** | 0417.0423.PCA |
| **Contract ID, Date** | PSI Proposal No. 0417-81562, signed November 9, 2012 |
| **Project Name** | Former Kmart Store |
| **Current Use or Property Type** | Neighborhood Shopping Center |
| **Address** | 3616 West Kimberly Road |
| **City, County, State, Zip Code** | Davenport, Scott County, Iowa 52801 |
| **Area of Site (acres)** | ±9.69 (per Davenport City Assessor) |
| **Number of Buildings/Area (SF)** | One/±86,448 SF (per Davenport City Assessor) |
| **Number of Stories** | One with mezzanines at storage areas |
| **Subgrade Spaces?** | None |
| **Year(s), First Developed for Current Use** | 1977 (per Davenport City Assessor) |
| **Year(s) Additional Phases** | None |
| **Years Significant Renovations** | Likely various; however, none reported |
| **Current Adjoining Uses: General** | Residential and Commercial |
| **Applicable Building Code(s): Original** | Unknown |
| **Applicable Building Code(s): Current** | 2003 International Building Code |
| **Outstanding Code Violations?** | Information requested from the local building and fire departments was not received in time for this report |
| **Zone** | C-2: General Commercial District |

1



# TABLE OF CONTENTS

| | | |
|---|---|---|
| **1.0** | **SUMMARY** | 1 |
| **2.0** | **USE AND QUALIFICATIONS** | 3 |
| | 2.1  USE BY OTHER PARTIES | 3 |
| | 2.2  STANDARD OF CARE AND WARRANTIES | 3 |
| | 2.3  QUALIFICATIONS | 4 |
| **3.0** | **CONTRACT AND PURPOSE OF SERVICES** | 6 |
| | 3.1  CONTRACT | 6 |
| | 3.2  PURPOSE OF SERVICES | 6 |
| **4.0** | **SCOPE, METHODOLOGY, & RESOURCES** | 7 |
| | 4.1  SCOPE OF SERVICES | 7 |
| | 4.2  METHODOLOGY | 7 |
| | 4.3  RESOURCES | 9 |
| | 4.4  ASSESSMENT LIMITATIONS | 11 |
| | 4.5  SIGNIFICANT ASSUMPTIONS | 12 |
| **5.0** | **SITE DESCRIPTION AND CONDITION** | 13 |
| | 5.1  GENERAL DESCRIPTION | 13 |
| | 5.2  SITE IMPROVEMENTS | 14 |
| | 5.3  STRUCTURE, FOUNDATION, & EXTERIOR WALLS | 15 |
| | 5.4  ROOFING | 16 |
| | 5.5  MECHANICAL, ELECTRICAL, & PLUMBING | 17 |
| | 5.6  VERTICAL TRANSPORTATION SYSTEMS | 17 |
| | 5.7  FIRE, LIFE SAFETY, & SECURITY SYSTEMS | 17 |
| | 5.8  INTERIOR FINISHES | 18 |
| **6.0** | **NON-ASTM SCOPE ASSESSMENTS** | 19 |
| | 6.1  LIMITED DISABLED PERSON ACCESSIBILITY ASSESSMENT | 19 |
| | 6.2  LIMITED MOLD ASSESSMENT | 19 |
| | 6.3  PROBABLE MAXIMUM LOSS ESTIMATE | 20 |

**APPENDICES**
Appendix A    Photographs
Appendix B    Supporting Documentation



Former Kmart Store
Davenport, Iowa
PSI Project No.: 0417.0423.PCA

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

# 2.0     USE AND QUALIFICATIONS

## 2.1     USE BY OTHER PARTIES

This report has been prepared to assist the client in evaluating the condition of various building components at the property referred to in the report.  This report may be relied upon by the client, Lawrence Kadish Real Estate, and its successors and assigns. There are no third party beneficiaries (intended or unintended) to this report, except as expressly stated herein.  This report speaks only as of its date.

This report was prepared pursuant to a contract between PSI and the client. That contractual relationship included an exchange of information about the property that was unique and serves as the basis upon which this report was prepared. Because of the importance of these understandings, our assessment may not be sufficient for the intended purposes of another party.

Reliance or any use of this report by anyone other than those parties identified above, for which it was prepared, is prohibited and therefore not foreseeable to PSI.  Reliance or use by any such third party without explicit authorization in the report does not make said third party a third party beneficiary to PSI's contract with the client.

Any unauthorized reliance on or use of this report, including any of the information or conclusions contained herein, will be at the third party's risk. For the same reasons, no warranties or representations, expressed or implied in this report, are made to any such third party.  Third party reliance letters may be issued upon timely request and payment of the then current fee for such letters**.**  All third parties relying on PSI's report, by such reliance, agree to be bound by PSI's proposal and General Conditions, regardless of the content of the reliance letter itself.

## 2.2     STANDARD OF CARE AND WARRANTIES

PSI performed the Limited Property Condition Assessment (PCA) using methods and procedures and practices generally conforming to ASTM E 2018-08, <u>Standard Guide for Property Condition Assessments: Baseline Property Condition Assessment Process</u>. The guide describes these methodologies as representing good commercial and customary practice for performing a Limited PCA of a parcel of property. Findings and conclusions derived from the methodologies described in the guide contain all of the limitations inherent in the methodologies that are referred to in ASTM E 2018-08. Our field services generally comply with the ASTM guideline although our reporting format has been modified to provide only brief documentation.

PSI warrants that the findings contained in this report have been prepared in general accordance with accepted professional practices at the time of report preparation as applied by similar professionals. Future changes in standards, practices, or regulations cannot be anticipated and have not been addressed.



Former Kmart Store
Davenport, Iowa
PSI Project No.: 0417.0423.PCA

The methodologies include reviewing information provided by other sources. PSI treats information obtained from the record reviews and interviews concerning the property as reliable and the ASTM guide does not require PSI to independently verify the information. Therefore, PSI cannot and does not warrant or guarantee that the information provided by these other sources is accurate or complete.

No other warranties are implied or expressed.

## 2.3    QUALIFICATIONS

Our services were not intended to be technically exhaustive.  There is a possibility that even with proper application of methodologies, conditions may exist on the property that could not be identified within the scope of the assessment(s) or that were not reasonably identifiable from the available information.

Our services and report are not an instrument of professional architectural or engineering service, and PSI did not develop architectural or engineering findings, conclusions or recommendations, nor did PSI verify designs or design capacities.   PSI's observations, opinions, and recommendations have been developed under the time and budgetary constraints inherent in ASTM E 2018-08 and the authorized scope of services.  Our opinions do not warrant or guarantee the performance of any building components or systems or adequacy of design.

In general accordance with ASTM E 2018-08, PSI's report is based on a limited, ground level (except where otherwise explicitly indicated) visual inspection of the property.  PSI did not gain access to all areas, perform any exploratory probing or discovery, perform tests, operate any specific equipment, or take measurements or samples.  The Limited PCA was not a building code, safety, regulatory or environmental compliance inspection.

No Limited PCA can wholly eliminate uncertainty regarding repair and maintenance needs in connection with the property. The Limited PCA was intended to reduce, but not eliminate uncertainty regarding such needs.

The observations and recommendations presented in this report are time dependent, and conditions will change.  This report speaks only as of its date.

As directed by the client, PSI also performed a limited assessment for the presence of visible mold. The assessment did not investigate other biological contaminants in or around any structure, and our service was not designed or intended to prevent or lower the risk of the occurrence of the amplification of the same. The client acknowledges that mold is ubiquitous to the environment with mold amplification occurring when building materials are impacted by moisture. The client further acknowledges that site conditions are outside of PSI's control, and that mold amplification will likely occur, or continue to occur, in the presence of moisture. As such, PSI cannot and shall not be held responsible for the occurrence or recurrence of mold amplification.



E-FILED  2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

Please contact Mr. Daniel Krzeczkowski at (708) 236-0720 ext. 140 with questions you have about this report.

Respectfully Submitted:
**PROFESSIONAL SERVICE INDUSTRIES, INC.**

Daniel Krzeczkowski, PE (IL)
Report Preparer
Principal Consultant

Mark A. Breitner, RRC, RRO
PCR Reviewer
Senior Roof Consultant

Report Date:
December 3, 2012



Former Kmart Store
Davenport, Iowa
PSI Project No.: 0417.0423.PCA

# 3.0     CONTRACT AND PURPOSE OF SERVICES

## 3.1     CONTRACT

| Contract Summary | |
|---|---|
| Client Name | Lawrence Kadish Real Estate |
| Authorizing Person's Name | Ms. Marcella Coffey |
| Authorizing Person's Title | Manager/Client Representative |
| Contract Identification | PSI Proposal No. 0417-81562, dated October 25, 2012 |
| Authorization Date | November 9, 2012 |

## 3.2     PURPOSE OF SERVICES

PSI understands that the client's purpose for having the Limited PCA performed is to conduct a baseline survey of the general physical condition of the improvements located on the subject property. The authorized scope of work includes the assessment of other conditions that are beyond the scope of ASTM E 2018-08.



# 4.0    SCOPE, METHODOLOGY, & RESOURCES

## 4.1    SCOPE OF SERVICES

### 4.1.1    PROPERTY CONDITION ASSESSMENT

PSI performed a Limited Property Condition Assessment of the subject property that generally conforms to the scope and limitations of ASTM Guide E 2018-08.

The assessment included a walk-though survey, records review, and interviews. Our services did not include sampling or testing of any kind.

### 4.1.2    NON-ASTM SCOPE CONSIDERATIONS

PSI assessed other conditions that are beyond the consideration of ASTM E 2018-08. They are tabulated below:

| Non-ASTM Scope Summary | | |
| --- | --- | --- |
| Performed? | | |
| Yes | No | |
| ☒ | ☐ | Disabled Person Access Assessment |
| ☒ | ☐ | Limited Mold Assessment |
| ☐ | ☒ | Probable Maximum Loss Estimation |

## 4.2    METHODOLOGY

### 4.2.1    LIMITED PROPERTY CONDITION ASSESSMENT

The Limited PCA includes:

- Conducting a walk-through survey of readily accessibly portions of the property

- Observing conspicuous conditions

- Researching readily available information relating to the property, and

- Recommending reasonable remedies

**WALK-THROUGH SURVEY**

Mr. Daniel Krzeczkowski, a PSI employee from our Hillside, Illinois office conducted the walk-through survey on November 19, 2012. Our observer was partially escorted by Mr. Bob Hodges, District Facilities Manager and tenant representative for Sears Holdings Management Corporation, during the site visit.

The walk-through survey consisted of observing obvious, easily visible items from the periphery of the property and from accessible adjacent public thoroughfares, as well as representative portions of the property's interior and building systems. These items were conspicuous and patent, and may be observed without intrusion, removal of materials, exploratory probing, use of



Former Kmart Store
Davenport, Iowa
PSI Project No.: 0417.0423.PCA

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

special protective clothing, or use of special equipment.

Visual reconnaissance of adjoining properties was limited to areas and facilities that were readily observable from the subject property or from public access areas. Photographs were taken to document the features observed during the walk-through, where possible.

## RESEARCH

PSI reviewed pertinent portions of practically reviewable documents. In addition, the Limited PCA normally includes interviews with persons knowledgeable about the site. The sources of information that PSI reviewed are listed in the subsequent sections of this report.

## ESTIMATION OF CONDITION

PSI used its experience and judgment to evaluate items observed, and to assign a condition assessment to them. The condition descriptions used in this report are described below:

- Good: Component or system is sound and performing its function. Although it may show signs of normal wear and tear, commensurate with its age, some minor remedial work may be required.

- Fair: Component or system is performing adequately at this time but: exhibits deferred maintenance, evidence of previous repairs, workmanship not in compliance with commonly accepted standards, is obsolete, or is approaching the end of its typical expected useful life. Repair or replacement is required to prevent further deterioration, restore it to good condition, prevent premature failure, or to prolong its remaining useful life. Component or system exhibits an inherent deficiency of which the cost to remedy is not commensurate with the deficiency but that is best remedied by a program of increased preventive maintenance or periodic repairs.

- Poor: Component or system has either failed or cannot be relied upon to continue performing its original function as a result of having realized or exceeded its typical expected useful life, excessive deferred maintenance, a state of disrepair, and inherent design deficiency or workmanship. Present condition could contribute or cause the deterioration of contiguous elements or systems. Repair or replacement is required.

It should be noted that a condition term applied overall to a system does not preclude that a part, section, or component of the system may differ in condition. The items will also be affected by circumstances that occur after the date of the walk-through survey.

## ESTIMATION OF AGE

PSI used information gathered about the property to estimate the Expected Useful Life (EUL) and Remaining Useful Life (RUL) of items observed. The use of these terms in this report is described below:

- Expected Useful Life (EUL): an estimate of the average amount of time, in years, that an item, component or system may function when installed new, assuming routine maintenance is practiced.



E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

- Remaining Useful Life (RUL): a subjective estimate of the number of remaining years that an item, component or system is able to function in accordance with is intended purpose before warranting replacement, based upon observation or average estimates of similar items, components, or systems or a combination thereof.

**ESTIMATION OF QUANTITIES**

PSI used the information gathered to estimate quantities of items or materials exhibiting similar conditions or characteristics. These estimates are not exact and were used to understand the magnitude of the representative conditions.

### 4.2.2   NON-ASTM SCOPE ASSESSMENTS

As requested, the authorized scope of work includes the assessment of other conditions that are beyond the scope of ASTM E 2018-08.  These include the following:

- Limited Disabled Person Accessibility Assessment: The Americans with Disabilities Act, (ADA) is a Federal Law effective on January 26, 1992. The Department of Justice published revised regulations for the ADA in the Federal Register on September 15, 2010.  Compliance with the 2010 ADA Standards for Accessible Design is required for new construction and alterations on or after March 15, 2012.  As defined under Title III of the ADA, existing facilities considered to be "public accommodations" must take steps to remove architectural and communication barriers that are deemed "readily achievable" under the retroactive requirements. This assessment includes a limited review of the "common" exterior path of travel areas of the property. Significant items of non-conformance, if any, were noted without regard as to whether or not they are "readily achievable."  Factors to be considered in determining whether or not an action is readily achievable include the nature and cost of the action, the number of person employees at the subject property and the financial resources available of ownership.  The decision as to which actions are to be undertaken as readily achievable is to be determined by building owner in consultation with its accountants, attorneys and design/construction professionals.  PSI recommends the performance of a full scale ADA survey if additional adaptation is required.

- Limited Mold Assessment: As part of the building walk-through general observations were made for evidence of water/moisture intrusion or damage, water staining or building material dampness, visible mold growth, and evidence of noticeable musty/ mildew odors.

- Probable Maximum Loss Estimate: PSI reviewed available seismic zone maps to evaluate whether the subject property is within a geographical location where there is an elevated probability of damaging ground motion from earthquakes. If the subject property is located within one of these zones, a seismic evaluation of the property would be warranted (generally not reported as part of this PCA, but in a separate document).

## 4.3     RESOURCES

Information sources are listed or referenced in subsequent sections of the report. Our interpretation of that information is discussed in the appropriate sections of this report. Selected



Former Kmart Store
Davenport, Iowa
PSI Project No.: 0417.0423.PCA

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

excerpts of the information obtained are appended.

## 4.3.1   BASIC PROPERTY INFORMATION

Ms. Marcella Coffey, a representative of Lawrence Kadish Real Estate, provided information regarding the size, age, and location of the subject property and instructions regarding access to the subject property. Mr. Bob Hodges the District Facilities Manager for Sears Holdings Management Corporation, the tenant, provided supplemental information regarding the subject property.

## 4.3.2   CLIENT PROVIDED INFORMATION

| Client Provided Information Summary | | | |
|---|---|---|---|
| | Provided/Sent to PSI | | |
| | | Obtained during Walk-Through Survey | |
| Resource | | | Comments |
| Record Construction Drawings | ☐ | ☐ | None provided for review |
| Maintenance Logs | ☐ | ☐ | None provided for review |
| Certificate of Occupancy | ☐ | ☐ | None provided for review |
| Prior Property Condition Report (PCRs) | ☐ | ☐ | None provided for review |
| Building, Fire, Life Safety and Zoning Violations | ☒ | ☐ | Information requested from the local building and fire departments was not received in time for this report |
| Safety inspection records | ☐ | ☐ | None provided for review |
| Appraisal | ☐ | ☐ | None provided for review |
| Warranty Information: Roof | ☐ | ☐ | None provided for review |
| Warranty Information: Boiler, chillers, cooling towers, etc. | ☐ | ☐ | Not applicable |
| Property specific historical repair and replacement cost information | ☐ | ☐ | None provided for review |
| Pending proposals or contracts for material repairs/replacements | ☐ | ☐ | None provided for review |
| ADA accessibility survey | ☐ | ☐ | None provided for review |
| Building rent roll, occupancy percentage, and turnover ratio | ☐ | ☒ | At the time of the site visit, the subject property was vacant (the former tenant was a Kmart store) |
| Marketing and/or Leasing Information | ☐ | ☐ | None provided for review |



E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

PSI was not provided any information regarding the subject property; however, information from the Davenport City Assessor Parcel Records for the subject property was found that shows aspects of the size and shape of the building and the boundaries of the property. Information reported to PSI is incorporated into and discussed in appropriate sections of the report.

### 4.3.3   PRIOR REPORTS

PSI was not provided with any prior property condition reports.

### 4.3.4   INTERVIEWS

PSI interviewed the parties tabulated below during this assessment:

| Interview Summary | | |
|---|---|---|
| **Name** | **Title/Function** | **Affiliation** |
| Ms. Marcella Coffey | Manager/ Client Representative | Lawrence Kadish Real Estate |
| Mr. Bob Hodges | District Facilities Manager/ Tenant Representative | Sears Holdings Management Corporation |
| Mr. Jake Ralfs | Building Inspector | City of Davenport |
| Mr. Lynn Washburn | Fire Chief | Davenport Fire Department |

### 4.3.5   OTHER RESOURCES

Other resources and information accessed for purposes of this site assessment are discussed in corresponding sections of the report. Published sources used to complete this Limited PCA but not previously listed are cited at the point they are referenced.

## 4.4   ASSESSMENT LIMITATIONS

ASTM E 2018-08 sets forth limitations in the assessment process. Limitations to the accuracy and completeness of this report are tabulated as follows:

| Assessment Limitations Summary | | |
|---|---|---|
| Limitation? | | |
| Yes | No | |
| ☒ | ☐ | Access Limitations |
| ☒ | ☐ | Physical Obstructions to Observations |
| ☒ | ☐ | Outstanding Information Requests |

- Access Limitations – Access to the former Garden Center at the west end of the store was not available (doors were locked).



E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

- Physical Obstructions to Observations - Portions of the occupied portions of the area floors, walls, and ceilings were not fully observable due to finishes. Some of the building was poorly lit or unlit, limiting observations.

- Outstanding Information Requests - Information requested from the local building and fire departments was not received in time for this report. If information received from these sources will alter the conclusions of this report, an addendum will be issued.

## 4.5    SIGNIFICANT ASSUMPTIONS

PSI made the following assumptions in developing our findings and conclusions:

- Extrapolation - PSI extrapolated observations and findings actually made to all typical areas or systems of the subject property for the purposes of describing such condition within the report and preparing opinions of probable costs for suggested remedies.

- Regulatory Information - PSI considers all other information obtained from regulatory or enforcement agencies, such as building departments, to be complete, accurate and current.

- Interviews - PSI considers all information provided through interviews to be complete and unbiased.

- Other - None.



Former Kmart Store
Davenport, Iowa
PSI Project No.: 0417.0423.PCA

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

# 5.0    SITE DESCRIPTION AND CONDITION

## 5.1    GENERAL DESCRIPTION

| | |
|---|---|
| **Property Name** | Former Kmart Store |
| **Current Use of Property Type** | Neighborhood Shopping Center |
| **Property Address** | 3616 West Kimberly Road |
| **City, County, State, ZIP Code** | Davenport, Scott County, Iowa 52801 |
| **Area of Site (acres)** | ±9.69 (per Davenport City Assessor) |
| **Number of Buildings/Area (SF)** | One/±86,448 SF (per Davenport City Assessor) |
| **Number of Stories** | One with mezzanines at storage areas |
| **Subgrade Spaces?** | None |
| **First Developed for Current Use** | 1977 (per Davenport City Assessor) |
| **Additional Phases** | None |
| **Significant Renovations** | Likely various; however, none reported |
| **Current Adjoining Uses (General)** | Residential and Commercial |

The subject property is identified as the Former Kmart Store and is located at the northeast corner of the intersection of North Fairmount Street and West Kimberly Road in Davenport, Scott County, Iowa. The subject property is a reported 86,448 square foot neighborhood shopping center comprised of one building (one former tenant). The southeast and southwest adjacent outlot buildings along West Kimberly Road are located on their own pads and are owned separately. There is also a vacant building parcel and associated agricultural land and parking lot adjacent to the subject property to the east that is its own pad and is owned separately. The subject building is a retail building located along the north side of the property. The main parking lot for the subject property is located south of the subject building with some additional parking west of the subject property. The main entrance to the building is along the storefront at the south elevation. The west elevation includes drive-in bays for the former automotive repair area. Receiving is located at an enclosed dock on the north side of the building. The access drives and ingress/egress are shared with the adjacent outlot buildings. The subject property currently includes the following tenant in the building identified as follows:

| Tenant Summary | | |
|---|---|---|
| **Tenant Name** | **Address** | **Area (Square Feet)** |
| Available (former Kmart store) | 3616 West Kimberly Road | 86,448 |

It is understood that the tenant is typically responsible for all interior areas of their leased spaces, as well as the signage and mechanical equipment on the roofs or outside the building. However, since the building is currently vacant, these aspects of the property are included in this assessment.



## 5.2    SITE IMPROVEMENTS

| Item | Condition | Comments |
|---|---|---|
| **5.2.1 Topography** | Good | The subject property occupies a generally irregular shaped parcel of a reported ±9.69 acres. The subject property is generally at grade with the surrounding properties. An approximately 15-foot high berm screens the subject property from the adjacent apartment complex to the north. The developed portion of the subject property generally has a gradual slope from the north downward to the south with an approximately 20 foot difference in elevation across the subject property. No apparent issues. |
| **5.2.2 Landscaping** | Fair | Landscaping is generally limited to some grass around the perimeter of the subject property along the north, south, and west. Some trees cover a portion of the berm along the north boundary and a few isolated areas elsewhere. Minor repairs if necessary are considered a maintenance item and are not included in the cost spreadsheet. No apparent issues. |
| **5.2.3 Site Access** | Good | The property is located on the northwest corner of the intersection of North Fairmount Street and West Kimberly Road. The subject property is generally separated from the intersection by an adjacent outlot parcel (IH Mississippi Valley Credit Union). There are three access points: two along North Fairmount Street at the west boundary and the third at West Kimberly Road at the south boundary of the subject property. None of the access points is signal or stop sign controlled. The property allows shared access with the east, southeast, and southwest adjacent properties. No apparent issues. |
| **5.2.4 Storm Water** | Good | The pavement areas drain via sheet flow to drop inlets. The roofs of the building generally drain via sheet flow to interior roof drains and downspouts. The high roof area at the rear of the building drains to perimeter gutters and downspouts along the inside perimeter onto the lower roof. All appear to discharge directly into the storm water sewer system for the property and eventually into the municipal storm water sewer system. No apparent issues. |
| **5.2.5 Concrete/ Features** | Poor/Fair | Concrete sidewalks are located along the storefront of the building and around the perimeter of the garden center at the west elevation. These connect the asphalt pavement to the main entrances. Concrete stoops or walkways are also located at secondary (rear) entrances. The garden center includes a concrete storage yard enclosed by fencing. A concrete storage pad is located west of the enclosed loading dock outside the north elevation of the subject building. Concrete curb and gutter is located along portions of the perimeter of the asphalt pavement. Site lighting poles are set on concrete piers. A concrete truck well and loading dock are located north of the subject building. The concrete truck-well and approximately half of the north storage pad (former trash compactor area) exhibit severe cracking with displacement. Elsewhere, the concrete site features generally exhibit minor isolated cracking and displacement with repairs considered maintenance items. **Replacement of the truck well (approximately 1,950 SF) plus a portion of the north storage area (approximately 1,050 SF) is anticipated.** |

14



| Item | Condition | Comments |
|------|-----------|----------|
| **5.2.6 Retaining Walls** | Fair | The truck well and loading dock includes a concrete retaining wall. The retaining wall is showing signs of isolated cracking.  Minor repairs if necessary are considered a maintenance item and are not included in the cost spreadsheet. |
| **5.2.7 Fencing** | Fair | An approximately 10'-high chain-link fence encloses the former garden center along the west elevation of the subject building. An approximately 5'-high chain-link fence is located between the soil berm along the north boundary and the north access road. The chain-link fences appear to have some minor damage. Repairs appear necessary, but are considered maintenance items and are not included in the cost spreadsheet. |
| **5.2.8 Signage** | Fair | A metal commercial sign is located along West Kimberly Road. There are signs of previous building-mounted signage (removed) over the tenant space entrance. Signage is a tenant responsibility and is not included in the cost spreadsheet. No apparent issues. |
| **5.2.9 Pavement/ Parking** | Poor/Fair | Access drives and parking areas surround the subject building and are constructed of asphalt pavement.  On-site parking includes approximately 421 surface-level spaces. There appears to be approximately 23,430 SY of asphalt pavement. Most of the pavement appears to be older with various signs of patching, especially at drive areas. The pavement surface and striping appear faded. Much of the parking areas include severe cracking with isolated potholes. **All of the pavement will likely require full depth replacement.** Also, **PSI generally recommends minor crack repair, seal coating and restriping the asphalt pavement at five year intervals.** If properly maintained, asphalt pavement should have an EUL of 25 years.  Parking lot lighting (building and pole-mounted) is original. With an EUL of 25 years, **replacement of the parking lot light poles (approximately 15) is anticipated** during the term. |

## 5.3     STRUCTURE, FOUNDATION, & EXTERIOR WALLS

| Item | Condition | Comments |
|------|-----------|----------|
| **5.3.1 Substructure** | Good | Shallow foundations are likely employed, consisting of reinforced spread footings at wall and column locations. Floor slab construction consists of a concrete slab-on-grade. No apparent issues. |
| **5.3.2 Structure** | Poor/Good | The building generally appears to be constructed of load-bearing masonry (CMU) walls and structural steel framing including bar joists, beams and columns supporting a standard ribbed metal roof deck.  Signs of water infiltration have been detected in the subject building. It is possible that the water infiltration may be corroding the metal roof deck (should be addressed with roof replacement in Section 5.4 Roofing). |
| **5.3.3 Exterior Façade** | Poor/Fair | The exterior walls of the building primarily consist of painted concrete masonry units (CMUs) with an exterior finish and insulation system (EIFS) background wall (with metal panel on the back side) for signage at the entrance canopy. Isolated holes, spalling of the masonry surface, and step cracks in the masonry are apparent throughout the building. The painted surfaces are |

15



| Item | Condition | Comments |
|---|---|---|
| **5.3.3 Exterior Façade (continued)** | Poor/Fair | faded. **PSI generally recommends minor repairs and the re-painting of building exteriors (EIFS and masonry - approximately 21,760 SF) every five to seven years.** Sealant in the control joints is dry and cracked. **Reworking of the sealant (approximately 670 linear feet) is anticipated.** |
| **5.3.4 Windows** | Fair/Good | The storefront windows consist of typical aluminum-framed single-pane glass units. Although older, the window units appear to be functional with replacement likely to be a tenant preference or on an "as needed" basis. No apparent issues. |
| **5.3.5 Doors** | Fair/Good | The storefront doors consist of typical aluminum-framed glass units (single-pane). Interior doors generally consist of steel framed wood or hollow metal doors. Insulated hollow-core metal egress doors with metal frames are located at service entrances. Although much of the doors are older, they appear to be functional with replacement likely to be a tenant preference or on an "as needed" basis. No apparent issues. |

## 5.4    ROOFING

| Item | Condition | Comments |
|---|---|---|
| **5.4.1 Roofing** | Poor/Fair | The main roof systems at the subject building consist of fully adhered single-ply Ethylene Propylene Diene Monomer (EPDM) membrane. All roof membranes appear to be supported over rigid insulation on a steel roof deck. The type and quality of installation of underlying components of the roofing systems could not be determined without intrusive investigation and testing. Access to the roofs is via fixed interior ladder and roof hatch. Signs of significant roof leaks are apparent. The age of the roof systems is generally unknown, but all appear to be circa-1990s. Due to signs of holes in the roof membrane and leaks inside the building, roof deck corrosion is a possibility. Single-ply roof membranes typically have EULs of 15 years. **The need for roof system replacement with some roof deck replacement is anticipated.** |
| **5.4.2 Roof Drainage** | Fair | The low-sloped roofs of the buildings drain via sheet flow to interior drains or to perimeter gutters with downspouts. The downspouts appear to discharge into a subsurface drainage system connected to the site storm water system. An overflow of the perimeter roof edge appears to satisfy secondary drainage. Roof drainage is typically replaced with the roof system (see Section 5.4.1 Roofing). |
| **5.4.3 Roof Accessories** | Fair | The observed rooftop penetrations include mechanical equipment vents, plumbing vents, and curb mounted HVAC equipment. No apparent issues. |
| **5.4.4 Roof Flashing** | Poor/Fair | The roofs are generally flashed with a continuation of the roof membrane terminating beneath a termination bar or a metal coping cap or a metal edge (along the gutter). Equipment curbs have a continuation of the roof membrane under a sheet metal counter-flashing. Pipe penetrations are typically flashed with pre-formed single-ply or elastomeric "boots" or lead sleeves. The roof flashings are typically replaced during re-roofing operations (prices already included, see Section 5.4.1 Roofing). |



## 5.5    MECHANICAL, ELECTRICAL, & PLUMBING

| Item | Condition | Comments |
|---|---|---|
| **5.5.1 Utilities** | Good | Utilities are provided by the following companies: MidAmerican Energy (electric and natural gas), AT&T (telephone), Iowa American Water Co. (potable water) and Davenport Public Works (sewer). No apparent issues. |
| **5.5.2 Mechanical** | Fair | The subject building is typically heated and cooled by rooftop split or package HVAC units (totaling approximately 197.5 tons and dated 1998 or 1999). Supplemental heat for the storage areas in the subject building is provided by approximately four natural gas-fired Sterling or Bryant unit heaters (approximately 50 to 100 MBH/ea. and dated circa-1990s) and a many (approximately 11) natural gas-fired infrared unit heaters. Conditioned air is supplied through sheet metal ducting and ceiling diffusers. With an EUL of 15 years for split and package HVAC units and 20 years for natural gas unit heaters (including infrared unit heaters), **replacement of most mechanical units is anticipated.** |
| **5.5.3 Electrical** | Good | Electricity is fed underground via a pad-mounted transformer located outside the north elevation of the building. The building is provided 800-amp, 208Y/120-volt and 1200-amp 277Y/480-volt, three-phase, four-wire service. No apparent issues. |
| **5.5.4 Plumbing** | Fair/Good | Domestic water piping is copper. Waste lines appear to be cast iron. The plumbing fixtures for restroom areas are of typical commercial grade vitreous china with associated hardware (where finished). The hardware is metal. A leaking sink was discovered during the site visit and reportedly repaired. No apparent issues. |
| **5.5.5 Domestic Water Heaters** | Fair | The tenant space has electric a natural gas-fired domestic water heater with circulation pump. The 2003 unit has a 50-gallon capacity. With an EUL of 10 years, **replacement of the domestic water heater is anticipated.** |
| **5.5.6 Other** | N/A | None apparent. |

## 5.6    VERTICAL TRANSPORTATION SYSTEMS

| Item | Condition | Comments |
|---|---|---|
| **5.6.1 Elevators** | N/A | None apparent. |
| **5.6.2 Escalators** | N/A | None apparent. |
| **5.6.3 Other** | N/A | None apparent. |

## 5.7    FIRE, LIFE SAFETY, & SECURITY SYSTEMS

| Item | Condition | Comments |
|---|---|---|
| **5.7.1 Fire Suppression** | Poor/Fair | The subject building is serviced by a wet-type fire sprinkler system that is provided water pressure from the local water utility. Automatic appears to be the manufacturer of the fire sprinkler heads. Fire extinguishers are mounted throughout the building Fire hydrants are located around the perimeter of the subject |



E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

| Item | Condition | Comments |
|------|-----------|----------|
| **5.7.1 Fire Suppression (continued)** | Poor/Fair | property. Tenants are typically responsible for fire extinguisher and sprinkler system inspections. Fire sprinkler inspections do not appear to be current; however, the fire extinguishers do appear to be current. **The fire sprinkler inspection will need to be updated as an immediate need.** The Davenport Fire Department did not respond in time for this report.<br><br>Please note that on July 19, 2001 the Consumer Product Safety Commission in conjunction with various sprinkler manufactures issued a "Voluntary Recall" of some 35 million sprinkler heads. PSI has not determined whether the particular sprinkler heads involved in this recall are located in the subject facility, but does recommend further investigation by the building owner. Information in regards to the specifics about the recall can be reviewed at the web site www.sprinklerreplacement.com. This information should be reviewed in conjunction with the owner's specifications and warranty information. This recall does provide for all cost associated with materials and labor for new head installation. Therefore, no costs are associated with this item. |
| **5.7.2 Life Safety** | Fair/Good | Lighted exit signs, smoke detectors, emergency lights, pull stations, and alarms are located in the subject building. The building has a Bosch fire alarm panel that appears to have been installed within the last five years (fire alarm panels have an EUL of 20 years). Life safety systems appear to be hard wired with battery back-up. Maintenance and repair of most life safety systems is reported to be a tenant expense and will be performed "as needed." This is not included in the cost spreadsheet. No apparent issues. |
| **5.7.3 Security** | Good | No security systems were observed. |
| **5.7.4 Other** | N/A | None apparent. |

## 5.8    INTERIOR FINISHES

| Item | Condition | Comments |
|------|-----------|----------|
| **5.8.1 Interior Finishes** | Poor/Fair | The interior finishes of the building includes painted gypsum wallboard, incandescent and fluorescent lighting, drop in ceiling tiles and a combination of flooring, including ceramic tile, vinyl and carpet floor coverings. Storage areas are typically exposed structure. Interior finishes such as **ceiling and floor tiles in the sales and office areas will likely require replacement**. |
| **5.8.2 Other** | N/A | None apparent. |



Former Kmart Store
Davenport, Iowa
PSI Project No.: 0417.0423.PCA

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

# 6.0    NON-ASTM SCOPE ASSESSMENTS

## 6.1    LIMITED DISABLED PERSON ACCESSIBILITY ASSESSMENT

| Item | Condition | Comments |
|---|---|---|
| **6.1.1 Tenant Space Entrances** | Good | The tenant space entrances and the sidewalks leading to them are generally wide enough to accommodate access. No apparent issues. |
| **6.1.2 Curb Ramps** | Good | The sidewalks are ramped from the pavement area parking spaces. No apparent issues. |
| **6.1.3 Restrooms** | Fair | The building was constructed prior to ADA requirements and some elements of the building are not accessible. Some restrooms exhibited elements of ADA guidelines, but not all were fully accessible. Adaptation of the restrooms to full ADA requirements would likely be required during any future renovation or employee needs. Costs for interior renovation are reportedly a tenant responsibility and are not included in the cost spreadsheet. No apparent issues. |
| **6.1.4 Parking** | Poor | Based on parking counts, the subject property includes approximately 421 total parking spaces. Based on this amount of parking, the facility is required to have nine ADA parking spaces with two of these spaces meeting "Van Accessible" guidelines. Currently the site has 12 marked ADA parking spaces; however, none of these spaces is designated as "Van Accessible," two of the spaces do not have appropriate signage, and all are faded. **Replace missing signage at two of the existing ADA spaces. Convert two ADA spaces to meet "Van Accessible" guidelines.** |
| **6.1.5 Other** | N/A | None apparent. |

## 6.2    LIMITED MOLD ASSESSMENT

| Item | Condition | Comments |
|---|---|---|
| **6.2.1 Limited Mold Assessment** | Poor | Management did not report any current areas of known microbial growth or mold; however, water/moisture intrusion was identified at various locations throughout the building (water-stained or damaged ceiling tiles). Musty or stale odors were not present during our observations. **PSI recommends removal and replacement of the water damaged finish materials.** These porous building materials generally include ceiling tiles and gypsum wallboard in the affected area. Since there may be a potential for fungal growth within the wall cavities, **any materials that cannot be removed should be thoroughly cleaned and disinfected.** Cleaning and disinfecting may be performed using commercially available products according to manufacturer's recommendations.

It is recommended that removal and cleaning of water-damaged materials be performed by qualified and trained individuals in accordance with recommended work practices. Recommended work practices may be referenced in the Institute of Inspection |



Former Kmart Store
Davenport, Iowa
PSI Project No.: 0417.0423.PCA

| Item | Condition | Comments |
|------|-----------|----------|
| **6.2.1 Limited Mold Assessment (continued)** | Poor | Cleaning and Restoration document entitled, IICRCS500 Standard and Reference Guide for Professional Water Damage Restoration. These repairs and cleaning are considered maintenance items and are not included in the cost spreadsheet. |
| **6.2.2 Other** | N/A | None apparent. |

## 6.3     PROBABLE MAXIMUM LOSS ESTIMATE

| Item | Condition | Comments |
|------|-----------|----------|
| **6.3.1 PML Estimate** | N/A | PSI did not perform a seismic evaluation of the property because it is not located in Zones 3 or 4 as defined by the Uniform Building Code (1997) or categories D, E, or F of the International Building Code (2000). The property is not located in a geographical location where there is an elevated probability of damaging ground motion from earthquakes. No apparent issues. |
| **6.3.2 Other** | N/A | None apparent. |



Former Kmart Store
Davenport, Iowa
PSI Project No.: 0417.0423.PCA

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

**PSI**
*To Build On*
Engineering • Consulting • Testing

December 3, 2012

Lawrence Kadish Real Estate
135 Jericho Turnpike
Old Westbury, NY 11568

Attn:  Charles Kadish

Re:   Phase I Environmental Site Assessment Services
      Kmart
      3616 W. Kimberly Road
      Davenport, Iowa
      PSI Project No.: 0417423

Mr. Kadish,

In accordance with our agreement dated November 9, 2012, Professional Service Industries, Inc. (PSI), has performed a Phase I Environmental Site Assessment of the above referenced property.  Please find one (1) copy of the final report enclosed.

Thank you for choosing PSI as your consultant for this project.  If you have any questions, or if we can be of additional service, please call us at 708.236.0720.

Respectfully submitted,

PROFESSIONAL SERVICE INDUSTRIES, INC.

Jeff  Goeden
Project Manager

Enclosures

EXHIBIT   11

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT



**Phase I Environmental
Site Assessment Report**

**of**

**Kmart**

**3616 W. Kimberly Road
Davenport, Iowa 52801**

**Prepared For:**

**Lawrence Kadish Real Estate
135 Jericho Turnpike
Old Westbury, NY 11568**

**Prepared By:**

**Professional Service Industries, Inc.
4421 Harrison Street
Hillside, Illinois 60162**

**PSI Project No.
0417423**

**Report Date: 11/30/2012**

# TABLE OF CONTENTS

General Information..................................................................................................1

1 Findings and Conclusions.................................................................................2
   1.1 Phase I ESA................................................................................................2
   1.2 Recommendations......................................................................................3

2 Introduction.........................................................................................................4
   2.1 Contract.......................................................................................................4
   2.2 Purpose of Services....................................................................................4
   2.3 Standard of Care and Warranties...............................................................4
   2.4 Reliance.......................................................................................................5
   2.5 Use By Other Parties...................................................................................5

3 Phase I ESA Scope and Methodology...............................................................6
   3.1 Phase I ESA................................................................................................6
   3.2 Limitations, Exceptions, Deviations and Data Gap....................................8
   3.3 Significant Assumptions..............................................................................8

4 User-Provided Information.................................................................................9
   4.1 User's Responsibilities.................................................................................9
   4.2 Suggested Information.................................................................................9
   4.3 Helpful Documents.......................................................................................9
   4.4 Proceedings.................................................................................................9

5 Subject Property Usage....................................................................................10
   5.1 Physical Setting.........................................................................................10
   5.2 Description and Current Uses.....................................................................10
   5.3 Past Uses...................................................................................................13

6 Adjoining and Surrounding Property Usage...................................................14
   6.1 Description and Current Uses.....................................................................14
   6.2 Past Uses...................................................................................................16

7 Environmental Regulatory Records Review....................................................18
   7.1 Database Findings......................................................................................18
   7.2 Other Regulatory Information......................................................................18

8 Interviews...........................................................................................................20

E-FILED 2015 JUN 01 4:25 PM SCOTT - CLERK OF DISTRICT COURT

# TABLE OF CONTENTS

**Appendices**

    Figures

    Photographs

    Environmental Database Report

    User Questionnaire Responses

    Historical Research Documentation

    Interview Documentation

    Data Gap Worksheet

    Personnel Qualifications

    Supplemental Documentation

Report Phase I Environmental Site Assessment                                    11/30/2012
PSI Project 0417423

# GENERAL INFORMATION

**Project Information:**
Kmart
**Project Number:** 0417423

**Consultant Information:**
PSI
4421 Harrison Street
Hillside, Illinois 60162
**Phone:**       708.236.0720
**Fax:**         708.236.0721
**E-mail Address:** jeffrey.goeden@psiusa.com
**Inspection Date:** 11/19/2012
**Report Date:**    11/30/2012

**Site Information:**
Kmart
3616 W. Kimberly Road
Davenport, Iowa 52801
County:   Scott
**Latitude, Longitude:**    41.562200, -90.628300
**Site Access Contact:**    Charles Kadish

**Client Information:**
Lawrence Kadish Real Estate
Charles Kadish
135 Jericho Turnpike
Old Westbury, NY 11568
**Contract/Proposal#:**     0417-81562
**Authorization Date:**     11/09/2012
**Authorization Party:**    Charles Kadish

**Site Assessor:**

Jeff Goeden
Project Manager

**Environmental Professional:**

Jeff Goeden
Project Manager

**Principal Consultant:**

Scott J. Dahlgren
Senior Consultant

**Certifications:**

I declare that, to the best of my professional knowledge and belief, I meet the definition of Environmental Professional as defined in 312.10 of this part.  I have the specific qualifications based on education, training, and experience to assess a property of the nature, history, and setting of the subject property.  I have developed and performed the all appropriate inquiries in conformance with the standards and practices set forth in 40 CFR Part 312.

Jeff Goeden - Project Manager



# 1 FINDINGS AND CONCLUSIONS

Professional Service Industries, Inc. (PSI) performed a Phase I Environmental Site Assessment (Phase I ESA) of the property at 3616 W. Kimberly Road, Davenport, Iowa 52801. The assessment included a Phase I ESA. PSI performed the assessment to comply with the contract between Lawrence Kadish Real Estate and PSI. The report should be read in its entirety to obtain a more complete understanding of the information provided and to aid in any decisions made or actions taken based on this information.

The subject property is approximately 9.86 acres and is developed with a 84,648 square foot commercial structure and associated parking lot and landscaped areas. The subject property was originally developed around 1978. The property is currently vacant and was previously developed as a Kmart retail store. This Kmart store also had a Penske Automotive facility located within the structure.

Current uses of the adjoining properties include apartment structures to the north, IH Mississippi Valley Credit Union and a strip mall and Highway 6 followed by grass outlots and a strip mall to the south, Fairmount Street followed by agricultural land to the west, and a grass lot and parking lot followed by a vacant grass lot to the east.

## 1.1 PHASE I ESA

### 1.1.1 Significant Data Gaps

Based on our experience, the information that we gathered and evaluated did not present significant data gaps that affected our ability to identify recognized environmental conditions (RECs) in connection with the subject property.

### 1.1.2 Historic Recognized Environmental Conditions

This assessment has revealed no evidence of historical recognized environmental conditions in connection with the subject property.

### 1.1.3 Recognized Environmental Conditions

PSI performed a Phase I Environmental Site Assessment of the subject property in conformance with the scope and limitations of ASTM Practice E 1527-05. Any exceptions to or deletions from this practice are described in Section 3.2 of this report. This assessment has revealed no evidence of recognized environmental conditions in connection with the property, except for the following:

**On-Site Conditions**

- The subject property previously had a Penske Automotive center present on the subject property. This area is currently vacant. PSI observed what appeared to be underground reservoir tanks for hydraulic lifts and a triple trap remaining in this area. Automotive centers typically generate hazardous waste in the form of waste oil and other waste automotive fluids as well as handle and store some amount of hazardous materials such as motor oil, antifreeze, paint, solvents, and other grease and oils. The historical use of this area as an automotive center is considered evidence of a recognized environmental condition in connection with the subject property at this time.
- The subject property previously had a UST present. The UST was reported as being removed in 1997. However, no documentation of the UST closure or confirmation sampling results were available for PSI's review and therefore it is unknown if there were any leaks associated with this UST. This former UST is considered evidence of a recognized environmental condition in connection with the subject property at this time.

**Off-Site Conditions**

- None were identified at this time.

# 1.2 RECOMMENDATIONS

Based on the information that PSI gathered and our experience, PSI recommends the following:

- Completion of a Phase II Environmental Site Assessment to investigate potential soil and groundwater contamination that may be present due to the REC(s) identified in this report.

# 2 INTRODUCTION

## 2.1 CONTRACT

The contract between PSI and its client is summarized in the General Information section of this report.

PSI considers the client to be the 'User' of our assessment, defined in ASTM Practice E 1527 as:

"the party seeking to use ASTM E 1527 to complete an environmental site assessment of the property. A user may include, without limitation, a potential purchaser of property, a potential tenant of property, an owner of property, a lender, or a property manager. The user has specific obligations for completing a successful application of this practice...."

## 2.2 PURPOSE OF SERVICES

PSI performed the Phase I ESA in conformance with ASTM E 1527-05, Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process (the Practice).  The purpose of the Practice was to define good commercial practice for conducting an environmental site assessment and as such, the Practice is intended to permit the user to satisfy one of the requirements to qualify for the Landowner Liability Protections (LLPs).  The goal of the processes established by the Practice is to identify RECs in connection with the property.

Based on the information provided, PSI understands that your purpose for having the Phase I ESA performed is to satisfy one of the LLPs.

## 2.3 STANDARD OF CARE AND WARRANTIES

Our services were not intended to be technically exhaustive. There is a possibility that with the proper application of methodologies, conditions may exist on the property that could not be identified within the scope of the assessment(s) or that were not reasonably identifiable from the available information.

No ESA can wholly eliminate uncertainty regarding the potential for RECs in connection with the property. The ESA was intended to reduce, but not eliminate uncertainty regarding the potential for RECs in connection with a property.

Our report is based on commonly known and reasonably ascertainable information, including limited, ground-level visual inspection of the property except where otherwise explicitly indicated, in conformance with ASTM E 1527-05. Findings and conclusions derived from the methodologies described in the Practice contain all of the inherent limitations in the methodologies that are referred to in the Practice.

PSI did not perform any exploratory probing or discovery, perform tests, operate any specific equipment, or take measurements or samples to perform the ESA scope. The ESA was not a building code, safety, regulatory or environmental compliance inspection. The ESA is not intended to reduce the risk of the presence of mold and physical deficiencies conducive to mold nor the risk that mold or physical deficiencies conducive to mold may pose to the buildings and building occupants.

The methodologies include reviewing information provided by other sources. PSI treats information obtained from the record reviews and interviews concerning the property as reliable and the ASTM protocol does not require PSI to independently verify the information. Therefore, PSI cannot and does not warrant or guarantee that the information provided by these other sources is accurate or complete.

E-FILED 2015 JUN 01 4:29 PM SCOTT - CLERK OF DISTRICT COURT

PSI has performed the services in a manner consistent with that level of care and skill ordinarily exercised by other members of our profession currently practicing in the same locality and under similar conditions, within the limitations of ASTM E 1527-05 standard, the All Appropriate Inquires Rule established by the U.S. Environmental Protection Agency (40 C.F.R. Part 312). No other warranties are implied or expressed.

The observations and recommendations presented in this report are time dependent, and conditions will change. This report speaks only as of its date.

## 2.4 RELIANCE

Lawrence Kadish Real Estate, PSI's client, may rely on this report.

## 2.5 USE BY OTHER PARTIES

This report was prepared pursuant to a contract between PSI and its client. That contractual relationship included an exchange of information about the property that was unique and serves as the basis upon which this report was prepared. Because of the importance of these understandings, our assessment may not be sufficient for the intended purposes of another party.

Reliance or any use of this report by anyone other than those parties identified above for which it was prepared, except with express written permission, is prohibited and therefore not foreseeable to PSI. Any unauthorized reliance on or use of this report, including any of the information or conclusions contained herein, will be at the third party's risk. No warranties or representations expressed or implied in this report are made to any such third party.

Third party reliance letters may be issued upon timely request and payment of the then-current fee for such letters. All third parties relying on our report, by such reliance, agree that such reliance is limited by our proposal and General Conditions.

# 3 PHASE I ESA SCOPE AND METHODOLOGY

PSI performed a Phase I ESA of the subject property.  The scope of our services and general methodology is presented below.

The information sources that PSI used, including published material, material obtained from commercial and other sources, is listed below and cited as it is presented in the report.  The information or excerpts thereof is appended.

## 3.1 PHASE I ESA

The assessment included four components:

- Records review;
- Reconnaissance;
- Interviews; and,
- Preparation of this report, including our evaluation.

### Physical Setting Sources

PSI reviewed United States Geological Survey (USGS) topographic (topo) maps and other information regarding the physical setting of the subject property to assist with the interpretation of subsurface water movement near the subject property.

**Summary**

| Source Name | Year Published/Issued |
|---|---|
| USGS 30 Minute Topographic Map - Rock Island, IL | 1901 |
| USGS 15 Minute Topographic Map - Davenport | 1894 |
| USGS 7.5 Minute Topographic Map - Davenport West | 1953, 1970, 1975, 1991 |
| United States Department of Agriculture (USDA) Web Soil Survey | Current |

### Environmental Regulatory Database Information

PSI retained Environmental Data Resources, Inc. (EDR) to provide environmental database information attributed to the site and its surroundings.  EDR obtains environmental databases published by local, state, tribal, and federal agencies and maps the information for electronic searches.  EDR's service includes reporting Standard Environmental Records Sources and, in most cases, some Additional Environmental Records Sources.

The search was performed to Approximate Minimum Search Distances (AMSD) listed in ASTM E 1527-05.

Unmappable (orphan) sites (if any were listed) having insufficient address information to be mapped were evaluated for potential location within the AMSD.  Those that could be determined to be within the AMSD are discussed in Section 7 of the report.

### Other Regulatory Information

PSI submitted requests under the Freedom of Information Act (FOIA) to the agencies tabulated below.

**Summary**

| Response? | Agency |
|---|---|
| Yes | Village of Davenport |
| No | Davenport Fire Department |

Note: Response status based on date of report.

## Historical Use Information

PSI used USGS topo maps and retained EDR to provide information about the history of the subject property and its surroundings. PSI referenced the following historical sources:

**Summary**

| Source Type | Years Reviewed | Source |
|---|---|---|
| USGS Topographic Maps | 1894, 1901, 1953, 1970, 1975, 1991 | USGS/EDR |
| Aerial Photographs | 1937, 1951, 1963, 1978, 1982, 1994, 2005, 2006, 2007, 2008 | EDR |
| City Directories | 1954, 1964, 1970, 1975, 1981, 1987, 1994, 2001, 2007, 2013 | EDR |
| Fire Insurance Maps | No Coverage Letter | EDR |

## Recorded Land Title Records

PSI did not review land title records to obtain information about the current and past owners of the subject property and past uses and tenancies.

### User-Provided Information: Liens, AULs and Other Information

The Practice requires that the User provide information about Environmental [Cleanup] Liens and Activity and Use Limitations (AULs) currently recorded against the property and indicates that the User should engage a title company to do the review or negotiate such engagement as an addition to the environmental professional's (EP) services.   In addition, the Practice suggests that the User provide the EP with certain other information about the property and the reason for the Phase I ESA.

PSI sent a questionnaire to the client requesting this information. The questionnaire/response is appended.

## Helpful Documents and Proceedings

The Practice requires that the environmental professional ask the property owner, the key site manager (if any is identified), and the User for certain helpful documents about the property and certain legal proceedings involving hazardous substances and the subject property.

PSI sent questionnaires requesting this information.  The questionnaires/responses documenting the persons we corresponded with are appended.

## 3.1.1 Reconnaissance

The ground reconnaissance consisted of observing the periphery of the subject property and viewing the subject property from accessible adjacent public access areas.  Visual reconnaissance of adjoining properties was limited to areas and facilities that were readily observable from the subject property or from public access areas.  PSI photodocumented selected features.

Mr. Bob Hodges of Sears Holdings, granted PSI access to the subject property. Our assessor was unescorted during the site reconnaissance.

PSI systematically toured interior portions of the subject property to provide an overlapping field of view. The peripheries of structures, where present on the subject property, were observed along with accessible interior common areas, maintenance/repair areas, and a representative number of occupant spaces.

### 3.1.2 Interviews

PSI made reasonable attempts to interview selected persons having knowledge of the uses and conditions of the subject property, past and present. A list of the persons that PSI interviewed or attempted to interview is presented in Section 8.

## 3.2 LIMITATIONS, EXCEPTIONS, DEVIATIONS AND DATA GAP

PSI considers that limitations, exceptions, and deviations from the Practice manifest as a lack of or inability to obtain information required by the Practice. This represents the definition of the 'data gap' contained in the Practice.

PSI listed the component objectives of the Practice on the appended Data Gap Worksheet and tracked the information obtained against the objectives. Therefore the limitations, exceptions and deviations are identified in the Worksheet.

In general, when required information was incomplete, not provided, otherwise not obtained, or indicated a need for additional information, PSI attempted to use information from other sources to meet the Practices' performance objectives. When the data gaps affected the Environmental Professional's ability to identify RECs, PSI considered the data gap(s) to be significant. PSI identified significant data gaps (if any) in the Data Gap Worksheet and reported them in Section 1.1.1.

## 3.3 SIGNIFICANT ASSUMPTIONS

PSI made the following assumptions in developing our Phase I ESA findings and conclusions:

• Regulatory Agency Information - PSI considers all information provided by our environmental database subcontractor regarding regulatory status of facilities to be complete, accurate, and current.
• Other Regulatory Information - PSI considers all information obtained from regulatory or enforcement agencies to be complete, accurate, and current.
• Title, Lien and AUL Information - PSI considers all information provided by real estate title record review firms regarding property use or ownership, encumbrances or other limitations to be complete, accurate and current.
• Interviews - PSI considers all information provided through interviews to be complete, unbiased and provided in good faith.

PSI interpreted and inferred the direction of the shallow groundwater movement based on the information we obtained and our experience. Actual groundwater flow may be locally influenced by many factors beyond the scope of this assessment. Subsurface investigation would be necessary to determine site-specific groundwater flow direction.

E-FILED 2015 JUN 01 4:23 PM SCOTT - CLERK OF DISTRICT COURT

# 4 USER-PROVIDED INFORMATION

## 4.1 USER'S RESPONSIBILITIES

### 4.1.1 Environmental Cleanup Liens

The client returned PSI's questionnaire indicating 'No' to the question: "Are you aware of any environmental cleanup liens against the property that are filed under federal, tribal, state or local law?"  The client did not provide supporting documentation.

### 4.1.2 AULS

The client returned PSI's questionnaire indicating 'No' to the question: "Are you aware of any AULs ... recorded against the property that are filed under federal, tribal, state or local law?" The client did not provide supporting documentation.

## 4.2 SUGGESTED INFORMATION

The client provided PSI with the following suggested information described by the Practice.

- The type of property and type of property transaction.
- The complete and correct address for the property.
- The scope of services desired for the Phase I ESA.
- Identification of all parties who will rely on the Phase I ESA report.
- Identification of the site contact and how the contact can be reached.

## 4.3 HELPFUL DOCUMENTS

PSI was not provided with other documentation about the subject property.

## 4.4 PROCEEDINGS

The client returned PSI's questionnaire indicating 'No' to the question: "Pursuant to ASTM E 1527-05 Section 10.9, as the user of this ESA do you know of (1) any pending, threatened, or past litigation relevant to hazardous substances or petroleum products in, on, or from the property; (2) any pending, threatened, or past administrative proceedings relevant to hazardous substances or petroleum products in, on, or from the property; and (3) any notices from any governmental entity regarding any possible violation of environmental laws or possible liability relating to hazardous substances or petroleum products?"

# 5 SUBJECT PROPERTY USAGE

The location and approximate boundaries of the property are illustrated on the appended figures.  The legal description of the property, if provided to PSI, is appended.

## 5.1 PHYSICAL SETTING

Based on our interpretation of the physical setting sources and our experience, PSI infers that the shallowest groundwater:

- Moves towards the southeast.
- Other characteristics are indeterminate using the qualitative data that PSI has, and therefore we are unable to infer its depth.

Information about the physical setting of the subject property is tabulated below.

Summary

| Nominal Elevations, (ft, MSL) | Approximately 715 feet. |
|---|---|
| Surface Topo Characteristics | The general slope in the area of the subject property is to the southeast. |
| General Soil Type, Slopes | The soil in the general vicinity of the subject property is classified as Tama silt loam, orthents, loamy, and urban land soils.  Most of the site is classified as urban land and orthents, loamy soils, which consists primarily of fill material for site development.  A small area of the subject property is listed as having Tama silty clay loams present.  This soil is known to have 5 to 9 percent slopes and a moderate permeability level. |
| Does EDR Map a Floodplain On-Site? | No floodplains are mapped on the subject property. |
| On-Site Water Bodies | No water bodies were observed on the subject property. |
| Off-Site Water Bodies | No water bodies were observed on the adjoining properties. |

Note: MSL means Mean Sea Level

## 5.2 DESCRIPTION AND CURRENT USES

The subject property is approximately 9.86 acres and is developed with a 84,648 square foot commercial structure and associated parking lot and landscaped areas. The subject property was originally developed in 1977. The property is currently vacant and was previously developed as a Kmart retail store. This Kmart store also had a Penske Automotive facility located within the structure.

### 5.2.1 Interior and Exterior Observations

A summary of uses and conditions is tabulated below.  Detailed information is discussed following the summary along with an opinion about the significance of the listing.

Summary

| Identified? | Item |
|---|---|
| Yes | Hazardous Substances |
| No | Petroleum Products |
| Yes | Aboveground or Underground Storage Tanks (ASTs/USTs) |
| No | Drums |

FILED 2015 JUN 01 4:25 PM SCOTT - CLERK OF DISTRICT COURT

Report for Phase I Environmental Site Assessment                    11/30/2012
PSI Project 0417423

| Identified? | Item |
|---|---|
| No | Suspect Containers Not Necessarily In Connection with Identified Uses |
| Yes | Electrical or Mechanical Equip. Suspected to Contain PCBs |
| No | Wastewater Discharges |
| No | Septic or Sewage Tanks |
| No | Drains or Sumps |
| No | Interior Stains or Corrosion |
| Yes | Stained Soil or Pavement |
| No | Pits, Ponds, or Lagoons |
| No | Pools of Liquid or Standing Water |
| No | Solid Waste Dumping/Landfills/Suspect Fill Material |
| No | Stressed Vegetation |
| No | Drinking Water Wells |
| No | Irrigation Wells |
| No | Monitoring Wells |
| No | Odors |
| No | Other Uses or Conditions of Concern |

## Hazardous Substances

PSI observed what appeared to be underground reservoir tanks for hydraulic lifts and a triple trap remaining in this area. Automotive centers typically generate hazardous waste in the form of waste oil and other waste automotive fluids as well as handle and store some amount of hazardous materials such as motor oil, antifreeze, paint, solvents, and other grease and oils. The historical use of this area as an automotive center is considered evidence of a recognized environmental condition in connection with the subject property at this time.

## Petroleum Products

PSI did not observe indications of significant quantities of petroleum products at the subject property.

## Aboveground or Underground Storage Tanks (ASTs/USTs)

A vent pipe was observed on the southwest corner of the subject property. The subject property previously had a UST present. The UST was reported as being removed in 1997. However, no documentation of the UST closure or confirmation sampling results were available for PSI's review and therefore it is unknown if there were any leaks associated with this UST. This former UST is considered evidence of a recognized environmental condition in connection with the subject property at this time.

## Drums

PSI did not observe drums at the subject property.

## Suspect Containers Not Necessarily In Connection with Identified Uses

PSI did not observe suspect containers at the subject property.

## Electrical or Mechanical Equip. Suspected to Contain PCBs

A pad-mounted transformer was observed on the subject property. This transformer appeared to be in fair to good condition and no apparent leaks or staining was observed around this transformer. Based on this information, this transformer is not considered evidence of a recognized environmental condition in connection with the subject property at this time.

FILED 2015 JUN 01 4:28 PM SCOTT - CLERK OF DISTRICT COURT

## Wastewater Discharges

PSI did not observe indications of wastewater discharges, other than domestic sewage, at the subject property.

## Septic or Sewage Tanks

PSI did not observe indications of the use of septic or sewage tanks at the subject property.

## Drains or Sumps

PSI did not observe drains or sumps at the subject property.

## Interior Stains or Corrosion

PSI did not observe significant stains or corrosion at the subject property.

## Stained Soil Or Pavement

PSI identified areas of minor staining of pavement on the paved parking area located on the subject property. The stains appear to be the result of leakage of automobile fluids and not the result of a large scale spill. PSI considers the presence of the staining a de minimis condition and, by definition, not a REC in connection with the subject property.

## Pits, Ponds, Or Lagoons

PSI did not observe indications of pits, ponds, or lagoons at the subject property.

## Pools of Liquid Or Standing Water

PSI did not observe indications of pools of liquid or standing water at the subject property.

## Solid Waste Dumping, Landfills, Or Suspect Fill Material

PSI did not observe indications of solid waste dumping, landfills, or suspect fill materials at the subject property.

## Stressed Vegetation

PSI did not observe stressed vegetation at the subject property.

## Wells

PSI did not observe wells at the subject property.

## Odors

PSI did not note odors at the subject property.

E-FILED 2015 JUN 01 4:29 PM SCOTT - CLERK OF DISTRICT COURT

**Other Uses or Conditions of Concern**

PSI did not observe other uses of the subject property or special conditions of concern at the subject property.

## 5.2.2 Utilities

Utility systems identified at the subject property are summarized below:

- The facility heating, ventilating and air conditioning (HVAC) system is located on the roof. The system is fueled by electricity and natural gas provided by MidAmerican Energy.
- Sewage disposal at the subject property is provided through the City of Davenport.
- Potable water at the subject property is obtained through Iowa-American Water.

# 5.3 PAST USES

Our interpretation of the past uses of the property is tabulated below.

**Summary**

| Year(s) | Interpreted Property use |
|---|---|
| 1894 - 1901 | Uses of the property could not be determined from the topographic maps reviewed. |
| 1937 - 1978 | Based on the aerial photographs and topographic maps reviewed, this property appeared to be agricultural land and have a farmstead present. |
| 1981 - 2008 | Based on the aerial photographs, topographic maps, and city directories reviewed, this property was developed as a Kmart. |
| 2012 | Based on the city directory reviewed, this property was listed as having a Jackson Hewitt Tax Service office present. |

The subject property previously had a Penske Automotive center present in the Kmart. This area is currently vacant. PSI observed what appeared to be underground reservoir tanks for hydraulic lifts and a triple trap remaining in this area. Automotive centers typically generate hazardous waste in the form of waste oil and other waste automotive fluids as well as handle and store some amount of hazardous materials such as motor oil, antifreeze, paint, solvents, and other grease and oils. The historical use of this area as an automotive center is considered evidence of a recognized environmental condition in connection with the subject property at this time.

# 6 ADJOINING AND SURROUNDING PROPERTY USAGE
# 6.1 DESCRIPTION AND CURRENT USES

Our interpretation of the uses of the adjoining and surrounding property is tabulated below and detailed in the subsequent sections.

Summary

| Direction | Interpreted Property Use |
|---|---|
| North | Apartment structures to the north. |
| South | IH Mississippi Valley Credit Union and a strip mall and Highway 6 followed by grass outlots and a strip mall to the south. |
| East | A grass lot and parking lot followed by a vacant grass lot to the east. |
| West | Fairmount Street followed by agricultural land to the west. |

## 6.1.1 Interior and Exterior Observations

A summary of our interpretation of the current and past uses and conditions of adjoining and surrounding property based on historical records and observations is provided below.

Summary

| Identified? | Item |
|---|---|
| No | Hazardous Substances |
| No | Petroleum Products |
| No | Aboveground or Underground Storage Tanks (ASTs/USTs) |
| No | Drums |
| No | Suspect Containers Not Necessarily In Connection with Identified Uses |
| Yes | Electrical or Mechanical Equip. Suspected to Contain PCBs |
| No | Wastewater Discharges |
| No | Septic or Sewage Tanks |
| No | Drains or Sumps |
| No | Interior Stains or Corrosion |
| Yes | Stained Soil or Pavement |
| No | Pits, Ponds, or Lagoons |
| No | Pools of Liquid or Standing Water |
| No | Solid Waste Dumping/Landfills/Suspect Fill Material |
| No | Stressed Vegetation |
| No | Drinking Water Wells |
| No | Irrigation Wells |
| No | Monitoring Wells |
| No | Odors |
| No | Other Uses or Conditions of Concern |

## Hazardous Substances

PSI did not observe indications of significant quantities of hazardous substances among the properties surrounding the subject property.

## Petroleum Products

PSI did not observe indications of significant quantities of petroleum products among the properties surrounding the subject property.

E-FILED 2015 JUN 01 4:28 PM SCOTT - CLERK OF DISTRICT COURT

Report on Phase I Environmental Site Assessment 11/30/2012
PSI Project 0417423

## Aboveground or Underground Storage Tanks (ASTs/USTs)

PSI did not observe indications of ASTs/USTs among the properties surrounding the subject property.

### Drums

PSI did not observe drums among the properties surrounding the subject site.

## Suspect Containers Not Necessarily in Connection with Identified Uses

PSI did not observe suspect containers among the properties surrounding the subject property.

### Electrical or Mechanical Equip. Suspected to Contain PCBs

There are transformers on the adjoining properties. These transformers appear to be the property of MidAmerican Energy, who assumes responsibility for any cleanup related to their equipment. No signs of release were noted around the transformers. Based on this information, these transformers do not represent a recognized environmental condition in connection with the subject property.

## Wastewater Discharges

PSI did not observe indications of wastewater discharges, other than domestic sewage, among the properties surrounding the subject property.

## Septic or Sewage Tanks

PSI did not observe indications of the use of septic or sewage tanks among the properties surrounding the subject property.

## Drains or Sumps

PSI did not observe drains or sumps among the properties surrounding the subject property.

### Interior Stains or Corrosion

PSI did not observe significant stains or corrosion among the properties surrounding the subject property.

### Stained Soil or Pavement

De minimis stains were observed on the asphalt pavement throughout the parking lots on the adjoining properties. The staining is likely the result of parked automobiles at the property. Based on the de minimis nature, the staining is not considered to be evidence of a REC in connection with the subject property.

### Pits, Ponds, or Lagoons

PSI did not observe indications of pits, ponds, or lagoons among the properties surrounding the subject property.

## Pools of Liquid or Standing Water

PSI did not observe indications of pools of liquid or standing water among the properties surrounding the subject property.

## Solid Waste Dumping, Landfills, Or Suspect Fill Material

PSI did not observe indications of solid waste dumping, landfills, or suspect fill materials among the properties surrounding the subject property.

## Stressed Vegetation

PSI did not observe stressed vegetation among the properties surrounding the subject property.

## Wells

PSI did not observe wells among the properties surrounding the subject property.

## Odors

PSI did not note odors among the properties surrounding the subject property.

## Other Uses or Conditions of Concern

PSI did not observe other uses or special conditions of concern among the properties surrounding the subject property.

# 6.2 PAST USES

Our interpretation of the past uses of the adjoining and surrounding property is tabulated below.

Summary

| Year(s) | Interpreted Property Use |
|---------|--------------------------|
| North Adjoining Property | |
| 1894 - 1901 | Uses of the property could not be determined from the topographic maps reviewed. |
| 1937 - 1978 | Based on the aerial photographs and topographic maps reviewed, this property appeared to be agricultural land. |
| 1982 - 2008 | Based on the aerial photographs and topographic maps reviewed, this property appeared to be developed with apartment buildings. |
| South Adjoining Property | |
| 1894 - 1901 | Uses of the property following Highway 6 could not be determined from the topographic maps reviewed. |
| 1937 - 1953 | Based on the aerial photographs and topographic map reviewed, this property was Highway 6 followed by agricultural land. |
| 1963 - 1978 | Based on the topographic map, city directories, and aerial photographs reviewed, this property was agricultural land and Highway 6 followed by two structures. The structures were listed as being occupied by Associated Pfister Growers, Inc (1964), as the United Parcel Service (1970), and later as an auto repair shop (1975). |

E-FILED 2015 JUN 01 4:25 PM SCOTT - CLERK OF DISTRICT COURT

| Year(s) | Interpreted Property Use |
|---|---|
| 1981 - 2001 | Based on the topographic map, city directories, and aerial photographs reviewed, this property was a vacant lot and Highway 6 followed by two structures.  The structures were listed as being vacant (1981, 1987), Thayer Systems, Inc. (1994), and Custom Truck Accessories (2001). |
| 2005 - 2012 | Based on the aerial photographs and city directories reviewed, this property was developed with two commercial structures and Highway 6 followed by outlots and a strip mall.  The commercial structures were listed as being a bank and multi-tenant retail property. |
| East Adjoining Property | |
| 1894 - 1901 | Uses of the property following Fairmount Street could not be determined from the topographic maps reviewed. |
| 1937 - 2008 | Based on the aerial photographs reviewed, this property was agricultural land. |
| West Adjoining Property | |
| 1894 - 1901 | Uses of the property could not be determined from the topographic maps reviewed. |
| 1937 - 1978 | Based on the aerial photographs and topographic maps reviewed, this property was agricultural land. |
| 1982 - 2008 | Based on the aerial photographs and topographic maps reviewed, this property was a grass lot and parking lot followed by a vacant grass lot. |

The south adjoining property was listed as previously having an auto repair facility present.  This facility is located topographically down-gradient of the subject property and assumed groundwater is to the southeast, away from the subject property.  Based on this information, this former auto repair is not considered evidence of a recognized environmental condition in connection with the subject property.

# 7 ENVIRONMENTAL REGULATORY RECORDS REVIEW
## 7.1 DATABASE FINDINGS

The distribution of listed sites with respect to the subject property is tabulated and mapped in EDR's report, which is appended. The reader is referred to the table which can be found near the front of EDR's report.

EDR's report identified the subject property, and the details of the listing are presented below.

EDR's report identified sites adjoining/surrounding the subject property. PSI considered the listed sites unlikely to impact the subject property, based upon factors including (but not limited to):

* The nature of the listing;
* The use of the site;
* When the site was listed and its current listed status;
* The developmental density of the setting;
* The distance between the listed sites and the subject property as related to the distance that releases are likely to migrate based on local surface and subsurface drainage conditions;
* The presence of intervening drainage divides; and/or
* The inferred groundwater movement.

Additional details regarding the remaining sites are tabulated below.

**Summary**

| | |
|---|---|
| **Site Name:** | KMART 3441/PENSKE AUTO CENTER |
| **Databases:** | UST, RCRA-NonGen, FINDS |
| **Address:** | 3616 W KIMBERLY RD |
| **Distance:** | 0 |
| **Direction:** | Northeast |
| **Elevation:** | Higher |
| **Comments:** | The subject property previously had a Penske Automotive center present on the subject property. This area is currently vacant. PSI observed what appeared to be underground reservoir tanks for hydraulic lifts and a triple trap remaining in this area. This facility was listed as being a former small quantity generator (SQG) and in the facility index system (FINDS). Automotive centers typically generate hazardous waste in the form of waste oil and other waste automotive fluids as well as handle and store some amount of hazardous materials such as motor oil, antifreeze, paint, solvents, and other grease and oils. The historical use of this area as an automotive center is considered evidence of a recognized environmental condition in connection with the subject property at this time. |
| | The subject property previously had a UST present. The UST was reported as being removed in 1997. However, no documentation of the UST closure or confirmation sampling results were available for PSI's review and therefore it is unknown if there were any leaks associated with this UST. This former UST is considered evidence of a recognized environmental condition in connection with the subject property at this time. |

## 7.2 OTHER REGULATORY INFORMATION

PSI submitted Freedom of Information Act (FOIA) requests to the City of Davenport and the Davenport Fire Department. The City of Davenport responded and stated that the property had two records of invoices for weed cutting and debris clean-up. The City of Davenport also stated that they did not have records of USTs on the property.

E-FILED 2015 JUN 01 4:23 PM SCOTT - CLERK OF DISTRICT COURT

As of the date of this report, no response has been recieved by the Davenport Fire Department.

PSI reviewed the following state or local databases to obtain further information about sites listed in the database report:

- Iowa Department of Natural Resources (IDNR) Online Database

# 8 INTERVIEWS

PSI interviewed parties potentially having information about current and/or former conditions at the subject property.  The parties and their affiliation are tabulated below.

**Summary**

| Name | Affiliation | Role |
|------|-------------|------|
| Marcella Coffey | Lawrence Kadish Real Estate | Client |
| Bob Hodges | Sears Holdings | Major Occupant |

Ms. Coffey filled out PSI's user questionnaire and in it stated that she was not aware of environmental liens, AULs, or environmental concerns in connection with the subject property. Ms. Coffey stated that she was not aware of previous environmental reports for the subject property.

Mr. Hodges granted PSI access to the subject property.  He stated that there previously was a Penske Automotive Center present.  He was not aware of previous environmental reports for the subject property, USTs, or potential environmental concerns in connection with the subject property.

E-FILED  2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT



**Report of**
**Phase II Environmental Site Assessment**

**of**

**Former Kmart Property**

**3616 Kimberly Road**
**Davenport, Iowa**

**Prepared for**

**Lawrence Kadish Real Estate**
**135 Jericho Turnpike**
**Old Westerbury, New York  11568**

**Prepared by**

**Professional Service Industries, Inc.**
**4421 Harrison Street**
**Hillside, Illinois**

**PSI Project No.**
**0046498**

**February 13, 2013**

EXHIBIT   12

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT



February 13, 2013

Lawrence Kadish Real Estate
135 Jericho Turnpike
Old Westerbury, New York  11568

Attention:        Mr. William Kadish
                  Assessment/Development Manager

Subject:          Phase II Environmental Site Assessment Report
                  Former Kmart Property
                  3616 Kimberly Road
                  Davenport, Iowa
                  PSI Project No. 0046498

Mr. Kadish:

Professional Service Industries, Inc. (PSI) is pleased to present to Lawrence Kadish Real Estate (Client) the findings of the attached Phase II Environmental Site Assessment Report.  PSI provided its services in accordance with PSI's proposal authorized by the Client on January 9, 2013.

Thank you for the opportunity to provide environmental consulting for Lawrence Kadish Real Estate  Please contact us at 303-424-5578 if you have questions regarding the project or if we may be of further service.

Respectfully Submitted,

**PROFESSIONAL SERVICE INDUSTRIES, INC.**


William G. Polivka, PG                    Patricia St. Peter, LPG (IN)
Senior Geologist                          Principal Consultant




Attachments

# TABLE OF CONTENTS

**1.0 EXECUTIVE SUMMARY** ........................................................................................... **1**
    1.1   PHASE II ESA RESULTS AND CONCLUSIONS ............................................. 1
    1.2   RECOMMENDATION ........................................................................................ 2
**2.0 INTRODUCTION** ..................................................................................................... **3**
    2.1   AUTHORIZATION ........................................................................................... 3
    2.2   SITE DESCRIPTION ...................................................................................... 3
    2.3   PROJECT BACKGROUND ............................................................................. 3
    2.4   PURPOSE AND SCOPE ................................................................................ 4
**3.0 ASSESSMENT ACTIVITIES** .................................................................................. **5**
    3.1   FIELD SAMPLING ACTIVITIES ..................................................................... 5
    3.2   INVESTIGATION DERIVED WASTES ........................................................... 5
**4.0 DATA ANALYSIS & INTERPRETATION** ................................................................ **6**
    4.1   SITE HYDROGEOLOGICAL CHARACTERISTICS ........................................ 6
    4.2   SUMMARY OF ANALYTICAL RESULTS ....................................................... 6
**5.0 CONCLUSIONS AND RECOMMENDATIONS** ....................................................... **8**
    5.1   ANALYTICAL RESULTS AND CONCLUSIONS ............................................. 8
    5.2   RECOMMENDATIONS ................................................................................... 8
**6.0 WARRANTY** ........................................................................................................ **10**
    6.1   RELIANCE ................................................................................................... 10
    6.2   USE BY THIRD PARTIES ............................................................................ 10
**7.0 REFERENCES** ................................................................................................... **12**

# FIGURES

Figure 1 - Site Vicinity Map
Figure 2 - Site Plan Map
Figure 3 - Boring Location Map

# TABLES

Table 1 - Soil Sample Analytical Summary

# APPENDICES

APPENDIX A - Boring Logs
APPENDIX B - Laboratory Analytical Report
APPENDIX C - Regulatory Reporting References

# ACRONYM LIST

| | |
|---|---|
| AMSL | Above Mean Sea Level |
| AOC | Area of Concern |
| AST | Above-Ground Storage Tank |
| ASTM | American Society for Testing and Materials |
| BGS | Below Ground Surface |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act |
| CBF | Coal-Based Fill Soils |
| COC | Constituent of Concern |
| CFR | Code of Federal Regulations |
| DNAPLs | Dense Non-Aqueous Phase Liquids |
| DRO | Diesel Range Organic Compounds |
| EPA | United States Environmental Protection Agency |
| EPCRA | Emergency Planning and Community Right-to-Know Act |
| ESA | Environmental Site Assessment |
| ESI | Environmental Subsurface Investigation |
| GRO | Gasoline Range Organic Compounds |
| IDNR | Iowa Department of Natural Resources |
| IDW | Investigative Derived Waste |
| LNAPLs | Light Non-Aqueous Phase Liquids |
| MCLs | Maximum Contaminant Levels |
| NGVD | National Geodetic Vertical Datum |
| NPDES | National Pollution Discharge Elimination System |
| NPL | National Priorities List (aka/Superfund) |
| OA2 | Total Extractable Hydrocarbon Compounds |
| OSHA | Occupational Safety and Health Administration |
| O&G | Oil And Grease |
| ORO | Oil Range Organic Compounds |
| OWS | Oil-Water Separator |
| PAHs | Polycyclic Aromatic Hydrocarbon Compounds |
| PCE | Tetrachloroethene |
| PLM | Polarized Light Microscopy |
| PID | Photoionization Detector Equipment |
| PSI | Professional Service Industries, Inc. |
| RCRA | Resource Conservation and Recovery Act |
| SVOCs | Semi-Volatile Organic Compounds |
| TCE | Trichloroethene |
| TPH | Total Petroleum Hydrocarbon Compounds |
| UST | Underground Storage Tank |
| VCP | Voluntary Cleanup and Redevelopment Program |
| VOCs | Volatile Organic Compounds |

# 1.0  EXECUTIVE SUMMARY

Professional Service Industries, Inc. (PSI) has completed a Phase II Environmental Site Assessment (ESA) of the former Kmart property located at 3616 Kimberly Road, in Davenport, Iowa.  The assessment was performed in accordance with the contract between the Client and PSI authorized on January 9, 2013.  Any exceptions or deletions from the scope of work are described in Section 2.4 of this report.

## 1.1   PHASE II ESA RESULTS AND CONCLUSIONS

Based on the methodologies described in this report, this assessment revealed:

- The Phase II ESA included advancing six soil borings (borings B1 through B6) to a total depth of 16 feet below ground surface (bgs) at a former onsite Penske auto service center located in the southwest corner of the subject property.  The borings were placed within the former automotive service center, at exterior asphalt patched area believed to be the location of a former underground storage tank (UST), and a UST vent pipe location associated with the former service center operations.

- Soil samples were collected from each of the six assessment borings.  Residual oil staining was observed in soil sample B3-3, a sample collected near a floor trench drain in the former auto service center.  No residual oil was detected in the other assessment soil samples.  A groundwater sample was collected from boring B5, a boring advanced adjacent to wall-mounted hydraulics within the service center.  Groundwater was observed at 13 feet bgs in boring B5.  Producible groundwater was not observed in the remaining assessment borings within the performance period of the Phase II field activities.

- The soil and groundwater samples were submitted to a third-party laboratory for analysis of volatile organic compounds (VOCs) and Total Extractible Hydrocarbons (TEH - petroleum compounds).

- Laboratory analysis of soil sample B3-3, a boring assessing environmental impact to soil beneath the service center trench floor drain, detected VOCs and TEH compounds in sample B3-3 at concentrations below the regulatory reporting criteria.  No regulated VOCs or TEH compounds were detected in the remaining soil samples by the laboratory analytical method.

- The groundwater analyses did not detect VOCs or TEH compounds in groundwater sample MW-B5, the only producible groundwater sample collected during the Phase II field activities.

As discussed in this report, residual oil staining was detected in sample B3-3.  Although the Iowa Department of Natural Resources (IDNR) has not promulgated regulatory cleanup standards for oil-range organic compounds (ORO), the presence of residual oil triggers an IDNR advisement to perform additional assessment of the site.

E-FILED  2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

*Phase II ESA Report*                                                    *February 13, 2013*
*Former Kmart Property, Davenport, Iowa*
*PSI Project No.  0046498*

## 1.2    RECOMMENDATION

PSI recommends further assessment of the former auto service center to assess the residual oil staining that was observed in soil sample B3-3.

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

# 2.0  INTRODUCTION

PSI has completed a Phase II Environmental Site Assessment (ESA) of the former Kmart property located at 3616 Kimberly Road, in Davenport, Iowa.  The assessment was conducted in general accordance with ASTM Standard E 1903-97, Standard Guide for Environmental Site Assessments: Phase II Environmental Site Assessment Process.

## 2.1    AUTHORIZATION

Authorization to perform the assessment was given on January 9, 2013 by a copy of PSI Proposal No. 0046-85803 signed by Lawrence Kadish Real Estate.  Mr. William Kadish with Lawrence Kadish Real Estate provided access to the property.

## 2.2    SITE DESCRIPTION

The subject property is an approximate 9.86-acre parcel developed with an 84,648 square-foot former Kmart retail store located at 3616 Kimberly Road in Davenport, Iowa.  The subject property was originally developed by Kmart around 1978; the property is now vacant.  Site improvements include the Kmart retail store structure, associated paved parking, and landscaped areas.  The former store operations included a Penske Automotive center.  A site location map is provided as Figure 1; Figure 2 presents a site plan map of the subject property and the adjoining properties.

## 2.3    PROJECT BACKGROUND

PSI performed a Phase I Environmental Site Assessment (ESA, dated November 30, 2012) for the subject property.   The ESA historical research identified the following recognized environmental conditions (RECs):

- *The subject property previously had a Penske Automotive center present on the subject property. This area is currently vacant. PSI observed what appeared to be underground reservoir tanks for hydraulic lifts and a triple trap remaining in this area. Automotive centers typically generate hazardous waste in the form of waste oil and other waste automotive fluids as well as handle and store some amount of hazardous materials such as motor oil, antifreeze, paint, solvents, and other grease and oils. The historical use of this area as an automotive center is considered evidence of a recognized environmental condition (REC) in connection with the subject property at this time.*

- *The subject property previously had an underground storage tank (UST) present. The UST was reportedly removed in 1997. However, no documentation of the UST closure or confirmation sampling results was available for PSI's review.  Therefore, it is unknown whether there were any leaks associated with this UST. This former UST is considered evidence of a REC in connection with the subject property at this time.*

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

*Phase II ESA Report*
*Former Kmart Property, Davenport, Iowa*
*PSI Project No. 0046498*

*February 13, 2013*

The ESA report recommended further evaluation of the RECs that were identified for the subject property.

## 2.4    PURPOSE AND SCOPE

The purpose of this Phase II ESA is to develop information to evaluate whether hazardous substances have been released at the property.

The Phase II scope of services included:

- Notification submitted to the utility alert service (Iowa One Call) a minimum of 48 hours before initiating the subsurface drilling activities, as currently required by the State of Iowa.

- Advancement of six soil borings at the subject property using direct-push soil core equipment. Two borings were advance at the former UST area; four borings were advanced within the former Penske Automotive center.

- Based on field screening methodologies, one soil sample from each boring was submitted for laboratory analysis. Grab groundwater samples were collected and submitted for laboratory analysis if producible groundwater was observed within the performance period of the Phase II field activities.

- The samples were submitted for the laboratory analyses: volatile organic compounds (VOCs, EPA Method 8260b) and Total Extractible Hydrocarbon compounds (TEH, EPA Method AO-2)

- Perform sample QA/QC

- Preparation of this Phase II ESA report.

# 3.0  ASSESSMENT ACTIVITIES

Prior to the commencement of assessment activities, Iowa One Call, the local utility alert service, was contacted to locate and mark buried public utilities beneath the subject property or as they entered the site.

## 3.1  FIELD SAMPLING ACTIVITIES

The Phase II ESA field sampling activities were completed on January 22, 2013 under the supervision of Chris Knuteson, a PSI Project Engineer.  The Phase II field activities included advancing the six soil borings (B1 through B6) discussed in Section 2.4.  PSI retained C.S. Drilling of Naperville, Illinois to use a truck-mounted direct push soil core rig to advance the investigation borings under the direction of PSI personnel.  The Phase II boring locations are shown on Figure 3.

The borings were advanced to a depth of 16 bgs to assess the subsurface environment beneath the subject property.  Continuous soil core samples were collected from each boring for observation, lithologic logging, and screening for organic vapors using portable organic vapor analysis-photoionization detector (PID) equipment.  Samples were immediately retained in laboratory-prepared glass jars for further laboratory analyses based on field observations and field PID screening results.  The soil boring logs are presented in Appendix A.

The borings were allowed to remain open during the assessment field activities for the purposes of observing for free groundwater invasion into the borings.  A grab groundwater sample MW-B5 was collected from free groundwater observed at a depth of 13 feet bgs in boring B5.  PSI inserted dedicated polyethylene tubing into the boring to collect groundwater sample MW-B5.  The tubing was attached to a surface electric peristaltic pump to develop the boring groundwater until relatively clear water was produced.  The peristaltic pump and poly tubing were again utilized to collect groundwater sample MW-B5.  Prior to sampling, an electronic water level meter was used to record the water table level in the boring.  Free groundwater was not observed in the remaining assessment borings within the performance period of the Phase II field assessment activities.

The soil and groundwater samples were submitted to ESC Laboratories of Mount Juliet, Tennessee for VOC and TEH laboratory analyses.  The laboratory analytical report is provided in Appendix B.

## 3.2  INVESTIGATION DERIVED WASTES

No unmanageable investigative derived waste was generated by the investigation.  Solid wastes, such as gloves, sample sleeves, etc., were disposed as common solid waste.

# 4.0  DATA ANALYSIS & INTERPRETATION

The following sections provide a discussion of the Phase II ESA data analysis and interpretations.  Where appropriate, the results are compared with regulatory limits for the chemicals and compounds identified in the applicable media.

## 4.1    SITE HYDROGEOLOGICAL CHARACTERISTICS

The USDA Soil Conservation Service Soil Survey identified the soil profile within the subject property vicinity as Urban land complex, which consists of clay loam soils developed in urban settings.

Investigation boring B1 was advanced in the former UST tank basin and encountered mixed gravel and clay backfill soil to approximately 13 feet bgs that was underlain by dark gray native clay soil.  With the exception of residual oil staining observed at a depth of 3 feet bgs in soil sample B3-3, borings B2 through B6 encountered discontinuous lenses of brown clay, silt, and sand from the ground surface to 16 feet bgs, the terminal depth of the assessment borings.

The description of the subsurface conditions provided herein was derived from on-site observations of soil samples and cuttings collected only from the locations where borings were installed.  The soil stratigraphy at the subject site was generally consistent between soil borings.

Free groundwater was observed at a depth of 13 feet bgs in boring B5.  Groundwater sample MW-B5 was collected for laboratory analysis from boring B5.  Free groundwater was not observed in the remaining assessment borings within the performance period of the Phase II field assessment activities.

## 4.2    SUMMARY OF ANALYTICAL RESULTS

The following sections summarize the sample analytical results, as reported above the reportable values established by the State of Iowa.  The soil and groundwater sample analytical results are summarized in Table 1.  The laboratory analytical reports are presented in Appendix B.

### 4.2.1  REGULATORY COMPARISON

The Phase II ESA VOC analytical results were compared to guidance standards described in the document: *Statewide Standards for Contaminants in Soil and Groundwater*, downloaded from the Iowa Department of Natural Resources website (IDNR, 2013).  The TEH sample analytical results were compared to petroleum soils remediation guidelines provided in IDNR document: Tier 1 Guidance, Site Assessment of Leaking Underground Storage Tanks (LUST) using Risk-Based Corrective Action (RBCA) effective November 1996.  Copies of the regulatory guidance documents are provided in Appendix C.

## 4.2.2  SOIL SAMPLE ANALYTICAL RESULTS

VOCs

Laboratory analysis of soil sample B3-3 detected sub-regulatory concentrations of various petroleum and solvent VOCs (i.e., n-butylbenzene, cis-1,2-dichoroethene, ethylbenzene. naphthalene, tetrachloroethene, toluene, 1,2,4-trimethylbenzene, 1,2,3-trimethylbenzene, 1,3,5-trimethylbenzene, and xylene compounds).   Boring B3 was advanced near the former Penske trench floor drain system.   The B3-3 soil sample VOC concentrations were below the regulatory reporting criteria.   The laboratory did not detect VOCs in the other Phase II assessment soil samples.   Table 1 presents a summary of the soil sample analytical results, compared to the IDNR Statewide Standards.

TEH

TEH analysis detects gasoline-range, diesel-range, and motor oil-range organic compounds (GRO, DRO, and ORO) when present in a soil or groundwater sample.   The laboratory did not detect GRO compounds in the Phase II soil samples.   The IDNR has established a 3,800 milligram per kilogram (mg/kg) statewide standard for DRO-impacted soils.   The laboratory did not detect DRO compounds in the Phase II soil samples.   Laboratory analyses detected 11 milligrams per kilogram (mg/kg) of ORO (motor oil petroleum compounds) in soil sample B2-9; a concentration of 3,900 mg/kg ORO was detected in the residual oil stained sample core collected at B3-3.   Although the Iowa Department of Natural Resources (IDNR) has not promulgated regulatory cleanup standards for oil-range organic compounds (ORO), the presence of residual oil in soil sample B3-3 may elicit an IDNR advisement to perform additional assessment of site.

## 4.2.3  GROUNDWATER SAMPLE ANALYTICAL RESULTS

Laboratory analysis did not detect VOC or TEH compounds in groundwater sample MW-B5.

E-FILED  2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

# 5.0   CONCLUSIONS AND RECOMMENDATIONS

PSI has performed a Phase II ESA in general conformance with the scope and limitations of the ASTM Standard E 1903-97 guide for the Kmart Property located at 3616 Kimberly Road in Davenport, Iowa.  The assessment was performed in accordance with the contract between the Client and PSI authorized on January 9, 2013.  Any exceptions to or deletions from the work scope are discussed earlier in this report.  Based on an evaluation of the findings of this assessment, the following conclusions and recommendations have been developed.

## 5.1    ANALYTICAL RESULTS AND CONCLUSIONS

Based on the methodologies described in this report, this assessment revealed;

- The Phase II ESA included advancing six soil borings (borings B1 through B6) to a total depth of 16 feet bgs at a former onsite Penske auto service center located in the southwest corner of the subject property.  The borings were placed within the former automotive service center, at exterior asphalt patched area believed to be the location of a former UST, and a UST vent pipe location associated with the former service center operations.

- Soil samples were collected from each of the six assessment borings.  Residual oil staining was observed in soil sample B3-3, a sample collected near a floor trench drain in the former auto service center.  No residual oil was detected in the other assessment soil samples.  A groundwater sample was collected from boring B5, a boring advanced adjacent to wall-mounted hydraulics within the service center.  Groundwater was observed at 13 feet bgs in boring B5.  Producible groundwater was not observed in the remaining assessment borings within the performance period of the Phase II field activities.

- The soil and groundwater samples were submitted to a third-party laboratory for analysis of VOCs and TEH - petroleum compounds.

- Laboratory analysis of soil sample B3-3, a boring assessing environmental impact to soil beneath the service center trench floor drain, detected VOCs and TEH compounds in sample B3-3 at concentrations below the regulatory reporting criteria.  No regulated VOCs or TEH compounds were detected in the remaining soil samples by the laboratory analytical method.

- The groundwater analyses did not detect VOCs or TEH compounds in groundwater sample MW-B5, the only producible groundwater sample collected during the Phase II field activities.

As discussed in this report, residual oil staining was detected in sample B3-3.  Although the IDNR has not promulgated regulatory cleanup standards for ORO, the presence of residual oil triggers an IDNR advisement to perform additional assessment of the site.

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

*Phase II ESA Report*                                                          *February 13, 2013*
*Former Kmart Property, Davenport, Iowa*
*PSI Project No.  0046498*

## 5.2    RECOMMENDATIONS

PSI recommends further investigation of the former auto service center to assess the residual oil staining that was observed in soil sample B3-3.

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

# 6.0  WARRANTY

PSI warrants that the findings and conclusions reported herein were conducted in general accordance with ASTM Standard E 1903-97 protocol.  These methodologies are described by the standard guide as representing good commercial and customary practice for conducting a Phase II Environmental Site Assessment of a parcel of property for the purpose of evaluating recognized environmental conditions.   However, these findings and conclusions contain all of the limitations inherent in these methodologies which are referred to in the standard guide and some of which are more specifically set forth below.   Additionally, this assessment was not intended to satisfy the requirements of a Risk-Based Corrective Action Tier 1 Assessment.

The Phase II ESA has been developed to provide the client with information regarding apparent indications of recognized environmental conditions relating to the subject property.  It is necessarily limited to the conditions observed and to the information available at the time of the work.  The assessment and conclusions presented herein were based upon the subjective evaluation of limited data.  They may not represent all conditions at the subject site as they reflect the information gathered from specific locations.  PSI warrants that the findings and conclusions contained herein have been promulgated in accordance with generally accepted environmental investigation methodology and only for the site described in this report.

Due to the limited nature of the work, there is a possibility that conditions may exist which could not be identified within the scope of the assessment or which were not apparent at the time of report preparation.  It is also possible that the testing methods employed at the time of the report may later be superseded by other methods.  The description, type, and composition of what are commonly referred to as "hazardous materials or conditions" can also change over time.  PSI does not accept responsibility for changes in the state of the art, nor for changes in the scope of various lists of hazardous materials or conditions.  PSI believes that the findings and conclusions provided in this report are reasonable.  However, no other warranties are implied or expressed.

## 6.1   RELIANCE

Lawrence Kadish Real Estate may rely on this report.

## 6.2   USE BY THIRD PARTIES

This report was prepared pursuant to the contract PSI has with Lawrence Kadish Real Estate That contractual relationship included an exchange of information about the subject site that was unique and between PSI and its client and serves as the basis upon which this report was prepared.  Because of the importance of the communication between PSI and its client, reliance or any use of this report by anyone other than Lawrence Kadish Real Estate, for whom it was prepared, is prohibited and therefore not foreseeable to PSI.

E-FILED  2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

*Phase II ESA Report*                                                       *February 12, 2013*
*Former Kmart Property, Davenport, Iowa*
*PSI Project No. 0046498*

Reliance or use by any other third party, other than those referenced in Section 6.2, without explicit authorization in the report does not make said third party a third party beneficiary to PSI's contract with Lawrence Kadish Real Estate.  Any such unauthorized reliance on or use of this report, including any of its information or conclusions, will be at third party's risk.  For the same reasons, no warranties or representations, expressed or implied in this report, are made to any such third party.

Third party reliance letters may be issued on request and payment of the, then current fee for such letters.  All third parties relying on PSI's reports, by such reliance, agree to be bound by the proposal and PSI's General Conditions.  No reliance by any party is permitted without such agreement, regardless of the content of the reliance letter itself.

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

*Phase II ESA Report*
*Former Kmart Property, Davenport, Iowa*                                    *February 12, 2013*
*PSI Project No. 0046498*

# 7.0   REFERENCES

ESC – Laboratory Report Summary, Report Number: L617002, Description: Site Investigation, Client Project: 004648-1.  Prepared for PSI dated February 1, 2013.

IDNR - <u>Iowa Statewide Standards for Contaminants in Soil and Groundwater</u>.  Iowa Department of Natural Resources, https://programs.iowadnr.gov/riskcalc/pages/standards.aspx

IDNR - Iowa Department of Natural Resources, *Tier 1 Guidance, Site Assessment of Leaking Underground Storage Tanks (LUST) Using Risk-Based Corrective Action (RBCA),* November 1996.

PSI – *Phase I Environmental Site Assessment Report of Kmart Property, 3616 Kimberly Road, Davenport, Iowa.*  Prepared by Professional Service Industries, Inc. (PSI), dated November 30, 2012.

# KMK | Keating Muething & Klekamp PLL

### ATTORNEYS AT LAW

**DANIEL E. IZENSON**
DIRECT DIAL: (513) 579-6480
FACSIMILE: (513) 579-6457
E-MAIL: DIZENSON@KMKLAW.COM

January 25, 2013

## *VIA CERTIFIED AND ORDINARY MAIL*

Mr. Rick A. Paternostro
Vice President, Finance
SCIenergy, Inc.
1945 The Exchange
Atlanta Georgia 30339

Re:  Lease by and between Lawrence Kadish (the "Landlord") and SCIenergy, Inc., as successor in interest to Abrams Properties, Inc./Financial Properties Developers, Inc. (the "Tenant") dated November 16, 1977, as amended (the "Lease") for the premises located at 3616 West Kimberly Road, Davenport, Iowa (the "Premises")/ Kmart Store #3441

Dear Mr. Paternostro:

### Notice of Default and Demand for Payment

This law firm and the undersigned represent Lawrence Kadish, Landlord over the Lease at the above referenced Premises.  We write to you in your capacity as the authorized representative of Tenant.  A copy of this letter is also being furnished to authorized representatives of Kmart Corporation ("Kmart"), the Subtenant of the Premises under its Sublease with Tenant.  Please direct any future inquiries or communications regarding this matter to my attention.

As you know, the Lease expired by its terms on November 30, 2012, and Kmart vacated and surrendered the Premises.[1] Landlord has assessed the post-surrender condition of the Premises and has determined that Tenant defaulted on certain of its obligations under the Lease. This letter serves as formal notice to Tenant of such defaults under the Lease, and of Landlord's demand for payment due to such defaults.

---

[1]      The initial terms of the Lease and the Sublease were 25 years with ten 5-year renewal options.  Given Tenant's recurring defaults under the Lease, the Landlord terminated the Lease effective September 12, 2012 following delivery of a second notice of default dated July 13, 2012. The Lease was terminated with full reservation of rights and the Tenant remaining liable for all damages under the Lease.
     Kmart closed its store earlier in 2012.  Kmart did not exercise the third 5-year renewal and the Sublease expired on November 30, 2012.

EXHIBIT  13

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

Mr. Rick A. Paternostro
January 25, 2013
Page 2

At the outset, Landlord wishes to make it clear that any agreement between Tenant and Kmart regarding their allocation for Landlord's damages under the Lease is a matter between Tenant and Kmart. It is for Tenant and Kmart to determine amongst themselves how much one, the other, or a combination of the two, pays for Landlord's damages under the Lease. Landlord is strictly concerned about the aggregate amount to resolve its claims, not the source of funding for its damages – be it from Tenant or Kmart. That being said, Tenant is ultimately responsible for Landlord's damages under the Lease, including any damages caused by Kmart, as the Subtenant.

Before addressing Tenant's post-surrender defaults, Tenant is hereby notified of its monetary default under the Lease for failure to pay November 2012 rent in advance as required under Section 3 of the Lease. Landlord therefore demands payment of the principal sum of $8,766.88. for past due November 2012 monthly rent, plus interest thereon as permitted under law.

### Tenant's Repair, Maintenance and Surrender Obligations under the Lease

Under the Lease, Tenant assumed full and sole responsibility for the condition, renovation, operation, repair, replacement, maintenance and management of the Demised Premises[2] and agreed to take "good care" of the Demised Premises and to make all repairs required to keep the Demised Premises and parking lots and driveways in "first class order, repair and condition." The following are the relevant repair, maintenance and surrender obligations of Tenant as specified in Section 6 of Lease.[3]

Section 6.01    "The Landlord shall not be required to furnish any services or facilities or to make any repairs or alterations in or to the Building, throughout the term of this Lease, the Tenant hereby assuming the full and sole responsibility for the condition, renovation, operating, repair, replacement, maintenance and management of the Demised Premises."

Section 6.04    "The Tenant shall take good care of the Demised Premises, make all repairs thereto, interior and exterior, structural and non-structural, ordinary and extraordinary, foreseen and unforeseen, and shall maintain and keep the said Demised Premises and the parking lots and driveways in first class order, repair and condition. . ."

Section 6.05    "The Tenant shall assume all of the obligations of the Landlord pursuant to lease dated April 14, 1977 between Financial Properties Developers, Inc., as Landlord, and K Mart Corporation, as Tenant ...."

---

[2]    The term "Demised Premises" is broadly defined in the Lease as "the Demised Land and the Buildings" *See* Lease, Section 2.01(a)-(c).

[3]    Kmart's repair and surrender obligations are found in Sections 15 and 31 of the Sublease.

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

Mr. Rick A. Paternostro
January 25, 2013
Page 3

|  |  |
|---|---|
| **Section 6.06** | "The Tenant will not do or permit or suffer any waste, damages, disfigurement or injury to or upon the Demised Premises or any part thereof." |
| **Section 6.12** | "Upon the expiration of the term of this Lease or upon a sooner termination thereof, the Tenant shall peaceably and quietly leave, surrender and yield up onto the Landlord all and singular the Demised Premises, broom-clean and free of occupants and shall repair all damage to the Demised Premises caused by or resulting from the removal of any removable property of the Tenant or of the subtenants or assignees." |

<u>**Tenant's Default Following Expiration of the Lease/Sublease and Surrender of the Premises**</u>

Landlord retained Professional Service Industries, Inc ("PSI") to conduct a property condition assessment of the Premises following Tenant and Kmart's surrender of the Premises and expiration of the Lease and Sublease. Attached for your reference under **Tab 1** is PSI's Report of Limited Property Condition Assessment dated December 3, 2012 (the "PCA Report"). The PCA Report includes, *inter alia*, recommendations of reasonable remedies or physical needs for the Premises and opinions of cost associated with remedies. Based on the findings of the PCA Report, Tenant breached its obligations under the Lease due to certain conditions existing at the Premises following the Lease and Sublease expiration. In accordance with PSI's estimates, the immediate needs and costs associated to perform the repairs and replacements necessary to remedy Tenant's defaults under the Lease equal $2,160,046.00.[4]

Landlord also retained PSI to perform a limited environmental assessment of the Premises. PSI prepared a Phase I Environmental Site Assessment Report dated November 30, 2012 memorializing its findings (the "Phase I Report"). A copy of the Phase I Report is attached for your reference under **Tab 2**.[5] The Phase I Report noted a Penske Automotive Center formerly operated at the site, as well as the presence of a UST which has since been removed.

Based on the findings and recommendations set forth in PSI's Phase I Report, Landlord retained PSI to provide a Limited Phase II Environmental Assessment Report (the "Phase II Report"). The purpose of the Phase II assessment is to investigate potential soil and groundwater contamination that may be present due to REC(s) identified in the Phase I Report. A copy of PSI's Phase II Report will be furnished to Tenant and Kmart upon receipt. Landlord is further investigating having a limited asbestos survey performed on the Premises. To the extent soil contaminants, asbestos or other environmental conditions exist at the Premises, Tenant shall be held responsible for any clean up, repair or remediation.

---

[4]     Note, this estimate does not take into account abatement costs associated with the asbestos tile and mastic of the flooring.

[5]     The Appendices to the Phase I Report are voluminous and therefore are being sent via certified mail only to the Kmart representative copied on this letter.

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

Mr. Rick A. Paternostro
January 25, 2013
Page 4

Accordingly, on behalf of Landlord, notice of default and demand is hereby made to Tenant for the following:

1.     The principal sum of $8,766.88. for past due November 2012 monthly rent, plus interest thereon as permitted under law;

2.     The sum of $2,160,046.00 for the cost to perform the repairs and replacements required under Section 6 of the Lease and/or for the waste and diminution in value of the Premises due to Tenant's defaults thereunder; and

3.     The sum of money (the precise sum to be determined following additional analysis) to remediate contaminants, asbestos or other environmental conditions specified in the Phase I Report, Phase II Report, and any asbestos survey performed and/or for the waste and diminution in value of the Premises due to Tenant's defaults under the Lease.

Nothing contained herein shall be construed as a waiver or release of Tenant's liabilities and obligations under the Lease. Landlord specifically reserves all of its rights and remedies against Tenant under the Lease and under applicable law, including, without limitation, the right to enumerate additional defaults under the Lease which have not yet accrued or which otherwise are not set forth herein.[6]

Please contact me, or if Tenant is represented by counsel, have your attorney contact me, should you have any questions. I am also copying this letter to James Terrell, John Kern and Marianne Simonini, Kmart representatives with whom I have dealt with in the past on outstanding issues pertaining to this location.

We look forward to your prompt reply.

Very truly yours,

KEATING MUETHING & KLEKAMP PLL

By: _____
          Daniel E. Izenson

---

[6]     In particular, Tenant and Kmart are on notice that pursuant to Section 4 of the Lease and Section 5 of the Sublease, real estate taxes and assessments levied, accrued and/or imposed upon the Premises through the date of expiration of the Lease and Sublease are their responsibility to pay (i.e., covering the period of the term of the Lease and Sublease through and including November 30, 2012). Given the taxing authority bills real estate taxes for this location in arrears, additional tax bills for this location will be issued and due and owing by the Tenant and Kmart. Landlord requests that it receive proof of payment to the taxing authority for all real estate tax bills covering the period of the term of the Lease and Sublease through and including November 30, 2012. In the past, we understand Kmart has been paying the real estate tax bills directly to the taxing authority. Landlord will pay its pro rata portion of the tax bill which covers the real estate taxes and assessments for the period following expiration of the Lease and Sublease.

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

Mr. Rick A. Paternostro
January 25, 2013
Page 5

DEI:jrr

cc:    Mr. James Terrell (via certified and electronic mail)
       Mr. John Kern (via certified and electronic mail)
       Marianne Simonini, Esq. (via certified and electronic mail)

4686938.2

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

# HOLT NEY ZATCOFF & WASSERMAN, LLP

ATTORNEYS AT LAW

100 GALLERIA PARKWAY, SUITE 1800

ATLANTA, GEORGIA 30339-5947

TELEPHONE 770-956-9600    FACSIMILE 770-956-1490

**Ellen W. Smith**
e-mail esmith@hnzw.com

February 19, 2013

**BY E-MAIL (dizenson@kmklaw.com)**
**AND BY FEDERAL EXPRESS**
Daniel E. Izenson, Esq.
Keating Muething & Klekamp PLL
One East Fourth Street
Suite 1400
Cincinnati, Ohio 45202-3752

Re:     Lease Agreement dated November 16, 1977 (as the same has been amended and assigned to date, the "**Lease**"), between Lawrence Kadish ("**Landlord**") and Abrams Properties, Inc., successor in interest to Financial Properties Developers, Inc. ("**Tenant**"), governing that certain premises commonly known as 3616 West Kimberly Road, Davenport, Iowa (a/k/a K-Mart Store 3441) (the "**Demised Premises**"), as more particularly described in the Lease[1]

Dear Daniel:

This law firm represents Tenant with respect to the Lease. On behalf of Tenant and at Tenant's direction, we respond to Landlord's January 25, 2013 letter (the "**Demand**"), seeking past due November 2012 rent, repair and replacement costs per Section 6 of the Lease, and environmental remediation costs relating to the Demised Premises.

Section 26.01 of the Lease provides:

Tenant shall have no personal liability for the performance of the obligations of Tenant hereunder, and in the event of a default by Tenant in the performance of its obligations, the sole remedy of Landlord shall be to terminate this Lease.

Accordingly, even assuming *arguendo* that Landlord's allegations of Tenant's defaults as set forth in the Demand are accurate (and Tenant disputes that they are[2]), Landlord's sole remedy is to terminate the Lease.

---

[1] Unless otherwise indicated, capitalized terms and phrases shall have the meanings given to them in the Lease.
[2] For example, upon information and belief, Landlord received November 2012 rent directly from K-Mart.

326695_1

EXHIBIT   14

E-FILED 2015 JUN 01 4:20 PM SCOTT - CLERK OF DISTRICT COURT

**HOLT NEY ZATCOFF & WASSERMAN, LLP**

Daniel E. Izenson, Esq.
February 19, 2013
Page 2


Landlord exercised its sole remedy to terminate the Lease effective September 12, 2012. Accordingly, Tenant considers this matter closed.

Tenant expressly reserves, and does not waive, all of its rights and remedies under the Lease and applicable law. Please be governed accordingly.

Sincerely,
HOLT NEY ZATCOFF & WASSERMAN, LLP

Ellen W. Smith

EWS/ews
cc: Mr. Rick A. Paternostro (by e-mail only)
Christopher Brophy, Esq. (by e-mail only)

## IN THE IOWA DISTRICT COURT FOR SCOTT COUNTY

| | | |
|---|---|---|
| **DAVENPORT CHESTER, LLC** | ) | |
| 135 Jericho Turnpike | ) | |
| Old Westbury, New York 11568-1508 | ) | Case No. _____ |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | (Judge _____) |
| | ) | |
| -v- | ) | |
| | ) | |
| **ABRAMS PROPERTIES, INC.** | ) | |
| 1945 The Exchange | ) | **ORIGINAL NOTICE** |
| Suite 300 | ) | |
| Atlanta, Georgia 30339 | ) | |
| | ) | |
| **Also serve:** | ) | |
| **ABRAMS PROPERTIES, INC.** | ) | |
| c/o its Statutory Agent: | ) | |
| CT Corporation System | ) | |
| 500 East Court Avenue | ) | |
| Des Moines, Iowa 50309 | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SCIENERGY, INC.** | ) | |
| 4100 Alpha Road, Suite 900 | ) | |
| Dallas, Texas 75244 | ) | |
| | ) | |
| **Also serve:** | ) | |
| **SCIENERGY, INC.** | ) | |
| c/o its Statutory Agent: | ) | |
| CT Corporation System | ) | |
| 1201 Peachtree Street, NE | ) | |
| Atlanta, Georgia 30361 | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| | ) | |

TO THE ABOVE-NAMED DEFENDANT(S):

You are hereby notified that there is now on file in the office of the clerk of the above

court a petition in the above-entitled action, a copy of which petition is attached hereto.  The

name and address of the plaintiff's attorney is Douglas R. Lindstrom, Jr., Lane & Waterman LLP, 220 North Main Street, Suite 600, Davenport, Iowa 52801.

You are further notified that the above case has been filed in a county that utilizes electronic filing.  Unless, within 20 days after service of this original notice upon you, you serve, and within a reasonable time thereafter file a motion or answer, in the Iowa District Court for Scott County, at the courthouse in Davenport, Iowa, judgment by default will be rendered against you for the relief demanded in the petition.  Please see Iowa Court Rules Chapter 16 for information on electronic filing and Iowa Court Rules Chapter 16, division VI regarding the protection of personal information in court filings.

**Note:**  The attorney who is expected to represent the defendant should be promptly advised by defendant of the service of this notice.

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at 328-4145.  (If you are hearing impaired, call Relay Iowa TTY at 1-800-735-2942).

# STATE OF IOWA JUDICIARY

*Case No.* CVCV294709

*County* Scott

*Case Title* DAVENPORT CHESTER LLC V ABRAMS PROPERTIES INC.

**THIS CASE HAS BEEN FILED IN A COUNTY THAT USES ELECTRONIC FILING.**
Therefore, unless the attached Petition and Original Notice contains a hearing date for your appearance, or unless you obtain an exemption from the court, you must file your Appearance and Answer electronically.

You must register through the Iowa Judicial Branch website at http://www.iowacourts.state.ia.us/Efile and obtain a log in and password for the purposes of filing and viewing documents on your case and of receiving service and notices from the court.

**FOR GENERAL RULES AND INFORMATION ON ELECTRONIC FILING, REFER TO THE IOWA COURT RULES CHAPTER 16 PERTAINING TO THE USE OF THE ELECTRONIC DOCUMENT MANAGEMENT SYSTEM:**
http://www.iowacourts.state.ia.us/Efile

**FOR COURT RULES ON PROTECTION OF PERSONAL PRIVACY IN COURT FILINGS, REFER TO DIVISION VI OF IOWA COURT RULES CHAPTER 16**: http://www.iowacourts.state.ia.us/Efile

*Scheduled Hearing:*

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at **(563) 328-4145**    . (If you are hearing impaired, call Relay Iowa TTY at **1-800-735-2942**.)

*Date Issued*  06/08/2015 12:25:52 PM



*District Clerk of* Scott                     *County*

/s/ Gaby Raya

IN THE IOWA DISTRICT COURT FOR SCOTT COUNTY

| | |
|---|---|
| DAVENPORT CHESTER, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>ABRAMS PROPERTIES, INC., and<br>SCIENERGY, INC.,<br><br>        Defendants. | Law Number: CVCV294709<br><br>**NOTICE OF REMOVAL** |

**COME NOW** the Defendants, Abrams Properties, Inc., and Scienergy, Inc., by and through undersigned counsel, and hereby and pursuant to 28 U.S.C. § 1446(d), hereby notifies the Iowa District Court in and for Scott County of thier Notice of Removal to the United States District Court in and for the Southern District of Iowa, Central Division.  A copy of the Notice of Removal is attached hereto and is by this reference made a part hereof.

BRADSHAW, FOWLER, PROCTOR & FAIRGRAVE, P.C.

By:   */s/ Jason C. Palmer*
　　　　Jason C. Palmer  AT0006089
　　　　801 Grand Avenue, Suite 3700
　　　　Des Moines, IA  50309-8004
　　　　Phone:  (515) 243.4191
　　　　Fax:  (515) 246-5808
　　　　E-Mail:  palmer.jason@bradshawlaw.com

ATTORNEY FOR DEFENDANTS

Original filed.

Copy to:

Robert V.P. Waterman, Jr.
Douglas R. Lindstrom, Jr.
LANE & WATERMAN LLP
220 N. Main Street, Suite 600
Davenport, IA 52801
Telephone:  563-333-6618
Facsimile:  563-324-1616
E-Mail:  bwaterman@l-wlaw.com
            dlindstrom@l-wlaw.com

Of Counsel:

Daniel E. Izenson
Michael T. Cappel
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, OH  45202
Telephone:  513-579-6480
Facsimile:  513-579-6457
E-Mail:  dizenson@kmklaw.com
            mcappel@kmklaw.com

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon one of the attorneys of record for all parties to the above-entitled cause by serving the same on such attorney at his/her respective address/fax number as disclosed by the pleadings of record herein, on the ___ of _____, 2015 by:

☐ U.S. Mail                    ☐ FAX
☐ Hand Delivered           ☐ UPS
☐ Federal Express          ☒ Other: CM/ECF

_____